2013 WL 1892337
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Cesar CRUZ, on behalf of himself and
others similarly situated, Plaintiffs,
v.
SKY CHEFS, INC. et.al., Defendants.

No. C–12–02705 DMR.
|
May 6, 2013.

**Attorneys and Law Firms**

Joseph Lavi, Leonard Henry Sansanowicz, Jordan Domingo Bello, Lavi and Ebrahimian LLP, Beverly Hills, CA, Sahag Majarian, II, Law Office of Sahag Majarian II, Tarzana, CA, Michael Sean Lavenant, Constangy, Brooks & Smith, Encino, CA, for Plaintiffs.

Jennifer Raphael Komsky, Michael Sean Lavenant, Sumithra Rao Roberts, Constangy Brooks & Smith, LLP, Encino, CA, for Defendants.

**ORDER DENYING DEFENDANT SKY CHEFS, INC.'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

DONNA M. RYU, United States Magistrate Judge.

**\*1** Defendant Sky Chefs, Inc. ("Sky Chefs") filed a Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to F.R.C.P. 12(b)(6) and (12)(b)(1) or Alternatively, Motion to Strike Class Allegations ("Motion"). [Docket No. 38.] This matter is appropriate for determination without oral argument. Civil L.R. 7–1(b). For the reasons stated below, the Motion is denied.

**I. Background**

Sky Chefs, a business which provides in-flight food and beverage catering services to numerous airline carriers within the United States, hired Plaintiff Cesar Cruz ("Plaintiff") in July 1996 as an assembler. Declaration of Franklin Bruce Murray ("Murray Decl.") [Docket No. 38–1] at ¶¶ 2, 6. During his employment, Plaintiff was a member of the Unite Here International Union (SFO/Union Local 2), and his relationship with Sky Chefs was governed by a collective bargaining agreement ("the CBA"). *Id.* at ¶¶ 3–4, Ex. A.

Plaintiff filed this putative class action on March 16, 2012 in Alameda County Superior Court. [*See* Docket No. 1 at 2.] On May 23, 2012, Plaintiff amended his complaint to state nine California state law causes of action against Sky Chefs and LSG Lufthansa Service Holding AG, dba LSG Sky Chefs.[1] On May 25, 2012, Sky Chefs removed the case to federal court, basing federal jurisdiction on the Class Action Fairness Act, 28 U.S.C. § 1332(d). [Docket No. 1.]

On October 5, 2012, Sky Chefs filed a motion to dismiss Plaintiff's complaint on the grounds that his claims are preempted by the Railway Labor Act ("RLA"). [Docket No. 20.] The court held a hearing on the motion on December 20, 2012. During the hearing, Plaintiff represented to the court that he would limit all claims to encompass only class members who had never received a shift differential or lead pay during the class period. He also stipulated to dismiss the third cause of action for overtime wages. He further conceded that he does not dispute the rate at which Sky Chefs calculated overtime pay as shown on the paystubs, except for Sky Chefs' alleged failure to include earned bonuses (as indicated on the paystubs) in its calculation of the regular rate of pay. Order Denying Motion to Dismiss First Amended Complaint [Docket No. 30] at 2–3. In light of these representations, Sky Chefs conceded that resolution of Plaintiff's claim for failure to pay overtime wages at the proper rate under California Labor Code §§ 510 and 1194 and the wage order (the "overtime wages rates claim") would not require the court to interpret the CBA and, therefore, would not be preempted by the RLA. *Id.* at 2–3. The parties' concessions resulted in one remaining issue in Sky Chefs' motion to dismiss. The court denied the motion and held that the RLA, which applies to Sky Chefs and its employees, did not preempt Plaintiff's California minimum wage claim because "resolution of this dispute turns merely on the number of hours worked by Plaintiff and putative class members, and whether they received the minimum wage for that time .... The court will not have to interpret the CBA to resolve the claim." *Id.* at 5–6. The court also dismissed Plaintiff's third cause of action pursuant to the parties' stipulation.

**\*2** On January 16, 2013, Plaintiff filed the SAC, alleging eight causes of action against Sky Chefs: (1) failure to pay

wages for compensable work at minimum wage pursuant to California Labor Code §§ 1194 and 1197 ("minimum wage claim"), (2) failure to pay earned wages for compensable time in violation of California Labor Code § 204 ("earned wages claim"), (3) failure to pay overtime wages at the proper rate under California Labor Code §§ 510 and 1194 and the wage order ("overtime wages rate claim"), (4) failure to provide required meal periods pursuant to California Labor Code §§ 226.7 and 512 ("meal period claim"), (5) failure to provide complete and accurate wage statements in violation of California Labor Code § 226 ("wage statements claim"), (6) failure to pay all wages timely upon separation of employment in accordance with California Labor Code §§ 201 and 202 ("timely payment of wages claim"), (7) unfair competition pursuant to California Business and Professions Code § 17200 ("unfair competition claim"), and (8) a request for civil penalties under the Labor Code Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 *et seq.* ("PAGA claim"). SAC at ¶¶ 33–90.

In the SAC, Plaintiff offered the following class definitions:

A. **Minimum Wage Class:** All current and former non-exempt employees, excluding non-exempt employees that received shift differential or lead pay, employed by DEFENDANTS in California at any time between March 16, 2008, through the date notice is mailed to a certified class, who were under control of DEFENDANTS during time they were engaged, suffered, or permitted to work and DEFENDANTS did not pay wages for that time at least at the legal minimum wage rate.

B. **Earned Wages Class:** All current and former non-exempt employees, excluding non-exempt employees that received shift differential or lead pay, employed by DEFENDANTS in California at any time between March 16, 2008, through the date notice is mailed to a certified class who were under control of DEFENDANTS during time they were engaged, suffered or permitted to work and DEFENDANTS did not pay those earned wages at the employees' regular rate of pay.

C. **Bonus Class:** All current and former non-exempt employees, excluding nonexempt employees that received shift differential or lead pay, employed by DEFENDANTS in California at any time between March 16, 2008, through the date notice is mailed to a certified class, who were under control of DEFENDANTS during time they were engaged, suffered or permitted to work and who received non-discretionary bonuses yet DEFENDANTS failed to include the bonuses and/or other forms of remuneration when calculating the rates of employees' overtime wages.

D. **Meal Period Class:** All current and former non-exempt employees, excluding nonexempt employees that received shift differential or lead pay, employed by DEFENDANTS in California at any time between March 16, 2008, through the date notice is mailed to a certified class who worked without all the uninterrupted, duty-free meal periods to which they were entitled due to DEFENDANTS' policies, practices and procedures.

**\*3** E. **Wage Statement Class:** All current and former non-exempt employees, excluding non-exempt employees that received shift differential or lead pay, employed by DEFENDANTS in California at any time between March 16, 2008, through the date notice is mailed to a certified class who received inaccurate or incomplete wage statements.

F. **Waiting Time Class:** All current and former non-exempt employees, excluding nonexempt employees that received shift differential or lead pay, employed by DEFENDANTS in California at any time between March 16, 2008, through the date notice is mailed to a certified class who did not receive payment of all unpaid wages with the statutory time period.

SAC at 9–10.

Sky Chefs filed this Motion requesting that the court dismiss the class allegations pursuant to Federal Rule of Civil Procedure 12(b) (6). Sky Chefs argues that (1) the class allegations do not allege sufficiently ascertainable classes, (2) individual questions of fact predominate, and (3) class treatment is not the superior method for resolving the claims of the class. In the alternative, Sky Chefs moves the court to strike the class allegations pursuant to Federal Rule of Civil Procedure 12(f). Sky Chefs also moves to dismiss the overtime rate claim pursuant to Federal Rule of Civil Procedure 12(b)(1) because it is preempted by the RLA.

The parties filed consents to this court's jurisdiction pursuant to 28 U.S.C. § 636(c). [Docket Nos. 9, 13.] The court therefore may enter judgment in the case. *See* 28 U.S.C. § 636(c)(1); Fed.R.Civ.P. 72(b); N.D. Cal. Civ. L.R. 72–1.

**II. Applicable Law**

A court will dismiss a party's claim for lack of subject-matter jurisdiction "only when the claim is so insubstantial, implausible, foreclosed by prior decisions of th[e Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (citation and quotation marks omitted); *see* Fed.R.Civ.P. 12(b)(1). When reviewing a Rule 12(b)(1) motion, the court sculpts its approach according to whether the motion is "facial or factual." *White v. Lee,* 227 F.3d 1214, 1242 (9th Cir.2000). A facial challenge asserts that "the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir.2004). A factual challenge asserts that subject-matter jurisdiction does not exist, independent of what is stated in the complaint. *White,* 227 F.3d at 1242. In contrast with a facial challenge, a factual challenge permits the court to look beyond the complaint, without "presum[ing] the truthfulness of the plaintiff's allegations." *Id.* Even the presence of disputed material facts "will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Roberts v. Corrothers,* 812 F.2d 1173, 1177 (9th Cir.1987). To successfully rebut a factual challenge in a motion to dismiss, the non-moving party " 'must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction.' " *White v. Astrue,* Case No. 10–CV–2124–CRB, 2011 WL 900289 at *3 (N.D.Cal. Mar.15, 2011) (quoting *Savage v. Glendale Union High Sch.,* 343 F.3d 1036, 1040 n. 2 (9th Cir.2003)).

**\*4** A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995). When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam) (citation omitted), and may dismiss the case "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.,* 622 F.3d 1035, 1041 (9th Cir.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 677–78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001) (quotation marks omitted). A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citation omitted). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)); *see Lee v. City of L.A.,* 250 F.3d 668, 679 (9th Cir.2001), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara,* 307 F.3d 1119 (9th Cir.2002). In reviewing a motion to dismiss, courts may consider documents attached to the complaint. *Parks,* 51 F.3d at 1484 (citation omitted).

Under Federal Rule of Civil Procedure 12(f), the court may strike "any insufficient defense or any redundant, immaterial, impertinent or scandalous matter." A motion to strike is properly granted where plaintiff seeks a form of relief that is not available as a matter of law. *Rosales v. Citibank, Federal Savings Bank,* 133 F.Supp.2d 1177, 1180 (N.D.Cal.2001) ("Under Federal Rule of Civil Procedure 12(f), a party may move to strike 'any redundant, immaterial, impertinent, or scandalous matter.' ... This includes striking any part of the prayer for relief when the relief sought is not recoverable as a matter of law").

In ruling on a motion to strike under Rule 12(f), the court must view the pleading in the light most favorable to the nonmoving party. *See California v. United States,* 512 F.Supp. 36, 39 (N.D.Cal.1981). Thus, "[b]efore granting such a motion ... the court must be satisfied that there are no questions of fact, that the [claim or] defense is insufficient as a matter of law, and that under no circumstance could [it] succeed." *Tristar Pictures, Inc. v. Del Taco, Inc.,* Case No. 99–CV–07655 DDP, 1999 WL 33260839 at *1 (C.D.Cal. Aug.31, 1999); *Cholakyan v. Mercedes–Benz USA, LLC,* 796 F.Supp.2d 1220, 1244–45 (C.D.Cal.2011).

### III. Discussion

#### A. Rule 12(b)(6) Motion to Dismiss and Rule 12(f) Motion to Strike Class Allegations

**\*5** Sky Chefs argues that the class definitions in the SAC are insufficient. It challenges Plaintiff's class allegations pursuant to Rule 12(b)(6). In the alternative, Sky Chefs moves to

strike the class allegations pursuant to Federal Rule of Civil Procedure 12(f).

Sky Chefs fails to identify any Ninth Circuit authority permitting the use of a Rule 12 motion to dismiss class allegations. It cites *Kamm v. Cal. City Dev. Co.,* 509 F.2d 205, 212 (9th Cir.1975), which does not support its position. There, the Ninth Circuit upheld the district court's dismissal of class allegations where defendants had moved pursuant to Federal Rule of Civil Procedure 23 to dismiss the class action and to strike all class allegations. *Id.* at 207. Sky Chefs also cites *John v. Nat'l Sec. Fire & Cas. Co.,* in which the Fifth Circuit held that "[w]here it is facially apparent from the pleadings that there is no ascertainable class, a district court may dismiss the class allegation on the pleadings." 501 F.3d 443, 445 (5th Cir.2007). The plaintiffs in that case did not even contend that the class they proposed was ascertainable, and therefore their class allegations did not survive scrutiny under Rule 12(b)(6). *Id.*

At least one court in this district has ruled that Rule 12(b)(6) is not the appropriate vehicle to challenge class allegations. *Clerkin v. MyLife.Com,* Case No. 11–CV–0527–CW, 2011 WL 3809912 at *3 (N.D.Cal. Aug.29, 2011). The *Clerkin* court denied the defendants' Rule 12(b)(6) motion to dismiss class allegations, holding that such arguments are more appropriately addressed through Rule 23 for procedural reasons:

> First, Rule 12(b)(6) permits a party to assert a defense that the opposing party has failed "to state a claim upon which relief can be granted." A class action is a procedural device, not a claim for relief. *See Deposit Guaranty Nat'l Bank v. Roper,* 445 U.S. 326, 331, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). Second, other Federal Rules of Civil Procedure exist to address impertinent allegations and class certification. Thus, the use of Rule 12(b) (6) to address the same would create redundancies in the Federal Rules. Finally, the standard of review applied to orders granting motions to dismiss differs from that governing orders granting or denying class certification. The Ninth Circuit reviews *de novo* orders dismissing claims pursuant to Rule 12(b)(6). *Whittlestone, [Inc. v. Handi–Craft Co.,]*618 F.3d 970, 974 [ (9th Cir.2010) ]. Grants and denials of class certification, however, are reviewed for abuse of discretion. *Marlo v. United Parcel Serv.,* 639 F.3d 942, 946 (9th Cir.2011).

*Id.* (directing defendants to present their arguments as an opposition to plaintiffs' motion for class certification).

In addition, as discussed at length in *Cholakyan,* many courts have recognized that the sufficiency of class allegations are better addressed through a class certification motion, after the parties have had an opportunity to conduct some discovery:

> **\*6** While defendant cites several cases for the proposition that class allegations can be stricken at the pleadings stage, it is in fact rare to do so in advance of a motion for class certification. See, e.g., *In re Wal–Mart Stores, Inc. Wage and Hour Litig.,* 505 F.Supp.2d 609, 614–16 (N.D.Cal.2007) ( "the granting of motions to dismiss class allegations before discovery has commenced is rare"); *Moreno v. Baca,* No. CV007149ABC (CWx), 2000 WL 33356835 at *2 (C.D.Cal.2000) (holding that defendants' motion to strike class allegations was premature because no motion for class certification had been filed); *Myers v. MedQuist, Inc.,* No. 05–4608, 2006 WL 3751210 at *4 (D.N.J.2006) (declining to strike class allegations because discovery had not yet commenced and observing that most courts deny such motions if brought prior to discovery); *see also* 7AA Charles Alan Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure Civil § 1785.3 (3d 2005) (noting that the practice employed in the overwhelming majority of class actions is to resolve class certification only after an appropriate period of discovery). *See also In re Saturn L–Series Timing Chain Prods. Liab. Litig.,* No. MDL 1920, 08:07CV298, 08:08CV79, 2008 WL 4866604, *24 (D.Neb. Nov.7, 2008) ("While Defendants note potential difficulties this Court may face in defining the class, these concerns do not justify a premature dismissal of all class allegations prior to the class certification stage. Defendants' arguments in support of premature dismissal are not persuasive since the cases they cite warranted premature dismissal on grounds that do not exist in this case. Even where 'plaintiffs' class definitions are suspicious and may in fact be improper, plaintiffs should at least be given the opportunity to make the case for certification based on appropriate discovery of, for example, the ... lists that they claim will identify the class members,' " citing *In re Wal–Mart Stores* [*Inc. Wage and Hour Litigation,* 505 F.Supp.2d 607, 615 (N.D.Cal.2007) ]; *In re NVIDIA GPU Litig.,* No. C 08–04312 JW, 2009 WL 4020104, *13 (N.D.Cal. Nov.19, 2009) ("A determination of the ascertainability and manageability of the putative class in light of the class allegations is best addressed at the class certification stage of the litigation"); *Shein v. Canon U.S.A., Inc.,* No. CV–08–07323CASEX, 2009 WL 3109721, *10 (C.D.Cal. Sept.22, 2009) ("The Court finds that these matters are more properly decided on a motion for class certification, after the parties have had

an opportunity to conduct class discovery and develop a record"); *In re Jamster Mktg. Litig.,* No. 05CV0819 JM (CAB), 2009 WL 1456632, \*7 (S.D.Cal. May 22, 2009) ("Even though the arguments of [the defendant] may ultimately prove persuasive, the court declines to address issues of class certification at the present time. Piecemeal resolution of issues related to the prerequisites for maintaining a class action do not serve the best interests of the court or parties"); *Rosenberg v. Avis Rent A Car Sys.,* No. CIV A 07–1110, 2007 WL 2213642, \*4 (E.D.Pa. July 31, 2007) (noting that defendant had used a motion to dismiss allegedly vague class action allegations "as an opportunity to attack the merits of the class itself" and concluding that such an attack was improper before a class certification motion had been filed); *Brothers v. Portage Nat'l Bank,* No. Civ. A 306–94, 2007 WL 965835, \*7 (W.D.Pa. Mar.29, 2007) (explaining that a Rule 12(b)(6) motion must not be used "as a vehicle for preempting a certification motion"); *Beauperthuy v. 24 Hour Fitness USA, Inc.,* No. 06–0715 SC, 2006 WL 3422198, \*3 (N.D.sCal. Nov. 28, 2006) (finding that a motion to strike class allegations from a complaint "is an improper attempt to argue against class certification before the motion for class certification has been made and while discovery regarding class certification is not yet complete"); *Cole v. Asurion Corp.,* No. CV 06–6649PSGJTLX, 2008 WL 5423859, \*14 (C.D.Cal. Dec.30, 2008) ("Undoubtedly, addressing these arguments at a later date will require additional time and expense on the part of the defendants. But the Court is reluctant to preemptively deny Plaintiff at least the opportunity to present a motion for class certification").

**\*7** *Id.*

In the present case, Sky Chefs has yet to file an answer and class discovery began only recently. Given the relatively early stage of the proceedings, it is premature to determine whether this matter should proceed as a class action. *Id.* (denying defendant's motion to strike class allegations because defendant had not filed answer and discovery had not yet begun). *See also In re Wal–Mart Stores Inc. Wage and Hour Litigation,* 505 F.Supp.2d 609, 615 (N.D.Cal.2007) ("In the absence of any discovery or specific arguments related to class certification, the Court is not prepared to rule on the propriety of the class allegations and explicitly reserves such a ruling"). Accordingly, the court denies Sky Chefs's motion to dismiss and motion to strike Plaintiff's class allegations.

**B. Rule 12(b)(1) Motion to Dismiss Overtime Wages Rate Claim**

Sky Chefs' motion to dismiss the overtime wages rate claim attempts to re-raise an argument that it has already conceded. At the December 20, 2012 hearing on the first motion to dismiss, Sky Chefs acknowledged on the record that this claim, as reformulated by Plaintiff, would not be preempted by the RLA. Nothing has changed in the SAC. Given its concession, Sky Chefs may not relitigate the point.

**IV. CONCLUSION**

For the reasons stated above, the Motion is denied.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1892337

## Footnotes

1   The court subsequently dismissed all claims against Defendant LSG Lufthansa Service Holding AG dba LSG Sky Chefs without prejudice pursuant to the parties' stipulation. [Docket No. 19.] Plaintiff filed a Second Amended Complaint ("SAC") [Docket No. 32], which again named as defendant Lufthansa Service Holding AG dba LSG Sky Chefs. The parties subsequently filed a joint statement, in which Plaintiff clarified that he had erroneously named LSG Sky Chefs as a defendant, that LSG Sky Chefs was never served with the SAC, and that "LSG Sky Chefs is, in fact, dismissed from the action." Joint Statement [Docket No. 49] at 2.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Prod.Liab.Rep. (CCH) P 18,819

2012 WL 957633
United States District Court, D. Massachusetts.

Kathleen DONOVAN and Patricia
Cawley, on behalf of themselves and
others similarly situated, Plaintiffs,
v.
PHILIP MORRIS USA, INC., Defendant.

Civil Action No. 06–12234–DJC.
|
March 21, 2012.

**Attorneys and Law Firms**

Amber Long, Erik Shawn, Jerome H. Block, Stephanie L. Busse, Steven Phillips, Victoria E. Phillips, Levy, Phillips & Konisberg LLP, New York, NY, Christopher Weld, Jr., Earthjustice, Washington, DC, David C. Strouss, Michael A. Lesser, Andrea Marino Landry, Thornton & Naumes LLP, Kevin T. Peters, Arrowood Peters LLP, Steven J. Phillips, Pair Project, Edward Foye, Todd & Weld LLP, Boston, MA, for Plaintiffs.

Gary R. Long, John K. Sherk, III, Shook, Hardy & Bacon L.L.P., Kansas City, MO, Jennifer L. Brown, Tammy B. Webb, Shook, Hardy & Bacon LLP, San Francisco, CA, Curtis L. Perry, Shook, Hardy & Bacon L.L.P., Tampa, FL, Edward Foye, Todd & Weld LLP, Kenneth J. Parsigian, Michael K. Murray, Goodwin Procter, LLP, Boston, MA, Gregory P. Stone, Truc T. Do, Munger, Tolles & Olson LLP, Los Angeles, CA, Judith Bernstein-Gaeta, Arnold & Porter, LLP, Robert A. McCarter, III, Shook, Hardy & Bacon LLLP, Washington, DC, for Defendant.

*MEMORANDUM AND ORDER*

CASPER, District Judge.

**I. Introduction**

 **\*1** Defendant Philip Morris USA, Inc. ("Philip Morris") has moved to decertify the class represented by named plaintiffs Kathleen Donovan ("Donovan") and Patricia Cawley ("Cawley") (collectively, "the plaintiffs") and certified by the Court's June 24, 2010 decision in *Donovan v. Philip Morris USA, Inc.,* 268 F.R.D. 1 (D.Mass.2010)

(Gertner, J.) (*Donovan II* ). For the reasons set forth below, the Defendant's motion is DENIED.

**II. Background**

 A. *Procedural History Prior to Class Certification*
On December 14, 2006, Donovan and Cawley brought suit against Philip Morris. Their complaint—filed on behalf of a purported class of Massachusetts residents who: a) are age fifty or older; b) have cigarette smoking histories of twenty pack-years[1] or more using Marlboro cigarettes; c) currently smoke Marlboro cigarettes or quit smoking within one year of the filing of the complaint; d) are neither diagnosed as suffering from lung cancer nor under investigation by a physician for suspected lung cancer as of the date of any judgment entered or relief obtained in this action; and e) have smoked Marlboro cigarettes in Massachusetts-accused Philip Morris of negligent design and breach of the implied warranty of merchantability by marketing cigarettes that were defectively designed and unreasonably dangerous. D. 1 at ¶¶ 1, 79–100. The complaint was subsequently amended to include allegations of violations of the Massachusetts Consumer Protection Act, Mass. Gen. L. c. 93A. D. 2 at ¶¶ 102–12; D. 29 at ¶¶ 100–10. The plaintiffs sought as relief a court-supervised screening program involving low-dose computed tomography ("LDCT"), which the plaintiffs alleged provides a means to identify and diagnose lung cancer at an early stage, when it is still curable. D. 29 at ¶¶ 2–3, 6–13 and page 22 ¶ B.[2]

On April 28, 2008, Philip Morris moved for judgment on the pleadings arguing that the plaintiffs' claims required present physical injury and they had failed to allege such an injury and Philip Morris moved separately for summary judgment on statute of limitation grounds. D. 32; D. 34. On July 1, 2008, while briefing proceeded on Philip Morris' motions, Donovan and Cawley moved to certify their purported class. D. 60.

After a hearing on Philip Morris' motions,[3] the Court (Gertner, J.), certified two questions to the Massachusetts Supreme Judicial Court: 1) "[d]oes the plaintiffs' suit for medical monitoring, based on the subclinical effects of exposure to cigarette smoke and consequent increased risk of lung cancer, state a cognizable claim and/or permit a remedy under Massachusetts state law?;" and 2) "[i]f the plaintiffs have successfully stated a claim or claims, has the statute of limitations governing those claims expired?" D. 98. The Court then denied Philip Morris' motions without prejudice

to their refiling once the Supreme Judicial Court opined on the certified questions. 2/27/2009 docket entry. On April 14, 2009, the case was stayed pending proceedings before the Supreme Judicial Court. D. 100.

**\*2** The Supreme Judicial Court issued its opinion on October 19, 2009, answering "yes" to the first question and "no" to the second. *Donovan v. Philip Morris USA, Inc.,* 455 Mass. 215, 216, 914 N.E.2d 891 (2009) (*"Donovan I"* ). As to liability, the Supreme Judicial Court specifically held that under Massachusetts tort law, a plaintiff seeking future damages for medical monitoring following exposure to hazardous substances must prove that "(1) [t]he defendant's negligence (2) caused (3) the plaintiff to become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness, or injury (4) for which an effective medical test for reliable early detection exists, (5) and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and (6) such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care, and (7) the present value of the reasonable cost of such tests and care, as of the date of the filing of the complaint." *Id.* at 226, 914 N.E.2d 891. As to the statute of limitations, the Supreme Judicial Court held that "the statute begins to run when (1) there is a physiological change resulting in a substantial increase in the risk of cancer, and (2) that increase, under the standard of care, triggers the need for available diagnostic testing that has been accepted in the medical community as an efficacious method of lung cancer screening or surveillance," and concluded that if the plaintiffs could prove to a factfinder that they had "no remedy until LDCT appeared," then "their claims are timely." *Id.* at 229, 914 N.E.2d 891. Additionally, the Supreme Judicial Court explicitly refused to weigh in on issues relating to class certification, noting that it considered the questions certified by this Court "in the context of a dispute between two individuals" and that its answers "address only the named plaintiffs and their individual claims" and that questions affecting class treatment were beyond the scope of the certified questions. *Id.* at 221, 914 N.E.2d 891.

On October 23, 2009, on the heels of the Supreme Judicial Court's ruling, this Court lifted the stay. On June 24, 2010, after supplemental briefing and a hearing, the Court granted in part and denied in part the plaintiffs' class certification motion. *Donovan II,* 268 F.R.D. at 30–31; D. 119. In regard to the plaintiffs' breach of implied warranty and 93A claims,

the Court found that the plaintiffs' proposed class satisfied the numerosity, commonality, typicality and adequacy of representation requirements under Fed.R.Civ.P. 23(a), that the plaintiffs had alleged a group injury insofar as Philip Morris has acted on grounds generally applicable to the class and had alleged further that injunctive relief would be appropriate respecting the class as a whole sufficient to satisfy the requirements of Fed.R.Civ.P. 23(b)(2) and that class issues sufficiently predominate over individual issues and that a class action was a sufficiently superior method for adjudicating the plaintiffs' claims to satisfy the requirements of Fed.R.Civ.P. 23(b)(3). *See Donovan II,* 268 F.R.D. at 10–29; D. 122. Accordingly, the Court certified the plaintiffs' proposed class under both Rule 23(b)(2) and (b)(3) as to the breach of implied warranty and 93A claims. *Donovan II,* 268 F.R.D. at 30. The Court declined to certify the plaintiffs' negligence claim for class treatment. *Id.* at 29–30.

**\*3** On July 8, 2010, Philip Morris sought interlocutory appellate review pursuant to Fed.R.Civ.P. 23(f). *Donovan v. Philip Morris USA, Inc.,* Case No. 10–8025 (1st Cir. case filed July 8, 2010). On September 1, 2010, after briefing by the parties, the First Circuit denied Philip Morris' petition for leave to file its interlocutory appeal. *Id.* (judgment entered Sept. 1, 2010). In its judgment, responding to Philip Morris' assertion that "this case presents novel and important issues and that interlocutory review would allow for more effective review of those issues," the First Circuit stated that, "[h]aving thoroughly reviewed the district court's certification decision and relevant portions of the record, we conclude that any novel issues presented would be susceptible to effective review as part of an appeal taken at the conclusion of the litigation, and we see no reason to delay the progress of this already complex litigation by interceding at this time." *Id.*

B. *Post–Certification Procedural Background and Developments in Controlling Law*

On May 20, 2011, Judge Gertner notified the parties that the case would have to be transferred from her session for trial purposes and expressed her desire to resolve all pre-trial matters before the case was transferred. 5/20/2011 docket entry. Over the next six weeks, the parties filed a flurry of pretrial motions and related briefs.[4]

On May 25, 2011, in response to a motion filed by the plaintiffs on April 5, 2011 (predating the Court's May 20, 2011 docket entry), the Court amended the definition of the certified class to require that class members "were residents

Prod.Liab.Rep. (CCH) P 18,819

of the Commonwealth as of any period between December 14, 2006, and May 2, 2011," so as to include individuals who would have been class members when the plaintiffs' complaint was filed but had subsequently moved out of state. D. 221. Accordingly, the current definition of the certified class is:

> individuals who, as of May 2, 2011: a) are fifty years of age or older, b) have cigarette smoking histories of twenty pack years or more using Marlboro cigarettes, c) currently smoke Marlboro cigarettes or quit smoking on or after December 14, 2006, d) are not diagnosed as suffering from lung cancer or under investigation by a physician for suspected lung cancer as of the date of any judgment being entered, or relief obtained, in this action, e) have smoked Marlboro cigarettes within the Commonwealth of Massachusetts, and f) were residents of the Commonwealth as of any period between December 14, 2006, and May 2, 2011.

D. 221.

On June 20, 2011, the Supreme Court issued its opinion in *Wal–Mart Stores, Inc. v. Dukes,* ––– U.S. ––––, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), which vacated the certification under Fed.R.Civ.P. 23(b)(2) of a class of plaintiffs in a Title VII employment discrimination case on the grounds that their claims did not satisfy the commonality requirement under Rule 23(a)(2) and that the monetary back pay awards sought by the plaintiffs precluded certification under Rule 23(b)(2) (and that awards of that sort should instead be subject to the protections set forth in Rule 23(b)(3)). *Id.* at 2550–52, 2557–59.

 **\*4** On July 14, 2011, Judge Gertner notified the parties that despite the best efforts of counsel and the Court, it would not be possible for this Court to resolve the pending pretrial motions before she retired and the case was transferred to another judge. 7/14/2011 docket entry.

On September 23, 2011, the case was reassigned from Judge Gertner to this session. 9/23/2011 docket entry. On October 11, 2011, the Court issued an order requiring the parties to confer to discuss the sequence in which the various pending motions and the unresolved issue of class notice should be resolved and file a proposed joint schedule for all pretrial matters. 10/11/2011 docket entry. The parties filed their joint statement on October 25, 2011, D. 309, and the Court held a status and scheduling conference with counsel on December 8, 2011. 12/8/2011 docket entry.

In the parties' October 25th joint statement, Philip Morris notified the Court of its intent to file a motion to decertify the plaintiffs' class "in light of several intervening developments in the relevant law and facts, including the U.S. Supreme Court's ruling in *Wal–Mart Stores, Inc. v. Dukes.*" D. 309 at 5. Philip Morris filed the instant decertification motion on October 31, 2011, asserting that "several intervening developments in the relevant law and facts require reconsideration of the Court's order certifying a class in this action." D. 312. In multiple rounds of briefing on its motion, Philip Morris has argued that both *Dukes* and information that has come to light since the Court's June 24, 2010 and May 25, 2011 certification orders justify decertifying the class. Def. Memo, D. 313 at 6–29; Def. Reply, D. 329 at 7–26. Philip Morris also appears to contest the grounds of the Court's original June 24, 2010 decision to certify the class. *See* Def. Memo, D. 313 at 12 n. 6; *see generally* Def. Memo, D. 313 at 8–29; Def. Reply, D. 239 at 8–26. The Court heard argument on Philip Morris' motion on January 27, 2012 and took the matter under advisement.[5]

## III. Discussion

### A. *Legal Standard*

Because both Philip Morris and the plaintiffs have cited in their respective briefs cases dealing with both motions to decertify and motions to reconsider, *see, e.g.,* Def. Memo, D. 313 at 6–7 (citing cases involving decertification and cases involving reconsideration); Pls. Memo, D. 315 at 11–12 (same), the Court briefly discusses the applicable standard.

As Philip Morris acknowledges, decertification is governed by Fed.R.Civ.P. 23(c)(1)(C), which states that "[a]n order that grants or denies class certification may be altered or amended before final judgment." Fed.R.Civ.P. 23(c)(1)(C). This rule authorizes "the court [to] decertify a class at anytime before final judgment." *In re Sonus Networks, Inc. Sec. Litig.,* 229 F.R.D. 339, 348 (D.Mass.2005). Decertification may be justified by post-certification developments "such as the discovery of new facts or changes in the parties or in the substantive or procedural law." *O'Connor v. Boeing N. Am., Inc.,* 197 F.R.D. 404, 410 (C.D.Cal.2000) (quoting *Cook v. Rockwell Int'l Corp.,* 181 F.R.D. 473, 477 (D.Colo.1998)); *see, e.g., In Re Sonus Networks,* 229 F.R.D. at 348 (decertifying class after change in parties); *Connor B. v. Patrick,* 278 F.R.D. 30, 2011 WL 5513233, at \*2–\*5 (D.Mass. Nov.10, 2011) (reviewing and rejecting a decertification motion based on an alleged change in law); *Payton v. Abbott Labs,* 100 F.R.D. 336, 339–40 (D.Mass.1983) (decertifying

Donovan v. Philip Morris USA, Inc., Not Reported in F.Supp.2d (2012)
Prod.Liab.Rep. (CCH) P 18,819

class after a change in applicable Massachusetts law); *see also Westways World Travel, Inc. v. AMR Corp.,* 2005 WL 6523266, at \*4–\*6 (C.D.Cal. Feb.24, 2005) (decertifying class based on new facts developed in post-certification discovery). A decision to decertify a previously certified class is not taken lightly, and, as other courts have noted, "should only be done where defendants have met their 'heavy burden' of proving the necessity of taking such a 'drastic' step." *In re Vivendi Universal, S.A. Sec. Litig.,* 2009 WL 855799, at \*3 (S.D.N.Y. Mar.31, 2009) (quoting *Gordon v. Hunt,* 117 F.R.D. 58, 61 (S.D.N.Y.1987)). On a motion to decertify a previously certified class, "[d]oubts regarding the propriety of class certification should be resolved in favor of certification." *Slaven v. BP Am., Inc.,* 190 F.R.D. 649, 651 (C.D.Cal.2000) (citing 4 H. Newberg & A. Conte, *Newberg on Class Actions* § 7540 (3d ed.1992)).

 **\*5** As to reconsideration independent of any changed conditions of fact or law, the proper method for challenging an adverse class certification decision prior to judgment is to seek interlocutory review pursuant to Fed.R.Civ.P. 23(f), which states that "[a] court of appeals may permit an appeal from an order granting or denying class-action certification under this rule if a petition for permission to appeal is filed with the circuit clerk within 14 days after the order is entered." Fed.R.Civ.P. 23(f). Reconsideration outside of this channel is disfavored, as it "would undermine the fourteen-day deadline to appeal a class certification order and would essentially give an unhappy litigant the power to seek reconsideration of an order at any time," and allowing litigants to file a reconsideration motion seeking decertification "at any time during the litigation, even when no subsequent case law or new facts have had any impact on the original rationale, would render Rule 23(f) meaningless." *Connor B.,* 278 F.R.D. 30, 2011 WL 5513233 at \*1, \*6. Accordingly, where, as here, a party has properly sought interlocutory appellate review pursuant to Rule 23(f) and that request has been denied by the First Circuit, subsequent reconsideration of the original certification by the district court should be exceedingly rare. *See In re Mercedes–Benz Tele Aid Contract Litig.,* 267 F.R.D. 113, 135 (D.N.J.2010) (noting that "[a]fter a thorough review of the case law in this and other circuits, the Court has been unable to find a single case in which a district court entertained a motion for reconsideration of an order certifying a class after a request for interlocutory review of that order pursuant to Rule 23(f) was denied"); *see also* 3 W. Rubenstein, A. Conte & H. Newberg, *Newberg on Class Actions* § 7:47 (4th ed.2011) (observing that "[i]n the absence of materially changed or clarified circumstances,

or the occurrence of a condition on which the initial class ruling was expressly contingent, courts should not condone a series of rearguments on the class issues by either the proponent or the opponent of class, in the guise of motions to reconsider the class ruling"). Accordingly, this Court shall treat Philip Morris' motion as it has been labeled: a motion for decertification. The Court, therefore, addresses Philip Morris' argument in the context of the Rule 23(c)(1)(C) standard, in which decertification may be warranted in light of changes in the law or the discovery of new facts as Philip Morris argues is the case here.

### B. *Analysis*

Philip Morris asserts three grounds for decertifying the class. First, Philip Morris argues that, in light of *Dukes* and factual developments, the relief sought by the plaintiffs is monetary, not injunctive, and thus the class should be decertified under Fed.R.Civ.P. 23(b)(2). Second, Philip Morris argues that, in light of *Dukes,* a combination of the Rules Enabling Act, 28 U.S.C. § 2072, and the commonality requirement set forth at Fed.R.Civ.P. 23(a)(2) preclude the plaintiffs from proving the causation and medical necessity elements of their claim on a class-wide basis rather than on an individual basis, and thus the plaintiffs' class should be decertified under both Fed.R.Civ.P. 23(b)(2) and (b) (3). Third and finally, Philip Morris argues that, in light of *Dukes* and other developments in the law, the plaintiffs' class is not ascertainable and thus the class should be decertified under both Fed.R.Civ.P. 23(b)(2) and (b)(3). Def. Memo, D. 313 at 6–8.

#### 1. *Injunctive v. Monetary Relief*

 **\*6** A class may only be satisfied under Fed.R.Civ.P. 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). "Rule 23(b) (2) certification is not appropriate when money damages are the predominant relief that the plaintiffs seek." *DeRosa v. Mass. Bay Commuter Rail Co.,* 694 F.Supp.2d 87, 95 (D.Mass.2010). Philip Morris argues that a judgment for plaintiffs in this case "would simply require P[hilip] M[orris] to provide money from which to pay for monitoring," which it asserts is "relief that does not qualify for (b)(2) treatment." Def. Memo, D. 313 at 14.

##### a. *Analysis in Donovan II*

Donovan v. Philip Morris USA, Inc., Not Reported in F.Supp.2d (2012)

Prod.Liab.Rep. (CCH) P 18,819

The Court addressed this issue in the original certification order. *Donovan II,* 268 F.R.D. at 22–27. First, the Court described the plaintiffs' proposed relief not as direct payment of the plaintiffs' medical expenses by Philip Morris but rather as "a structured program, monitored by and staffed with medical personnel, in which class members will receive regular medical screenings" and which would require "hir[ing] medical and administrative personnel, purchas[ing] equipment, and establish[ing] procedures for intake, informed consent, record keeping, and so on." *Id.* at 22. After an exhaustive review of analogous cases, the Court concluded that "[m]any courts have found medical monitoring relief structured as this one would be to be injunctive," *id.* at 22–23 (collecting cases), and that "even those courts that have found the monitoring remedy as proposed to be compensatory have reiterated that claims for medical monitoring alone may indeed be certified under 23(b)(2)." *Id.* at 23 (collecting cases).

Next, the Court in *Donovan II* reviewed *Donovan I* to determine whether the Supreme Judicial Court's opinion foreclosed the possibility that the claim stated here by the plaintiffs permitted equitable, injunctive relief rather than legal damages redressable only through a monetary award, *Donovan II,* 268 F.R.D. at 23–26, and concluded that "the SJC left open the possibility of purely equitable relief for medical monitoring product liability claims." *Id.* at 25. Specifically,

> [t]he SJC opinion acknowledged that in some circumstances, legal damages will be perfectly appropriate, even preferable. For example, if a medical test is easily accessible and can be purchased, damages will suffice. This is most likely to be the case in an individual suit, which was precisely the way in which the SJC approached the certified questions. *See Donovan [I]* [at 900 n. 10]. An elaborate medical monitoring program may not make sense if only a few individuals seek relief. But a class presents different issues—including lack of doctors and access to technology.
>
> Moreover, the fluid nature of medical monitoring remedies fits within broader tort law, which envisions a range of remedies. A cause of action in tort does not preclude an injunctive remedy.... While in most tort cases, plaintiffs seek compensation in the form of money, in some circumstances, money cannot adequately compensate, and an injunction is therefore required to remedy the harm.... If the nuisance is continuing, an injunction is appropriate because damages will not fully remedy the harm.

**\*7** *Id.* (internal citations and footnote omitted).

Next, the Court reviewed the evidence available to the Court as of June 24, 2010, *Donovan II,* 268 F.R.D. at 26, and concluded that the "[p]laintiffs' injuries are not adequately compensable by monetary damages." *Id.* Specifically, citing the record developed by the parties, the Court noted that "LDCT screening is not available through most health insurance programs," that "many class members may lack primary care physicians to prescribe LDCT screening," and that "[d]etermining the cost of the tests, particularly where potential class members are dispersed around Massachusetts and have access to different types of facilities, will be difficult." *Id.* (citations omitted).

Finally, the Court turned to the question of whether the injunctive relief was the predominant form of relief sought by the plaintiffs. *Donovan II,* 268 F.R.D. at 26–27. After reviewing the various tests courts have applied when determining the predominance of injunctive relief, *id.* at 27, the Court concluded that the plaintiffs here have established predominance regardless of which test was applied "because the relief they seek is *wholly* injunctive [;][t]hey do not seek compensatory or punitive damages, and the remedy will be class-wide." *Id.* (emphasis in original).

### b. *Change in Law: Wal–Mart Stores, Inc. v. Dukes*

Philip Morris argues that the Supreme Court's recent opinion in *Dukes* compels the conclusion that the relief sought by the plaintiffs here is monetary, not injunctive, and thus not appropriate for certification under Fed.R.Civ.P. 23(b)(2). Philip Morris relies heavily on *Dukes* not only for its argument with regard to injunctive versus monetary relief, but also for its subsequent arguments regarding commonality and ascertainability, which are discussed more fully below.

In *Dukes,* the Supreme Court reviewed the certification of a class comprised of roughly one and a half million current and former female employees of Wal–Mart—described by the Court as "one of the most expansive class actions ever"—who alleged that their local supervisors' discretion over pay and promotion matters violated Title VII by discriminating against women. 131 S.Ct. at 2546. The *Dukes* plaintiffs did not allege that Wal–Mart had any express policy that could be construed as discriminatory; instead, they argued that Wal–Mart's "strong and uniform 'corporate culture' " permitted bias against women to "infect" the decisionmaking of thousands of individual store supervisors, who had wide discretion over pay and promotions, leading to a series of uncoordinated acts of discrimination and allegedly making

every woman who worked for Wal–Mart "the victim of one common discriminatory practice." *Id.* at 2548. The plaintiffs sought injunctive and declaratory relief as well as a monetary award of back pay specifically authorized by Title VII, 42 U.S.C. § 2000e–5(g)(1), which would vary in amount for different class members depending on their employment relationship with Wal–Mart and upon Wal–Mart's Title–VII–specific statutory defenses. *Id.* at 2549.

**\*8** In a two-part decision, the Supreme Court held that the *Dukes* plaintiffs failed to show that "there are common questions of law or fact common to the class" as required by Fed.R.Civ.P. 23(a) (2), *Dukes,* 131 S.Ct. at 2554–57, and held unanimously both that monetary relief that is not incidental to injunctive or declaratory relief cannot be certified for class treatment under Fed.R.Civ.P. 23(b)(2) (thus clarifying the dispute mentioned in *Donovan II* regarding the proper test for determining whether injunctive relief is "predominant" over monetary relief in the (b) (2) context, *Donovan II,* 268 F.R.D. at 26–27) and that the back pay sought by the *Dukes* plaintiffs fell into the category of monetary relief that may not receive (b)(2) treatment. *Id.* at 2557–61. It is the latter portion of *Dukes* that Philip Morris relies upon in support of its injunctive relief argument. Specifically, Philip Morris points both to the Court's holding regarding predominance and to the *Dukes* plaintiffs' failed argument that their back pay claims were appropriate for (b)(2) treatment because a back pay award is technically an equitable remedy rather than a remedy at law. The Supreme Court noted that the assertion that back pay is equitable relief "may be true, but it is irrelevant.... Rule [23(b)(2) ] does not speak of 'equitable' remedies generally but of injunctions and declaratory judgments. As Title VII makes pellucidly clear, backpay is neither." *Dukes,* 131 S.Ct. at 2560.

This language in *Dukes* does not change the analysis of whether the plaintiffs' proposed remedy is fit for Rule 23(b)(2) certification contained in this Court's June 24, 2010 order. Although that order does refer intermittently to the remedy sought by the plaintiffs as "equitable," *see Donovan* II, 268 F.R.D. at 17, 22, 24, 25, 27, 30, it is abundantly clear that the Court found that the proposed remedy belonged not only to the general category of equitable relief but also to the narrower category of injunctive relief. *See id.* at 22–23 (section entitled "Is medical monitoring injunctive?"); *see also id.* at 22 ("[t]he medical monitoring remedy that plaintiffs seek here is nearly identical to the injunctive program described by *Day [v. NLO, Inc.,* 144 F.R.D. 330, 335–36 (S.D.Ohio 1992), *vacated in part on other grounds, In*

*re NLO, Inc.,* 5 F.3d 154, 160 (6th Cir.1993) ] and *Arch [v. Am. Tobacco Co., Inc.,* 175 F.R.D. 469, 483–84 (E.D.Pa.1997) ]"); *id.* ("[m]any courts have found medical monitoring relief structured as this one would be to be injunctive"); *id.* at 23 ("[i]n sum, the plaintiffs' proposed remedy is injunctive in nature and may be pursued under 23(b)(2)"). Similarly, the discussion in *Dukes* shedding light on the standards to be applied in Rule 23(b)(2) predominance analysis does not change the outcome of the certification analysis in the Court's June 24, 2010 order, which explicitly states that no matter what standard is applied, "the plaintiffs' class is properly certified under (b)(2) because the relief they seek is *wholly* injunctive." *Donovan II,* 268 F.R.D. at 27 (emphasis in original).

**\*9** At base, Philip Morris relies on *Dukes* less as a post-certification change in controlling law that makes any material difference in the analysis in this case and more as the basis for resurrecting an argument that was argued and considered by the Court in *Donovan II:* that "[t]he relief sought by plaintiffs—even if it is 'equitable' in nature—is clearly not 'injunctive' because there is no such thing as 'an injunction to pay money.' " Def. Memo, D. 313 at 13–14 (quoting *U.S. Indus., Inc. v. Anderson,* 529 F.2d 1227, 1229 (10th Cir.1978)). The argument raised here in support of the decertification motion is an echo of the argument made in opposition to the plaintiffs' certification motion, *see, e.g.,* Def. Memo in Opp. to Class Certification, D. 72 at 42 n. 51 (citing cases for the proposition that a "[p]laintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money") and is one that the Court has already rejected. *Donovan II,* 268 F.R.D. at 27 (noting that "Philip Morris argues that the medical monitoring claim is a 'thinly-disguised request for money damages,' [D. 72] at 29[ ], and emphasizes that a plaintiff cannot convert a legal action into an equitable one by asking for an injunction ordering the payment of money. The plaintiffs, however, are not asking for an injunction that orders the payment of money. They are seeking a specific, equitable remedy. Simply because an injunction requires the defendant to pay money does not convert it into a monetary action") (internal citations omitted). For the reasons stated above, *Dukes* does not constitute a change in the law warranting decertification.

### i. *PostDukes cases*

Although Philip Morris cites to a number of post-*Dukes* cases in support of its argument for decertification on the grounds that the relief sought is not injunctive, none of them compel

Prod.Liab.Rep. (CCH) P 18,819

the result it seeks. Philip Morris offers one recent case, *Gates v. Rohm & Haas Co.,* 655 F.3d 255 (3d Cir.2011), which involved a class-based medical monitoring claim arising out of allegations that a company dumped toxic wastewater that seeped into an aquifer and evaporated, polluting the air with the toxic carcinogen vinyl chloride, and which Philip Morris asserts stands for the proposition that "a judgment [that] would simply require P[hilip] M[orris] to provide money from which to pay for monitoring [constitutes] relief that does not qualify for (b)(2) treatment in the wake of *Dukes.*" Def. Memo, D. 313 at 14. But *Gates* does not support that proposition; indeed, it expressly stopped short of weighing in on the issue. *Gates,* 655 F.3d at 263 ("[i]n light of the Supreme Court's recent decision in *Wal–Mart Stores, Inc. v. Dukes,* we question whether the kind of medical monitoring sought here can be certified under Rule 23(b)(2) but we do not reach the issue.... If the plaintiffs prevail, class members' regimes of medical screenings and the corresponding cost will vary individual by individual. But we need not determine whether the monetary aspects of plaintiffs' medical monitoring claims are incidental to the grant of injunctive or declaratory relief. [Here,] a single injunction or declaratory judgment cannot provide relief to each member of the class proposed here due to individual issues unrelated to the monetary nature of the claim") (internal quotations and citations omitted).

**\*10** Philip Morris also briefly discusses *Huber v. Taylor,* 2011 WL 4553154 (W.D.Pa.2011), which it offers as an example of a court that "applied fresh scrutiny to arguments that claims for 'equitable' remedies are fit for certification under (b)(2), and ... rejected such claims where the primary object of the suit is payment of money by the defendant." Def. Reply, D. 329 at 9–10. Although *Huber* did cite Dukes in support of that proposition, *Huber,* 2011 WL 4553154, at *1, Philip Morris' reliance on *Huber* is misplaced. *Huber* was not a medical monitoring case. Instead, the defendants in *Huber* were lawyers who had represented a group of asbestos-related-injury plaintiffs in a consolidated, class-action-like proceeding; the *Huber* plaintiffs were a subset of those plaintiffs who sued the lawyers alleging misuse of class funds and claiming disgorgement of fees and punitive damages for the lawyers' alleged past misconduct. *Huber,* 2011 WL 4553154, at *1–*2. Indeed, the *Huber* plaintiffs filed an amended complaint that "purposefully abandon[ed] claims for injunctive relief" in lieu of monetary relief in the form of fees and damages. *Id.* at *2. When the *Huber* plaintiffs sought to be treated as a Rule 23(b)(2) class, the court rightly pointed out that Rule 23(b)(2) treatment was unavailable to defendants seeking only monetary damages, *id.,* a point that

was clear before *Dukes.* See *Huber,* 2011 WL 4553154 at *2 (citing *Jefferson v. Ingersoll Int'l, Inc.,* 195 F.3d 894, 897 (7th Cir.1999)). Indeed, with regard to Rule 23(b)(2) certification, *Huber* is the exact converse of the instant case: here, as the Court has noted multiple times, "the relief [the plaintiffs] seek is *wholly* injunctive. They do not seek compensatory or punitive damages." *Donovan II,* 268 F.R.D. at 27 (emphasis in original).

Similarly, Philip Morris points to *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970 (9th Cir.2011), which it describes as a case "vacating certification of [a] (b)(2) class because *Dukes* bars (b)(2) claims for individualized relief." Def. Memo, D. 313 at 18. The plaintiffs in *Ellis,* who (like the plaintiffs in *Dukes* ) alleged gender discrimination in violation of Title VII, sought not only injunctive relief but also punitive monetary damages and individual monetary awards of back pay and compensatory damages and their request for certification under Rule 23(b)(2) was rejected because *Dukes* explicitly precluded (b)(2) certification for claims for individualized monetary relief such as back pay. *Ellis,* 657 F.3d at 977, 987–88.[6] *Ellis* does not suggest that plaintiffs seeking wholly injunctive relief and disclaiming any monetary damages, individualized or otherwise, may not pursue that relief through a Rule 23(b)(2) class action.

Finally, a month after the Court's January 27, 2012 hearing on Philip Morris' decertification motion, Philip Morris notified the court of the Seventh Circuit's recent opinion in *Jamie S. v. Milwaukee Pub. Schs.,* 668 F.3d 481 (7th Cir.2012). In *Jamie S.,* plaintiffs sought structural reform of special education in the Milwaukee Public School district ("MPS") as a remedy for alleged violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.,* under which "local districts must identify children with disabilities, determine whether these children require special-education services, and develop individualized education programs ("IEPs") tailored to each student's specific needs." *Jamie S.,* 668 F.3d at 485. "Each step in th[is] process is highly individualized because every child is unique." *Id.* Pursuant to Fed.R.Civ.P. 23(b) (2), the district court certified a class of "students eligible to receive special education from MPS who are, have been or will be denied or delayed entry into or participation in the IEP process." *Id.* (internal quotations omitted). Following certification and several years of discovery, the court held a bench trial and found the defendants liable. *Id.* at 488. After the finding of liability, the court sought briefing from the parties as to "how putative members of the class were to be evaluated for inclusion in the

class; how individual liability and compensatory-education determinations should be made; which party should prevail when the evidence is inconclusive; how disputes between the parties should be resolved; and who should pay for the dispute-resolution process." *Id.* at 489. After receiving the parties' briefs, the Court "ordered the creation of a 'hybrid' IEP team, closely resembling the IEP team required by the IDEA but including a court-appointed independent monitor to oversee its operation." *Id.* The court-monitored hybrid IEP team had a great deal of authority and wide discretion:

 **\*11**  The hybrid IEP team was charged with ... determin[ing] how to proceed in each individual [class member's] case. In some cases it might be obvious that the child is not disabled, and no further evaluation would be required. In others a professional evaluation would be required to determine whether the child has a disability. In others a full IEP meeting would be needed to determine whether the child requires special-education services in order to receive a free appropriate public education. And finally, in some cases the child might be entitled to compensatory education—a remedy available under the IDEA—to compensate for a past denial of a free appropriate public education. The hybrid IEP team was given the authority to grant compensatory-education awards, subject to the court's oversight. The estimated cost to MPS to implement this remedy: between $11.5 and $40 million, depending on how many parents responded and the extent of the compensatory education awarded to qualifying children.

*Id.* On appeal, the Seventh Circuit vacated the district court's certification decision, on the ground that the relief ordered by the court was purely injunctive but was not nearly "final," as required by Fed.R.Civ.P. 23(b)(2). *Id.* at 498–50. Instead, the "intricate remedial scheme ordered by the district court ... requires thousands of individual determinations of class membership, liability, and appropriate remedies" and "merely establishes a system for eventually providing individualized relief. It does not, on its own, provide 'final' relief to any class member." *Id.* at 499.

While the *Jamie S.* case may be more instructive than the various other cases invoked by Philip Morris as post-*Dukes* authority discussing Fed.R.Civ.P. 23(b)(2), *Jamie S.* is nonetheless distinguishable and does not implicate the Court's earlier conclusion that the remedy proposed here by the plaintiffs is final injunctive relief for the purposes of Rule 23(b)(2). The LDCT screening program urged by the plaintiffs will have no discretionary power to determine liability with regard to an individual class member; the

liability determination will be made in a binding group-based determination by the factfinder prior to the award of any relief. *Donovan II,* 268 F.R.D. at 12–22. The contours of class membership have been clearly and objectively delineated by the Court such that the administration of the LDCT monitoring program will involve applying the orders of this Court regarding class membership and relief, rather than making discretionary determinations about these matters. *Id.* at 9. Similarly, the remedy here is monitoring; the class in the instant case does not seek post-monitoring relief akin to the post-evaluation "compensatory education" relief sought by the class in *Jamie S. Jamie S.,* 668 F.3d at 489. Although *Jamie S.* may provide an example of unique injunctive relief that cannot survive post-*Dukes* Rule 23(b)(2) review, it does not cast doubt on this Court's June 24, 2010 determination that the programmatic injunctive relief sought by the plaintiffs satisfies the requirements of Rule 23(b)(2).

 **\*12**  Accordingly, there has been no change in law under *Dukes* and its progeny as to the issue of whether the relief sought by the plaintiffs is sufficiently injunctive to merit decertification of the class in this case under Fed.R.Civ.P. 23(b)(2).

   c. *Post–Certification Discovery: New Information about LDCT Scans*

As the Court has noted previously, "[t]o obtain injunctive relief, a plaintiff generally must satisfy a four-part test: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.' " *Donovan II,* 268 F.R.D. at 26 (quoting *CoxCom, Inc. v. Chaffee,* 536 F.3d 101, 112 (1st Cir.2008)). In its June 24, 2010 certification order, the Court found that the plaintiffs here had satisfied all four parts of this test. *Id.* at 26. Philip Morris argues that recently discovered facts have disproved the Court's analysis with regard to the second part of the test and have shown that "[t]he class members here have an adequate legal remedy available to them: monetary damages that they can use to purchase LDCT scans on their own." Def. Memo, D. 313 at 15. Based on the recent discovery material provided by the parties, the Court reaches the opposite conclusion: the inadequacy of providing the plaintiffs with money damages, as opposed to programmatic injunctive relief, appears even more clear now than it was when the Court issued its June 24, 2010 certification order.

Prod.Liab.Rep. (CCH) P 18,819

Before turning to the discovery Philip Morris offers in support of its argument, the Court must first address the issue of the proper standard for determining whether a remedy at law-here, monetary damages-is sufficiently "adequate" to preclude injunctive relief. "What constitutes an adequate legal remedy depends on the facts of each case." 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2944 (2d ed.2011). "An adequate remedy at law means a remedy which is plain and complete and as practical and efficient to the ends of justice and its prompt administration as a remedy in equity by injunction." *Id.* (quoting *Local Union 499 of Int'l Bhd. of Elec. Workers, AFL–CIO v. Iowa Power & Light Co.,* 224 F.Supp. 731, 738 (S.D.Iowa 1964)); *see also Am. Life. Ins. Co. v. Stewart,* 300 U.S. 203, 214, 57 S.Ct. 377, 81 L.Ed. 605 (1937) ("[a] remedy at law does not exclude one in equity unless it is equally prompt and certain and in other ways efficient"); *City of Walla Walla v. Walla Walla Water Co.,* 172 U.S. 1, 12, 19 S.Ct. 77, 43 L.Ed. 341 (1898) ("the remedy at law, in order to exclude a concurrent remedy at equity, must be as complete, as practical, and as efficient to the ends of justice and its prompt administration, as the remedy in equity"); *Interstate Cigar Co. v. United States,* 928 F.2d 221, 223 (7th Cir.1991) ("an available remedy at law must be plain, clear and certain, prompt or speedy, sufficient, full and complete, practical, efficient to the attainment of the ends of justice, and final") (quoting 27 Am.Jur.2d *Equity* § 94 (1966)); *United States v. Bluitt,* 815 F.Supp. 1314, 1317 (N.D.Cal.1992) (same) (quoting *Interstate Cigar Co.,* 928 F.2d at 223); *Jones v. Fenton Ford, Inc.,* 427 F.Supp. 1328, 1337 (D.Conn.1977) ("[i]t is well settled, however, in the federal system at least, that equity jurisdiction is not barred unless the available legal remedy is as complete, as practical and as efficient to the ends of justice as that afforded by equity") (internal quotations and citations omitted) (collecting cases). The standard applied under Massachusetts state law is essentially identical. *See McGrath v. C.T. Sherer Co.,* 291 Mass. 35, 41–42, 195 N.E. 913 (1935) ("[a]n adequate remedy at law which will deprive a court of equity of jurisdiction is a remedy as certain, complete, prompt and efficient to attain the ends of justice as the remedy in equity"). A legal remedy may be deemed inadequate if any of a number of factors is present, including "if plaintiff shows that a monetary award would be speculative because the amount of damage would be difficult or impossible to measure, or if plaintiff demonstrates that effective legal relief can be secured only by a multiplicity of actions, as, for example, when the injury is of a continuing nature, so that plaintiff would be required to pursue damages each time he was injured." 11A Charles Alan Wright et al.,

*Federal Practice and Procedure* § 2944 (2d ed.2011) (internal citations omitted).

**\*13** The Court's June 24, 2010 certification order found monetary damages inadequate in part because "[d]etermining the cost of the tests, particularly where potential class members are dispersed around Massachusetts and have access to different types of facilities, will be difficult." *Donovan II,* 268 F.R.D. at 26. Philip Morris argues that this contention has been disproved by an expert report, issued on March 2, 2011, by the plaintiffs' experts Arnold Epstein, M.D., M.A. and Gerry Oster, Ph.D., discussing the estimated cost of an LDCT lung cancer screening program for twenty-pack-year smokers of Marlboro cigarettes in Massachusetts, D. 313–2, and which, according to Philip Morris, opines that the remedy sought by the plaintiffs "can be monetized with pinpoint precision." Def. Memo, D. 313 at 14. The Court disagrees.

The purpose of the Epstein/Oster report was to estimate both the number of participants eligible for and the total cost of the LDCT screening program that the plaintiffs seek as relief in this action; the results of the study led to an estimate of a program that would run for 28 years, include 36,671 eligible participants and have a net present value total cost of $187,461,720 (including both central administration costs and marginal costs for each participant and each scan performed, but excluding the cost of recruiting eligible individuals into the program). D. 313–2 at 5, 31. This number is the basis of Philip Morris' claim regarding "pinpoint precision." But nothing in that report suggests that a cash award of $187,461,720 shared among the class members would provide relief that would be as certain or as complete as the LDCT program the plaintiffs actually seek. First, Philip Morris overestimates the importance of the fact that the Epstein/Oster report includes a specific dollar estimate for the total cost of the program and underestimates the importance of the fact that the specific dollar amount identified in the report is only an estimate. The report is candid about the fact that the estimated LDCT program cost is built on a long series of assumptions,[7] and to the extent that those assumptions deviate from the actual inputs into or results from injunctive relief ordered by the Court-if, for example, advances in oncology in the next few decades increase the percentage of individuals who survive cancer after being diagnosed via LDCT screening above the 80% estimated in the study, *id.* at 17, or if advances in health care coverage and technology reduce overall mortality rates and extend general lifespan in Massachusetts beyond the levels estimated in the study (which are drawn from nationwide statistics for the

year 2007), *id.* at 23, either of which would increase re-enrollment in the program over the levels estimated in the study and thus would drive up costs, *id.* at 27–30–the actual cost of the program will deviate from the estimated cost. At least some evidence recently submitted to the Court suggests that such deviation might not be unexpected. *See* Philipson Report (excerpts submitted by the plaintiffs), D. 316–23 (May 19, 2011 report of Philip Morris' expert Tomas Philipson, Ph.D, disputing assumptions underlying the Epstein/Oster report's estimated class size). Indeed, perhaps the clearest lesson to be taken from a full review of Dr. Epstein and Dr. Oster's comprehensive report (as well as the Philipson report) is that estimating the cost of the plaintiffs' proposed program is exceedingly difficult. Accordingly, the Epstein/Oster report reinforces, rather than undermines, the Court's earlier conclusion that "the LDCT screening program is ... difficult to monetize." *Donovan II,* 268 F.R.D. at 26.

 **\*14**  In certifying the plaintiffs' class, the Court accepted, at least conditionally, the plaintiffs' assertion that "class members would not be able to purchase LDCT tests if they were simply awarded damages," in part because "LDCT scans are not generally available throughout Massachusetts." *Donovan II,* 268 F.R.D. at 26. Philip Morris argues that post-certification discovery has disproved this assertion. Specifically, Philip Morris points to the June 9, 2011 deposition of the plaintiffs' expert Dr. Christine Oliver, in which she testified about, among other things, the possibility that LDCT scans may be currently available for purchase at four sites in the Boston area (at two hospitals in Boston, one in Newton, and at a medical center in the North Shore area), and the probability that LDCT scanning will become available in more hospitals. Oliver Deposition (excerpts provided by Philip Morris), D. 313–3 at 4–8. Philip Morris also points to the October 31, 2011 affidavit of Philip Morris' expert Dr. Robert M. Schick, in which he opined that "major hospitals, medical centers and imaging facilities have begun to offer LDCT lung cancer screening services in Massachusetts," specifically identifying three hospitals in Boston, one medical clinic with three campuses in the Boston area (in Somerville, Burlington and the North Shore) and one hospital in Plymouth that "are today offering LDCT scans for lung cancer screening for high risk individuals seeking those services." D. 313–4 at ¶¶ 8, 32.[8] They also note that in depositions taken after the Court's June 24, 2010 certification order, the named plaintiffs, Donovan and Cawley, each stated that with Dr. Oliver's assistance they had received an individual LDCT scan. Donovan Deposition (excerpts provided by Philip Morris), D. 313–5 at 6–7; Cawley Deposition (excerpts

provided by Philip Morris), D. 313–6 at 3–4. These newly-discovered facts, which are uncontested by the plaintiffs, do not undermine the Court's earlier conclusion that LDCT screening is not yet generally available in Massachusetts. That individuals in the greater Boston area, or those with the assistance of an expert like Dr. Oliver, are able to acquire individual LDCT scans establishes little about the ability of individuals without such assistance (precisely the type of expertise that the plaintiffs' proposed programmatic relief is designed to make available to the class) or those located elsewhere in Massachusetts, *see Donovan II,* 268 F.R.D. at 26 (noting that "potential class members are dispersed around Massachusetts"), to obtain such scans and have them interpreted effectively.[9]

In any event, for the purposes of an adequacy of remedy analysis, the narrow questions of whether the cost of the plaintiffs' proposed relief can be estimated with precision or whether LDCT tests are readily available for purchase are less important than the larger question of whether any amount of money damages could provide a remedy to the plaintiffs that is as complete, certain and efficient as the programmatic injunctive relief they seek. Put another way, even if it were possible both to anticipate accurately the precise cost of the plaintiffs' proposed programmatic remedy and for members of the class to divide up a damages award equal to that precise cost and use the proceeds to purchase individual LDCT tests, the plaintiffs' proposed remedy would not be precluded unless purchasing individual LDCT tests provided them relief that was as certain, complete and efficient as the proposed programmatic remedy.[10] The discovery materials provided to the Court by the parties make clear that, even under these hypothetical circumstances, damages would be inadequate compared to programmatic injunctive relief.

 **\*15**  For example, in her June 9, 2011 deposition, Dr. Oliver opined that merely having LDCT scans available for purchase (as is now the case at some Boston-area hospitals) is inferior to a fully developed LDCT screening program of the kind proposed by the plaintiffs, which according to Dr. Oliver would include not only individual scans but also infrastructure and dedicated staff for enrollment, smoking cessation efforts, coordination with primary care physicians, and tracking and follow-up procedures. Oliver Deposition (excerpts provided by the plaintiffs), D. 316–8 at 9–12. Similarly, in his June 8, 2011 deposition, the plaintiffs' expert Dr. Harvey Pass discussed the importance of aggressively following up with individuals depending on the results of their LDCT scans or their attendance at scheduled follow-up

Donovan v. Philip Morris USA, Inc., Not Reported in F.Supp.2d (2012)

Prod.Liab.Rep. (CCH) P 18,819

scans, which requires programmatic rather than one-off fee-for-service arrangements. Pass Deposition (excerpts provided by the plaintiffs), D. 316–9 at 3–9; *see also* Markowitz Deposition (excerpts provided by the plaintiffs), D. 316–15 at 3–4 (the plaintiff's expert Dr. Stephen Markowitz, deposed on June 7, 2011, discussing the importance of systematic patient tracking and follow-up after LDCT scans). Indeed, Philip Morris' expert, Dr. Schick, acknowledged in a January 28, 2011 deposition in a different tobacco medical monitoring case, *Xavier v. Philip Morris USA Inc.,* No. C. 10–02067–WHA (N.D.Cal.) (case filed May 14, 2010), that a screening program "absolutely" has advantages over individual LDCT screens, at least in terms of cost effectiveness and the efficient use of resources, and that a program might help develop practice and procedures regarding quality control in interpreting LDCT screens to the extent such controls are currently underdeveloped. Schick Deposition (excerpts provided by the plaintiffs), D. 316–14, at 14–15.

These factual developments are consistent with the substantial amount of pre-certification factual development suggesting that the plaintiffs' proposed programmatic injunctive relief would provide more complete and more efficient relief than could be provided by money damages allowing individual class members to purchase individual LDCT scans. Relevant pre-certification discovery included evidence documenting the importance of administrative oversight, not to make discretionary decisions about class membership or judicial relief as in *Jamie S.,* but to ensure initial outreach and continued participation and to organize communication between clinicians, radiologists and patients once class members receive LDCT scans, *see, e.g.,* Miller Report, D. 316–2 at ¶ 50 (November 13, 2007 report of the plaintiffs' expert Dr. Albert Miller); Miller Deposition (excerpts submitted by the plaintiffs), D. 316–6 at 5–14 (deposition taken November 30, 2006 in a different medical monitoring case, *Caronia v. Philip Morris USA Inc.,* No. 06–CV–0224 (E.D.N.Y.) (case filed January 19, 2006)); Markowitz Report, D. 316–3 at 4–5 (dated November 15, 2007); Markowitz Deposition (excerpts submitted by the plaintiffs), D. 316–5 at 3–14 (deposition taken December 15, 2006 in *Caronia* ); Oliver Report, D. 316–4 at 4–10 (dated November 28, 2007); McCunney Deposition (excerpts submitted by the plaintiffs) D. 316–12 at 4–9 (deposition of Dr. Robert McCunney, taken on June 12, 2008), to accelerate development and refinement of proper algorithms for distinguishing suspicious, indeterminate and non-suspicious scan results from one another, *see, e.g.,* Markowitz Report, D. 316–3 at 4–5 (dated November 15,

2007); Markowitz Deposition (excerpts submitted by the plaintiffs), D. 316–5 at 3–14 (deposition taken December 15, 2006 in *Caronia* ); Oliver Report, D. 316–4 at 8–9 (dated November 28, 2007); Oliver Deposition (excerpts provided by the plaintiffs), D. 316–10 at 2–7, 10–15 (deposition taken March 4, 2008); Miller Deposition (excerpts submitted by the plaintiffs), D. 316–6 at 5–14 (deposition taken November 30, 2006 in *Caronia* ); McCunney Deposition (excerpts submitted by the plaintiffs), D. 316–12 at 4–9 (deposition taken on June 12, 2008), and to ensure quality control. *See, e.g.,* Goodman Deposition (excerpts provided by the plaintiffs), D. 316–13 at 4 (deposition of Dr. Philip Goodman, taken on January 30, 2007 in *Caronia* ), Markowitz Report, D. 316–3 at 5 (dated November 15, 2007).

**\*16** Further, as the Court noted in its June 24, 2010 certification order, given the difficulty in precisely estimating the cost of relief to the plaintiffs, any money damages award would run the risk of overcompensating the plaintiffs, and the surest way for the Court to avoid any such inefficiency is to fashion relief through an injunction rather than a money damages award. *Donovan II,* 268 F.R.D. at 25 ("[l]egal damages, while intended to compensate the plaintiff for some harm, may be used for anything. Courts may not put restrictions on monetary awards once paid. Money damages are meant to stand in and compensate in whatever way the plaintiff chooses. Equity, on the other hand, is specific.... Medical monitoring here is specific. Funds not used for this purpose are returned to the defendant"); *id.* (" 'the lump sum usually awarded for future medical expenses, may, in cases such as this, be ordered paid into an appropriate account and drawn down as the expenses are actually incurred. *If they are not used, the award, or balance thereof, may be returned to the defendant who was obligated to make such payment.* A plaintiff's reasonable attorney's fees and costs may be paid out of such award' ") (quoting *Donovan I,* 455 Mass. at 226 n. 12, 914 N.E.2d 891) (emphasis added by *Donovan II* ).

By way of comparison, the parties have not alerted the Court to any facts or expert opinion, discovered either before or after the Court's June 24, 2010 certification order, that stand for the proposition that a simple money damages award could fashion relief that is as certain, complete and efficient as the injunctive programmatic remedy sought by the plaintiffs.

Accordingly, the recently discovered that Philip Morris relies upon regarding whether money damages would provide a sufficiently adequate alternative to the relief sought by

Prod.Liab.Rep. (CCH) P 18,819

the plaintiffs under Fed.R.Civ.P. 23(b)(2) does not justify decertifying the class in this case.

### 2. *Commonality, Group Injury and Remedy, and Predominance*

No class action, whether brought pursuant to Fed.R.Civ.P. 23(b)(2), (b)(3) or otherwise, may be certified unless "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Additionally, prior to certifying a class under Rule 23(b)(3), a court must "find[ ] that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). Although there is no similar predominance requirement in the text of Rule 23(b)(2), certification under that subsection does require that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief ... is appropriate respecting the class as a whole," Fed.R.Civ.P. 23(b)(2), or, put another way, requires an affirmative answer to the question, "was there group injury that may be proven on a class-wide basis?," *Donovan II,* 268 F.R.D. at 12, and requires further that "the remedy sought must be group." *Id.* at 27. Philip Morris argues that questions of medical necessity and causation that are central to this case can be proved only on an individual rather than common group basis, that the remedy sought in this case is individual rather than group, and that any common questions that do exist in this case do not predominate over these allegedly individual questions. Accordingly, Philip Morris contends that the plaintiffs' class should be decertified under both Rule 23(b)(2) and Rule 23(b)(3). *See, e.g.,* Def. Memo, D. 313 at 17–26; Def. Reply, D. 329 at 15–21; *see also* Def. Notice of Supplemental Authority, D. 344 at 1–5. Further, Philip Morris argues that to allow certification to stand under Rule 23(b)(2) or Rule 23(b)(3) is to deny Philip Morris due process by effectively lowering the plaintiffs' burden of proof, Def. Memo, D. 313 at 27, 29, and violating the Rules Enabling Act's prohibition against "employing Rule 23 in a way that would 'abridge, enlarge or modify any substantive right.' " Def. Memo, D. 313 at 27–29 (quoting Rules Enabling Act, 28 U.S.C. § 2072(b)).

### a. *Analysis in Donovan II*

**\*17** The original certification order in *Donovan II* addressed each of these issues. *Donovan II,* 268 F.R.D. at 10, 12–17, 28–29. The Court shall begin its analysis by examining each relevant section of *Donovan II* in turn.

#### i. *Rule 23(a)(2)—Commonality*

First, as to the commonality requirement set forth in Fed.R.Civ.P. 23(a)(2), the Court noted that "[c]ommonality is a 'low hurdle,' " *Donovan II,* 268 F.R.D. at 10 (quoting *S. States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.,* 241 F.R.D. 85, 87 (D.Mass.2007)), because "a single factual issue can suffice." *Id.* (citing *Payne v. Goodyear Tire & Rubber Co.,* 216 F.R.D. 21, 25 (D.Mass.2003)). Applying that standard, the Court identified both a common issue of fact in that the "case involves one manufacturer of one brand of cigarettes" and "[c]ommon questions of law includ[ing] proximate causation and breach of warranty deriving from that one brand," and concluded that the plaintiffs "have met the commonality requirement." *Id.*

#### ii. *Rule 23(b)(2)—Group Injury and Group Remedy*

Turning to the certification requirements set forth in Fed.R.Civ.P. 23(b)(2), the Court listed each of the seven elements of the medical monitoring cause of action as set out by the Supreme Judicial Court in *Donovan I*—that "(1) the defendant's negligence (2) caused (3) the plaintiff[s] to become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness, or injury (4) for which an effective medical test for reliable early detection exists, (5) and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and (6) such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care, and (7) the present value of the reasonable cost of such tests and care, as of the date of the filing of the complaint," *Donovan I,* 455 Mass. at 226–and determined that the presence or absence of these seven elements could be established on a class-wide basis, making the plaintiffs' class fit for certification under Rule 23(b)(2). *Donovan II,* 268 F.R.D. at 12–17. The Court also determined that the remedy sought by the plaintiffs was a group remedy rather than an individual remedy. *Id.* at 27. Because Philip Morris currently disputes *Donovan II's* conclusions with regard to the elements of causation and medical necessity and disputes the nature of the remedy, Def. Memo, D. 313 at 17–26, the Court will review in more detail *Donovan II's* analysis of those two elements and of the group basis for the plaintiffs' proposed remedy.

##### a) *Causation*

In *Donovan II,* the Court observed that the relevant question for this case is whether "the design defect [alleged by the plaintiffs]—Marlboro cigarettes' excessive carcinogenicity-caused their injury, meaning both proximate cause (legal cause) and the cause-in-fact (actual cause) of their subcellular harm." *Donovan II,* 268 F.R.D. at 14 (citing *Wasylow v. Glock, Inc.,* 975 F.Supp. 370, 377 (D.Mass.1996) and *Ulwick v. DeChristopher,* 411 Mass. 401, 408, 582 N.E.2d 954 (1991)). The Court noted that proximate cause "is an objective requirement," *id.* (quoting *United States v. Patriarca,* 912 F.Supp. 596, 608 (D.Mass.1995)) that "focuses on what the defendant knew at the time of the alleged wrongdoing," *id.* (citing *Patriarca,* 912 F.Supp. at 608) and "can therefore be proven on a class-wide basis and is not at issue here." *Id.* Actual causation, on the other hand, turns on a substantial factor test in cases that involve two or more causal events allegedly sufficient to bring about plaintiffs' harm, *id.* at 14 n. 8 (citing *Matsuyama v. Birnbaum,* 452 Mass. 1, 30–31 and 30 n. 47, 890 N.E.2d 819 (2008)),[11] and was vigorously disputed by Philip Morris in certification proceedings. The Court considered a series of arguments made by Philip Morris-first, that the plaintiffs must prove not only that Philip Morris could have designed an alternative, safer cigarette, but also "that the alternative design *would have* prevented their injury, which they cannot do," *id.* at 14, 890 N.E.2d 819 (emphasis in original); second, that "proof of alternative design requires proof that the plaintiffs *would have* smoked the less carcinogenic cigarettes, which necessarily involves individual inquiries," *id.* at 14, 890 N.E.2d 819 (emphasis in original); and third, that "excessive carcinogenicity [in Marlboro cigarettes] cannot be the 'but for' cause of [the] plaintiffs' injuries because their subcellular harm would have occurred even if they had smoked cigarettes that were less carcinogenic," *id.*—and rejected each one. *Id.* at 14–16, 890 N.E.2d 819.

**\*18**  First, as to Philip Morris' contention that an alternative design would have prevented the plaintiffs' injury, the Court stated that this position rests on a "mischaracteriz[ation of] the law." *Donovan II,* 268 F.R.D. at 14. The Court reviewed the relevant state law and concluded that "in fact, Massachusetts law only requires the plaintiff to show that 'an available design modification would ... *reduce* the risk.' " *Id.* (quoting *Colter v. Barber–Greene Co.,* 403 Mass. 50, 57, 525 N.E.2d 1305 (1988)) (emphasis added by *Donovan II* ); *see id.* (collecting cases). The Court thus held that in this case, "under Massachusetts law, [the] plaintiffs need only show that the less carcinogenic cigarette design would have *reduced* their risk of lung cancer, not that it would have prevented

it entirely," *id.* (emphasis in original), noting that "[t]o hold otherwise would contradict the SJC's holding in *Haglund v. Philip Morris,* 446 Mass. 741 [, 743] (2006), in which the SJC agreed that 'there is no such thing as a safe cigarette.' The best plaintiffs can ask for is a *safer* cigarette. To require Plaintiffs to prove that their proposed alternative design would completely prevent injury would preclude all liability in design defect cases for tobacco and, indeed, all other dangerous products—just what the SJC opinion in *Haglund* seeks to avoid.... Philip Morris' proposed requirement that an alternate cigarette design completely prevent injury is incompatible with both Massachusetts design defect case law and the SJC's holding in *Haglund.*" *Donovan II,* 268 F.R.D. at 14–15 (emphasis in original).[12]

Second, as to Philip Morris' argument "that cause-in-fact requires [the] plaintiffs to prove they would have smoked the less carcinogenic cigarettes," the Court held that "[a]gain, [D]efendant mischaracterizes Massachusetts law." *Donovan II,* 268 F.R.D. at 15. Read properly, "Massachusetts design defect law does not require proof that [a] plaintiff would have used the alternative design had it been available. Rather, the plaintiffs must prove only that Marlboro cigarettes' design enhanced their injury 'over and above that which would have been sustained' with a safer design." *Id.* (quoting *Lally v. Volkswagen Aktiengesellschaft,* 45 Mass.App.Ct. 317, 698 N.E.2d 28, 38 (Mass.App.Ct.1998)). That is, "[r]ather than proving that [a] plaintiff would have used the alternative design, '[a] plaintiff need only convince the jury that a safer alternative design was feasible, not that any manufacturer in the industry employed it or even contemplated it.' " *Id.* (quoting *Haglund,* 446 Mass. at 746, 847 N.E.2d 315). Thus, since a "plaintiff need not prove that a manufacturer even contemplated an alternative design, she obviously cannot be required to prove she would have used it." *Id.*

Finally, *Dononvan II* held that this conclusion "also disposes of Philip Morris' argument that whether the less carcinogenic cigarette would reduce a class member's risk of cancer will vary because individuals smoke cigarettes differently—for example, they take different sized puffs, take a different number of puffs per cigarette, etc."—or that "some smokers may compensate if they switch cigarette styles by smoking more cigarettes or holding smoke in their lungs longer," *Donovan II,* 268 F.R.D. at 15, because:

> **\*19**  whether an alternative design will decrease risk is a theoretical and probabilistic inquiry. Since plaintiffs did not use the alternative design (indeed the design need not

have ever been manufactured), it is impossible to know the exact effect on the particular smoker. If Philip Morris' argument were correct, no plaintiff could prove causation, as a defendant could always argue that the plaintiff would have used the alternative design in such a way as to reintroduce the risk.

*Id.* at 15 n. 9. The Court also examined the plaintiffs' allegation that, as a matter of fact, while the extent of "expos[ure] to subcellular harm and increased risk of cancer ... may vary among class members, ... twenty pack-years of smoking *necessarily causes* subcellular harm." *Id.* at 16 (emphasis in original). The Court noted that the "[p]laintiffs, of course, must prove this at trial" in order to ultimately prevail in this case, but found that "their expert affidavits and depositions" submitted prior to the certification proceedings were "sufficient on this point for class certification purposes." *Id.* (citations to the record omitted).

### b) *Medical Necessity*

After discussing causation at considerable length, the Court in *Donovan II* dealt more swiftly with the issue of medical necessity. The Court acknowledged the plaintiffs' expert Dr. Albert Miller's statement that "before prescribing a LDCT scan to a class member, he would also consider that person's other illnesses and overall state of health," *Donovan II,* 268 F.R.D. at 16 (citing Miller Deposition (unexcerpted), D. 114–8 at 75–76 (deposition taken January 12, 2010)), and conceded that this was "an individual inquiry," *id.,* but nonetheless held that "this threshold question need not foreclose class certification" because "[t]he remedy [the] plaintiffs seek is a program that invites medical personnel to manage it and its participants" and these personnel "would surely ask preliminary medical questions before performing the scan to ensure its safety for the patient" because here, "[a]s in any medical monitoring program, some variation among patients is built into the program." *Id.* at 16–17.

### c) *Group Injury and Remedy*

*Donovan II* considered but dismissed Philip Morris' argument that the relief sought by the plaintiffs was individual rather than "respecting the class as a whole." *Donovan II,* 268 F.R.D. at 27 (quoting Fed.R.Civ.P. 23(b)(2)). The Court found that "the medical monitoring remedy the plaintiffs seek here will be uniform for all members and does not require individual tailoring." *Id.* The Court conceded that "[c]ertainly, some minor variation among members is to be expected," but noted that "this is built into and part of the remedy" because "[t]he monitoring program would include

medical personnel to manage the participants ... [,] is a single consistent program and does not 'depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members.' " *Id.* (quoting *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, AFL–CIO,* 216 F.2d 577, 580 (7th Cir.2000)). The Court then found that as a general matter, " '[t]o administer medical monitoring piecemeal is unworkable,' " *id.* (quoting *Day v. NLO,* 851 F.Supp. 869, 886–87 (S.D.Ohio 1994)), since "[t]he groupwide provision of relief follows from the common nature of th[e] uncertain harm [inherent in medical monitoring claims]," *id.* (quoting Pankaj Venugopal, Note, *The Class Certification of Medical Monitoring Claims,* 102 Colum. L.Rev. 1659, 1684 (2002)), and found further that in this case the specific LDCT screening program proposed by the plaintffs "is by its nature group." *Id.*[13] Additionally, the Court noted that the plaintiffs' "proposed relief, the LDCT program, will be common to and uniform for all class members. If successful, [the] plaintiffs will receive from Philip Morris a medical monitoring fund which they may only use to implement their proposed program. Thus damages will not present individualized determinations since class members will not receive individual awards." *Id.* at 29. Accordingly, the Court found that the plaintiffs had met the Rule 23(b)(2) criteria and were eligible for certification under that rule. *Id.* at 28.

### iii. *Rule 23(b)(3)*

**\*20** In regard to Rule 23(b)(3)'s predominance requirement, the Court in *Donovan II* noted that, "[w]hile 'the predominance criterion is far more demanding' than the commonality requirement" in Rule 23(a)(2), *Donovan II,* 268 F.R.D. at 28 (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)), the predominance requirement nonetheless "presumes that individual issues will exist," *id.* (citing *Payne,* 216 F.R.D. at 26–27), and "the heart of the predominance inquiry is whether the 'uncommon issues' outweigh the commonalities." *Id.* (quoting *Amchem,* 521 U.S. at 624). *See also id.* ("Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class") (quoting *Smilow v. Sw. Bell Mobile Sys., Inc.,* 323 F.3d 32, 39 (1st Cir.2003)). The Court held that "[h]ere, [the] plaintiffs' common issues predominate." *Id.* Referring to *Donovan II's* earlier analysis in the Rule 23(b)(2) context of the seven elements of the medical monitoring cause of action set forth by the Supreme Judicial Court in *Donovan I,* the Court reiterated that "all seven elements ... may be proven on a class-wide basis," and

noted specifically that the "plaintiffs share common questions of (1) Philip Morris' alleged breach of warranty; (2) causation; (3) exposure, subcellular harm, and increased risk of cancer; (4) the efficacy of LDCT testing; (5) the standard of care; and (6) the cost of the proposed monitoring program" as well as "proposed relief [that] will be common to and uniform for all class members [and] .... will not present individualized determinations." *Id.* at 28–29. Accordingly, the Court found that "common issues predominate" sufficient to render the plaintiffs' class eligible for certification pursuant to Rule 23(b)(3). *Id.* at 29.

The Court's analysis of Philip Morris' motion for decertification with regard to commonality, group injury and remedy, and predominance will turn on the impact, if any, of post-certification discovery or changes in controlling law.

### b. *Change in Law: Dukes and PostDukes Caselaw*

Philip Morris argues, correctly, that *Dukes* "clarified" Rule 23(a)(2)'s commonality requirement. Def. Memo, D. 313 at 17. *Dukes* noted that Rule 23(a)(2)'s "language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.' ... What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.' " *Dukes,* 131 S.Ct. at 2551 (quoting Richard A. Nagareda, *Class Certification in an Age of Aggregate Proof,* 84 N.Y.U. L.Rev. 97, 131–32 (2009)). Applying this rule to the case brought by the plaintiffs in *Dukes,* who "wish[ed] to sue about literally millions of employment decisions at once," *id.* at 2552, in a legal context where "the crux of the inquiry is 'the reason for a particular employment decision,' " *id.* (quoting *Cooper v. Fed. Reserve Bank of Richmond,* 467 U.S. 867, 876, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984)), the Court concluded that "without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the critical question *why was I disfavored." Id.* at 2552 (emphasis in original).

 **\*21** *Dukes'* clarification of the commonality requirement set forth in Fed.R.Civ.P. 23(a)(2), however, does not undercut this Court's earlier finding that the action brought by the plaintiffs in this case present common issues sufficient to satisfy Rule 23(a)(2). Specifically, questions that go to the heart of the elements of the cause of action in this case—questions such as "Did Philip Morris design Marlboro cigarettes defectively and negligently?," "Does a 20–pack–year history of smoking

Marlboro cigarettes necessarily lead to subcellular change that increases the risk of lung cancer?," "Are LDCT scans an effective medical test for reliable early detection of lung cancer?," and "Does early detection of lung cancer, combined with prompt and effective treatment, significantly decrease the risk of death?," which track the first, third, fourth and fifth elements for a medical monitoring action set forth in *Donovan I,* 455 Mass. at 226, 914 N.E.2d 891—will each be answered either "yes" or "no" for the entire class; the answers will not vary by individual class member. Similarly, Philip Morris does not dispute that the question "How much will the plaintiffs' proposed LDCT screening program cost?," which tracks the seventh element set forth in *Donovan I, id.,* will have one answer that applies to the entire class.[14] As the Court held in its June 24, 2010 certification order, these common issues are more than enough to satisfy the commonality requirement set by Rule 23(a)(2). *Donovan II,* 268 F.R.D. at 10. *Dukes* does not change that analysis. *Dukes,* 131 S.Ct. at 2556 ("for purposes of Rule 23(a)(2), even a single common question will do") (internal citations and quotations omitted).

The various cases offered by Philip Morris involving courts that have relied on *Dukes'* discussion of Fed.R.Civ.P. 23(a)(2)'s commonality requirement, each of which lacks common issues of the sort abundantly present in this case, are not to the contrary. *See, e.g., In re Countrywide Financial Corp. Mortg. Mktg. and Sales Practices Litig.,* 277 F.R.D. 586, 2011 WL 4809846, at \*7–\*20 (S.D.Cal. October 11, 2011) (no commonality where each element of each claim required individual evidentiary inquiry above and beyond the body of evidence shared in common by the plaintiffs); *In re BisphenolA (BPA) Polycarbonate Plastics Prods. Liab. Litig.,* 276 F.R.D. 336, 340–46 (W.D.Mo.2011) (no commonality where multi-state nature of litigation precludes any accurate grouping of claims to establish common questions of law); *Haynes v. Planet Automall, Inc.,* 276 F.R.D. 65, 79–80 (E.D.N.Y.2011) (no commonality where plaintiff has not shown that "the only genuinely disputed questions of law or fact ... can be answered uniformly on a classwide basis"); *Groussman v. Motorola, Inc.,* 2011 WL 5554030, at \*3 (N.D.Ill. November 15, 2011) (no commonality where "[p]laintiffs have not shown that class members in the proposed class have suffered the same injury"); *Jamie S.,* 668 F.3d 481, 2012 WL 336170 at \*14 (no commonality where the class "lack[s] any common questions"). The only possible exception is *Corwin v. Lawyers Title Ins. Co.,* 276 F.R.D. 484 (E.D.Mich.2011), where a court opining in the wake of *Dukes* appeared to hold that the Rule 23(a)(2) commonality requirement could not be satisfied unless every (rather than

any) key legal question could be answered on the basis of common proof. *See Corwin,* 276 F.R.D. at 490 (concluding that "the plaintiff cannot satisfy the requirement of Rule 23(a)(2) because, although there are questions common to the absent class members and the plaintiff that must be decided before liability is established, the critical inquiry without which liability cannot attach requires individualized determination"). Even if this can be fairly construed as the holding of *Corwin,* such an out-of-circuit holding is not binding on this Court, *United States v. Lang,* 2012 WL 502698, at *6 n. 15, nor does it appear to be consistent with the persuasive manner in which courts in this district have interpreted Rule 23(a)(2) in the wake of *Dukes. See, e.g., Connor B.,* 278 F.R.D. 30, 2011 WL 5513233 at *4 (noting that commonality turns on whether "there is *no* common question that could generate a common answer to resolve an issue central to the litigation") (emphasis added).[15] In any event, because the Court's June 24, 2010 order did hold that each key legal question in this case is susceptible to common proof, and because (as discussed below) there is no reason to revisit that conclusion, Philip Morris' reliance on *Corwin* does not undermine this Court's earlier conclusion that the plaintiffs have satisfied Rule 23(a)(2)'s commonality requirement.

**\*22**  In its decertification motion, Philip Morris argues that the two of the elements of the plaintiffs' medical monitoring claim—causation (i.e., whether the plaintiffs would have avoided the need for medical monitoring by use of an alternatively designed cigarette, Def. Memo, D. 313 at 23–26) and medical necessity (i.e., whether each class member has twenty pack-years of smoking and whether each class member's age, smoking history, and health history permits them to benefit from LDCT scanning, Def. Memo, D. 313 at 20–23)—can be proved only on an individual basis, not a group-wide basis, and asserts that the plaintiffs are thus unable to satisfy either Rule 23(b)(2)'s requirement that the defendant has acted "on grounds that apply generally to the class" or Rule 23(b)(3)'s requirement that common issues "predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(2)-(3). As discussed above, the Court, in its June 24, 2010 certification order, already evaluated these arguments at length and rejected them, *Donovan II,* 268 F.R.D. at 14–17, 27–29, so whether decertification is warranted turns on any subsequent change in law or fact. Philip Morris has offered a handful of cases that it asserts establish a change in the law; the Court will address each case in turn.

First and foremost, *Dukes*—which involved allegations of employment discrimination rather than defective product design and claims of back pay rather than a medical monitoring claim—does not speak directly to issues of medical necessity or causation in either the general applicability context of Rule 23(b)(2) or the predominance context of Rule 23(b)(3), or, for that matter, the commonality context of Rule 23(a)(2). *See Dukes,* 131 S.Ct. at 2556–61. Accordingly, *Dukes* does not on its face compel the Court to change the analysis included in *Donovan II* regarding causation or medical necessity in the Rule 23(b) context. Philip Morris concedes as much, arguing not that *Dukes* establishes new controlling law with regard to Rule 23(b) but only that "[r]ecent decisions have ... recognized that the *Dukes* commonality holding has implications for the application of Rules 23(b)(2) and (b)(3)." Def. Memo, D. 313 at 18.

Philip Morris first reinvokes *Gates,* already discussed *supra* in the injunctive relief context, this time for the proposition that, "because [causation and medical necessity] are almost always individualized, medical monitoring cases generally 'founder' at class certification." Def. Memo, D. 313 at 19–20 (citing *Gates,* 655 F.3d at 264). *Cf. Gates,* 655 F.3d at 264 ("[b]ecause causation and medical necessity often require individual proof, medical monitoring classes may founder"). *Gates* is clearly distinguishable from the case at hand. In *Gates,* the proposed medical monitoring class would have included "[a]ll individuals who lived for one year or more in total" in a certain community "from January 1, 1968 to December 31, 2002," *id.* at 259, and liability turned in part on whether the plaintiffs had endured "exposure greater than normal background levels" to vinyl chloride, whether "as a proximate result of the exposure, [each] plaintiff has a significantly increased risk of contracting a serious latent disease" and whether "the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles," as interpreted under Pennsylvania law. *Id.* at 265.

**\*23**  As to causation, the *Gates* court noted that "Plaintiffs have failed to propose a method of proving the proper point where exposure to vinyl chloride presents a significant risk of developing a serious latent disease for each class member. [Instead,] Plaintiffs propose a single concentration without accounting for the age of the class member being exposed, the length of exposure, other individual factors such as medical history, or showing the exposure was so toxic that such individual factors are irrelevant" under Pennsylvania law. 655 F.3d at 268. Here, in contrast, the plaintiffs have proposed and the Court has already accepted for class certification

purposes that, "[w]hile the extent of the damage and risk may vary among class members, ... twenty pack-years of smoking *necessarily causes* subcellular harm" sufficient to establish harm under Massachusetts law. *Donovan II,* 268 F.R.D. at 16 (emphasis in original).

As to medical necessity, the *Gates* court first noted that as a general matter, the Third Circuit has "been skeptical that the necessity for individuals' medical monitoring regimes can be proven on a class basis" since long before *Dukes* was issued, *Gates,* 655 F.3d at 268 (citing *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 146 (3d Cir.1998)), and held that in light of the deeply divided expert testimony as to whether "the negative health effects of [plaintiffs' proposed] screening [regimen][16] may outweigh any potential benefits" and the "defense experts' detailed discussions of why the medical monitoring regime would present individual rather than common issues," the district court was entitled to deny certification. *Id.* at 269. Here, in contrast, the Court held the fact that "before prescribing a LDCT scan to a class member, [a doctor] would also consider that person's other illnesses and overall state of health" as part of an individual inquiry was merely a "preliminary medical question" that is "built into the program" of administering any medical monitoring program, and did not preclude a determination as to whether "LDCT screening is 'reasonably necessary' [under Massachusetts law] on a class basis." *Donovan II,* 268 F.R.D. at 16–17. There is far less factual dispute in this case than there was in *Gates* as to whether the monitoring regime proposed by the plaintiffs would pose medical risks that could outweigh the benefits of monitoring. While it may still be possible that, in light of the Third Circuit's skepticism about the nature of the medical necessity for medical monitoring and in light of any relevant differences between Massachusetts and Pennsylvania law regarding medical necessity, the *Gates* court would have refrained from certifying the class in this case, any difference between the *Gates* court and this Court would have existed at the time this Court issued its June 24, 2010 certification order. Gates in no way suggests that *Dukes* constitutes a change in controlling law that would merit revisiting this Court's earlier rejection of Philip Morris' arguments with regard to either medical necessity or causation.

**\*24** Philip Morris next points to *Witt v. Chesapeake Exploration, LLC,* 276 F.R.D. 458 (E.D.Tex.2011), which it asserts stands for the proposition that "[a]llowing [the] plaintiffs to prevail on their medical monitoring claims without proving medical necessity ... merely because that element of their claims cannot be determined on a classwide

basis" would impermissibly "alter the plaintiffs' burden of proof at trial in order to facilitate class certification." Def. Memo, D. 313 at 22. Before turning to *Witt* itself, the Court notes that Philip Morris' assertion misconstrues the Court's June 24, 2010 certification order with regard to medical necessity. Under Massachusetts state law, the key question is whether there has been "a physiological change resulting in a substantial increase in the risk of cancer, and ... that increase, under the standard of care, triggers *the need* for available diagnostic testing [via] an efficacious method of lung cancer screening or surveillance." *Donovan I,* 455 Mass. at 229, 914 N.E.2d 891 (emphasis added); *see also id.* at 226, 914 N.E.2d 891 (elements of medical monitoring claim include proof that "diagnostic medical examinations are reasonably (and periodically) *necessary,* conformably with the standard of care") (emphasis added). Philip Morris is correct to point out that certain individuals may be unfit to receive the LDCT scans sought by the plaintiffs, either because they are too obese to fit in the LDCT scanner or because they have co-morbidities that would preclude them from receiving the surgical care indicated by a positive LDCT scan, and the Court acknowledged as much. *Donovan II,* 268 F.R.D. at 16–17. But an individual plaintiff's medical inability to satisfy his or her *need* for diagnostic examination does not alter the fact that he or she has undergone physiological change that increases a risk of cancer and triggers the need for diagnostic surveillance in the first place. As the Court has already noted, the June 24, 2010 certification order made clear that the Court accepted for certification purposes the assertion that *"everyone* with a twenty pack-year smoking history has suffered subcellular harm, and subcellular changes necessarily mean increased risk of lung cancer," which is sufficient to trigger a *need* for monitoring that is common to the class, whether or not that need can actually be satisfied in any individual case. *Donovan II,* 268 F.R.D. at 16 (emphasis in original) (internal citations omitted).

*Witt* does not compel a different conclusion since it is clearly distinguishable. *Witt* involved a group of mineral lessors who sued an oil and gas company for alleged breach of over 500 oil and gas leases in Texas. 276 F.R.D. at 460. The *Witt* court held that whether any individual lease was breached turned on "the circumstances surrounding the negotiation, execution, and delivery of each individual lease as well as the reasons that payment [under the lease] was reduced, delayed or refused," and that the defendant had the right, under both the statutory law of Texas and that state's common law, to examine those circumstances, especially with regard to the issue of waiver. *Id.* at 469, 469 n. 51. *Witt* cited *Dukes* for the proposition

that " 'a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims.' " *Id.* at 469 (quoting *Dukes,* 131 S.Ct. at 2561). Here, however, Philip Morris is not invoking any statutory defense; it is contesting the fundamental issue of whether the class actually needs monitoring and it is fully entitled to litigate at trial its position on that question. Its right to do so is in no way abridged by this Court's earlier ruling that the question is susceptible to common rather than individual proof.

**\*25** Finally, Philip Morris points to recent decisions in two tobacco-related medical monitoring class action cases, *Caronia v. Philip Morris USA, Inc.,* 2011 WL 338425 (E.D.N.Y. January 13, 2011) and *Gargano v. Philip Morris USA, Inc.,* 2011 WL 2445869 (S.D.Fla. June 20, 2011), where district courts have dismissed medical monitoring claims very similar to the one brought by the plaintiffs in this case. Significantly, neither case was governed by the Supreme Judicial Court's opinions in *Donovan I, Haglund* and *Matsuyama,* as are the plaintiffs' claims here. *Caronia* and *Gargano* turned on the but-for causation tests applicable under New York law and Florida law, respectively, and both opinions explicitly rejected the less onerous substantial factor test urged by the plaintiffs in the respective cases. *Caronia,* 2011 WL 338425 at * 11–* 12; *Gargano,* 2011 WL 2445869 at *2. More specifically, in both *Caronia* and *Gargano,* the plaintiffs alleged that excessive carcinogens in Marlboro cigarettes increased their risk of cancer above and beyond the increased risk they would have suffered had Philip Morris developed a safer cigarette, and each court held that the relevant test was not whether a safer cigarette would have merely reduced the degree of the plaintiffs' increased cancer risk but rather whether it would have removed the increase entirely even in light of the plaintiffs' smoking history. *Caronia,* 2011 WL 338425 at * 11–* 12; *Gargano,* 2011 WL 2445869 at *2. Massachusetts law is notably different. Massachusetts law requires a plaintiff to show only that an available design modification would reduce risk compared to an allegedly negligent design rather than prevent the injury entirely. *Donovan II,* 268 F.R.D. at 14 (citing *Colter,* 403 Mass. at 57, 525 N.E.2d 1305). Additionally, as the Court has previously noted, *Donovan I* and *Haglund* taken together "sharply curtailed the applicability of the unreasonable use defense" under Massachusetts law and thus "limited the relevance of individual circumstances of use" in Massachusetts compared with the law in other states. *Donovan II,* 268 F.R.D. at 30. Neither *Caronia* nor *Gargano*

provides a reason for revisiting this Court's previous holdings with regard to Massachusetts law.

Accordingly, there has been no change in law—at least as to whether the plaintiffs' claims exhibit sufficient commonality, group-based injury, group-based remedy, and predominance of common issues—that would support decertifying the class here.

c. *Post–Certification Discovery: Limits on Who Receives LDCT Scans*

Philip Morris points briefly to three examples of post-certification deposition testimony in support of its assertion that "even for those individuals who have smoked the requisite number of cigarettes, determining medical necessity would involve other individualized inquiries regarding their age, smoking history, health history and ability to benefit from the scan." Def. Memo, D. 313 at 21 (citing Oliver Deposition (excerpts provided by Philip Morris), D. 313–3 at 3 ("if people have significant co-morbidities that would preclude their having surgeries ... those individuals perhaps should be advised not to participate unless their medical condition changed") (deposition taken June 9, 2011); Markowitz Deposition (excerpts provided by Philip Morris), D. 313–9 at 5 (individual class member should "participate in the decision making about [whether to receive a] CT scan" based on "individual risk factors for lung cancer, and the problems if they have a CT scan or not [and] what the limitations might be of having a CT [scan]") (deposition taken June 7, 2011); Pass Deposition (excerpts provided by Philip Morris), D. 313–10 at 4 (whether to perform a LDCT scan on an individual class member "depends upon the function of the patient, whether the patient is going to be able to tolerate treatment if treatment is going to be recommended, or biopsy, if a biopsy is going to be recommended ... there may be patients who are functionally not able to participate") (deposition taken June 8, 2011)). This evidence is wholly consistent with the Court's statement on June 24, 2010 that "[t]he remedy [the] plaintiffs seek is a program that invites medical personnel to manage it and .... [who] would surely ask preliminary medical questions before performing [an LDCT] scan to ensure its safety for the patient." *Donovan II,* 268 F.R.D. at 16. As the Court held on June 24, 2010, this fact is unremarkable in a medical monitoring class action and does not preclude the Court reaching a class-wide determination as to whether the plaintiffs have a need for available diagnostic testing, whether or not they are individually medically able to satisfy that need. *Id.*

Donovan v. Philip Morris USA, Inc., Not Reported in F.Supp.2d (2012)

Prod.Liab.Rep. (CCH) P 18,819

**\*26** Accordingly, the post-certification deposition testimony relied upon by Philip Morris does not justify decertifying the class as to the issue of whether the medical necessity element of the plaintiffs' claim can be addressed on a class-wide as opposed to individual basis.

### 3. *Ascertainability*

Although not explicitly mentioned in Rule 23,[17] an implicit prerequisite to class certification is that a "class" exists—that is, it must be "administratively feasible to determine whether a particular individual is a member." *Kent v. SunAmerica Life Ins. Co.,* 190 F.R.D. 271, 278 (D.Mass.2000) (citing 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1760 (2d ed.1972)). A class need only be determinable by "stable and objective factors" at the outset of a case, *id.;* not every class member must be identified, but the class must be sufficiently ascertainable to permit a court to "decide and declare who will receive notice, who will share in any recovery, and who will be bound by the judgment." *Id.* (citing *Crosby v. Soc. Sec. Admin. of the U.S.,* 796 F.2d 576, 580 (1st Cir.1986)). Philip Morris argues that the class here is unascertainable both in that "each purported class member's smoking history would not be verifiable by objective evidence because it would depend significantly on each individual's own promise that he or she meets the criteria" and in that "determining whether each individual was under medical investigation or a physician's care for lung cancer ... would entwine the Court in fact-intensive inquiries." Def. Memo, D. 313 at 27.

### a. *Analysis in Donovan II*

These contentions were raised during the certification proceedings and were explicitly rejected by the Court in *Donovan II.* First, the Court rejected as inapposite cases that "involve much more complex medical determinations than those at issue here," *Donovan II,* 268 F.R.D. at 9, noting that "there are only two factors to examine—smoking history and a diagnosis of lung cancer," both of which are clearly objective: "Either someone has smoked for at least twenty pack-years or he has not; either someone is under a physician's care for suspected cancer or he is not." *Id.* Indeed, the Court pointed out that "Philip Morris itself possesses an objective way to determine the smoking history of many purported class members, namely, its internal database of long-term customer information, the Marlboro Miles program, which contained about 25 million names as of 1999." *Id.* The Court thus held that Philip Morris' concern "is 'primarily one of manageability, and not ascertainability.' " *Id.* (quoting *In re*

*Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* 209 F.R.D. 323, 337 n. 20 (S.D.N.Y.2002)). The Court also noted both that "potential class members who are already suspected of having lung cancer would have little incentive to lie about their situation" since "medical monitoring would not benefit them," *id.* at 9, and that "[a]n illiquid remedy" such as the one sought here by the plaintiffs "reduces the incentives for plaintiffs to falsely claim relief not owed to them" because class members cannot "cash out their share of the medical monitoring relief." *Id.* at 10 (quoting Venugopal, *supra,* at 1693). In light of these findings, the Court found the class to be ascertainable. *Id.* at 10.

### b. *Change in Law: Xavier, Dukes and Jamie S.*

**\*27** Philip Morris concedes that the arguments it marshals in support of decertification as to ascertainability were explicitly rejected by the Court's June 24, 2010 order. Def. Memo, D. 313 at 27 (citing *Donovan II,* 268 F.R.D. at 9). It argues that three post-certification cases, *Xavier v. Philip Morris USA Inc.,* 787 F.Supp.2d 1075 (N.D.Cal.2011), *Dukes* and *Jamie S.,* have changed the legal landscape enough to justify decertification. The Court disagrees.

To be sure, *Xavier* is a case that flatly disagrees with the analysis in this Court's June 24, 2010 order. The plaintiffs in *Xavier,* like the plaintiffs here, sought to certify a class of individuals who had a twenty-pack year history of smoking Marlboro cigarettes and had not yet contracted lung cancer, *Xavier,* 787 F.Supp.2d at 1088, urged the court to look at the Marlboro Miles program as proof that ascertainability would not be problematic, *id.* at 1090, urged further that the court should allow plaintiffs to submit affidavits attesting to their smoking history and emphasized that there was little or no incentive for non-class-members to lie in order to obtain class relief, *id.,* and concluded that the real issue was not ascertainability but administration, which could be easily addressed by referring physicians as part of the relief sought by the plaintiffs. *Id.* The plaintiffs here raised each of those points and on each point the Court agreed; in *Xavier* the court rejected each point in turn, *id.* at 1088–91, and concluded that "individuals with a twenty-pack-year history as Marlboro smokers could not be identified through any reliable, manageable means" and that "[a]ccordingly, the proposed class lacks ascertainability." *Id.* at 1091. Of course, *Xavier* is not controlling on this Court. To the extent that *Xavier* rejects grounds adopted by this Court in *Donovan II,* the Court finds *Donovan II* more persuasive and *Xavier* insufficient to justify decertification here.

*Dukes,* on the other hand, does control this Court. *Dukes* was handed down by the Supreme Court two months after *Xavier* was decided, and Philip Morris argues that *Dukes* "confimed [the] underlying reasoning" of *Xavier.* Def. Memo, D. 313 at 28. Specifically, it points to *Dukes'* statement that "Wal–Mart is entitled to individualized determinations of each employee's eligibility for back pay," *Dukes,* 131 S.Ct. at 2560, and interprets the statement as an endorsement of *Xavier* 's position that there is no reliable way to determine an individual's smoking history without individual adversarial proceedings and as a rejection of this Court's contrary conclusion that smoking history can be administratively determined as part of the plaintiffs' proposed programmatic remedy. Def. Memo, D. 313 at 28–29. The Court cannot subscribe to this interpretation of *Dukes,* which rooted its holding regarding back pay in the specific statutory scheme at issue; the statement in *Dukes* so heavily relied on by Philip Morris is immediately followed by the following statement: "Title VII includes a detailed remedial scheme." *Dukes,* 131 S.Ct. at 2560. *Dukes* then traced both the authority of courts to fashion a remedy for Title VII violations and the defenses available to a Title VII defendant employer to the specific text of Title VII. *Id.* at 2560–61 (quoting at length from Title VII, 42 U.S.C. § 2000e–5(g)(1) and § 2000e–5(g)(2)(a)). The opinion proceeded to discuss the caselaw surrounding special individual proceedings available to defendants who face allegations of Title VII "pattern or practice" violations (as Wal–Mart did in *Dukes* ). *Id.* at 2561 (quoting at length from *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 361–62, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). *Dukes* concluded by citing the Rules Enabling Act, 28 U.S.C. § 2072(b), frequently invoked here by Philip Morris, for the principle that "a class cannot be certified on the premise that Wal–Mart will not be entitled to litigate its *statutory defenses* to individual claims." *Id.* (emphasis added).

 **\*28**  Of course, here (and in *Xavier* as well), the issue is a common law tort rather than a statutory violation, Philip Morris has no statutory defenses to invoke, and the issue of whether an individual purported class member does in fact belong to the discrete category of smokers with a twenty-packyear history of smoking Marlboro cigarettes is not a specific defense to be asserted by Philip Morris but instead either 1) a determination to be made after the merits questions of whether Philip Morris is liable to anyone so situated has been litigated, *Donovan II,* 268 F.R.D. at 9, or 2) an element of the plaintiffs' burden on the merits of liability. *Xavier,* 787 F.Supp.2d at 1089. *Dukes* is thus of little use in resolving any disparity between the analyses presented in this Court's

June 24, 2010 order and the analysis presented in *Xavier,* and therefore does not compel this Court to decertify the plaintiffs' class on the basis of ascertainability.

The final case offered by Philip Morris is *Jamie S.* In a notice filed with the Court after the January 27, 2012 decertification hearing, Philip Morris points out that *Jamie S.* stands for the proposition that a class is unascertainable where "the relevant criteria for class membership is unknown." Def. Notice of Supplemental Authority, D. 344 at 4 (quoting *Jamie S.,* 668 F.3d at 495). Indeed, *Jamie S.* went further, explicitly suggesting that where identifying whether an individual falls within the class definition "is a complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria," it may not be possible to ascertain a class. *Jamie S.,* 668 F.3d at 496. It is clear that the standard articulated in *Jamie S.* would not preclude class certification in this case. In *Jamie S.,* the mechanism by which class membership was to be determined was for a court sitting in 2012 "to decide whether there was reason to believe *in 2000–2005* that a presently unidentified child was *potentially eligible* for special-education services," *Jamie S., id.* at 495 (emphasis in original), a determination that even if done contemporaneously (rather than at a remove of seven to twelve years) would be "highly individualized because every child is unique." *Id.* at 485. Here, on the other hand, the Court has already ruled that an individual's smoking history is a known, simple, objective criterion, *Donovan II,* 268 F.R.D. at 9, which coupled with the other criteria for class membership does not approach the indeterminate criteria that the Seventh Circuit disapproved in *Jamie S.* Accordingly, none of the post-certification cases cited by Philip Morris for its argument regarding ascertainability warrants decertifying the class certified by this Court's June 24, 2010 and May 25, 2011 orders.

    c. *Post–Certification Discovery: Marlboro Miles Program*
Philip Morris has offered no recently discovered evidence in support of its arguments relating to ascertainability. The plaintiffs, however, point to one category of post-certification developments that reinforces the Court's conclusion that the class here is ascertainable: the production of Marlboro Miles program data by Philip Morris to the plaintiffs. Pls. Memo, D. 315 at 33–35. The plaintiffs argue that this program confirms that "Philip Morris maintains an extraordinarily robust up-to-the-moment customer database, tracking the names, ages, and various forms of contact information of Marlboro smokers," includes "[t]he names and contact information" of individuals "who apparently satisfy the class definition," and

is "sufficient to corroborate class membership." *Id.* Because the Court can (and has) rejected Philip Morris' arguments with regard to ascertainability without reliance upon the program, the Court need not address it in the context of Philip Morris's decertification motion.

#### 4. *Mass. Gen. L. ch. 93A*

**\*29** The plaintiffs assert that even if their class were to be decertified as to the medical monitoring claim defined in *Donovan I,* the class should survive with regard to the plaintiffs' claim under Mass. Gen. L. ch. 93A, because chapter 93A "provides a basis for class certification which is independent of, and far less demanding than, that contained in Fed.R.Civ.P. 23." Pls. Memo, D. 315 at 36. Philip Morris did not address decertification of the class with regard to the plaintiffs' chapter 93A claim in its principal motion papers, *see* Def. Memo, D. 313, but only in its reply to the plaintiffs' claim that the class should survive even if the medical monitoring class was decertified. Philip Morris disagrees with the plaintiffs' suggestion that a less rigorous standard exists for the certification of chapter 93A claims, and relies on *Shady Grove Orthopedic Assocs. P.A. v. Allstate Ins. Co.,* ——U.S. ——, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010), for the proposition that state laws of procedure regarding the certification of class actions "cannot apply in diversity suits" in federal court. Def. Reply, D. 329 at 25 (quoting *Shady Grove,* 130 S.Ct. at 1437). Similarly, the parties dispute

whether the presence of an adequate remedy at law precludes class action proceedings pursuant to chapter 93A. Pls. Memo, D. 315 at 37; Def. Reply, D. 329 at 25–26. In light of the Court's conclusion that the plaintiffs' class continues to merit certification under Fed.R.Civ.P. 23 and the Court's continued rejection of Philip Morris' argument that a remedy at law would be adequate in this case, the Court need not reach the parties' arguments regarding how to proceed under Mass. Gen. L. ch. 93A in the event that the plaintiffs' class is decertified with regard to the medical monitoring claim since the Court has declined to do the latter.

### IV. Conclusion

As discussed above, there is no change in law or relevant facts to warrant decertification of the class. Accordingly, the Court's prior certification decision, which was the result of a half-decade's worth of diligent advocacy by the parties and thorough review by the Court before the instant case was transferred to this session, will stand. Philip Morris' motion for decertification is DENIED.

**So ordered.**

### All Citations

Not Reported in F.Supp.2d, 2012 WL 957633, Prod.Liab.Rep. (CCH) P 18,819

#### Footnotes

1     As noted previously in this litigation, a "pack-year" is the average number of packs of cigarettes smoked per day multiplied by the number of years the person has smoked. One pack a day for twenty years, for example, equals twenty pack-years. *Donovan II,* 268 F.R.D. at 5 n. 1.

2     Given the voluminous filings in this case, when citing to specific pages of documents the Court will rely on the uniform Electronic Case Filing ("ECF") pagination inserted by the clerk's office and found at the top of each page of docketed material, rather than the parties' various forms of pagination found at the bottom of each page of briefing and at various locations in deposition transcripts and other discovery materials.

3     The plaintiffs' class certification motion was mentioned at this hearing, but was not the subject of formal argument. *See generally* Transcript of November 6, 2008 Hearing, D. 85. 3

4     *See, e.g.,* D. 222, 223, 224, 226, 227, 229, 230, 231, 232, 233, 234, 235, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 247, 248, 249, 250, 251, 252, 253, 254, 255, 256, 257, 258, 259, 260, 261, 263, 264, 265, 266, 267, 268, 270, 271, 272, 274, 275, 276, 277, 278, 279, 281, 282, 283, 286, 287, 288, 289, 290, 291, 292, 293, 294, 295, 296, 297, 298, 299, 300, filed between May 26, 2011 and July 12, 2011.

5     The Court notes that it has also reviewed the post-hearing filings submitted by the parties on February 14 and 21, 2012. Def. Notice of Supplemental Authorities, D. 344; Plaintiffs' Letter/Request, D. 345.

Prod.Liab.Rep. (CCH) P 18,819

6      The district court presiding over the *Ellis* case certified the proposed class under Rule 23(b)(2), in an order issued prior to *Dukes,* on the ground that the injunctive relief sought by the plaintiffs predominated over the other requested forms of relief. *Ellis,* 657 F.3d at 978. The Ninth Circuit, reviewing the case in the wake of *Dukes,* held that the plaintiffs' back pay claims were individual monetary claims that could be certified only under Rule 23(b)(3), not Rule 23(b)(2), and remanded to the district court to determine in the first instance whether the plaintiffs' non-individual monetary claim for punitive damages was susceptible to Rule 23(b)(2) certification in light of *Dukes. Ellis,* 657 F.3d at 987–88.

7      The estimates and assumptions underlying the Epstein/Oster report included but were not limited to assumptions about the size of the class; how long members would remain in the class; the likely results of LDCT scans for class members; mortality rates; the costs of a Court-ordered program compared with market rates and federal Medicare rates; and the overall costs of the program. Epstein/Oster Report, D. 313–2 at 7–29. Additionally, the report assumed that there would be one-time start-up costs relating to setting up the central administrative apparatus, negotiating with medical facilities and providers, developing standard protocols of care "and so forth," and the report "arbitrarily assumed that these costs would total $1 million." *Id.* at 26.

8      Dr. Schick's affidavit also states that "[i]t is common among even the smaller and more rural community hospitals to maintain 'clinical affiliation' with larger urban medical centers or medical schools.... Hence, imaging facilities and physicians in smaller, rural hospitals have access to the highest level of care through their affiliations with the major urban medical facilities in Massachusetts." D. 313–4 at ¶ 33. Dr. Schick also notes, as a theoretical matter, that "[t]he lung cancer screening requested by plaintiffs can be performed in the normal practice of radiology departments," *id.* at ¶¶ 12, but his affidavit does not suggest that a person who desires an LDCT scan could, at present, purchase and receive one at any facility in Massachusetts other than the five mentioned by name in the affidavit. *Id.* at ¶ 32.

9      Similarly, Philip Morris' reliance on Dr. Schick's statement, uncontested by the plaintiffs, that "today nearly all Massachusetts residents are insured" as "only 1.9% of Massachusetts residents remain uninsured as of summer of 2010," D. 313–4 at ¶ 34, does not undermine the Court's conclusion in its June 24, 2010 certification order that whether individuals have health insurance or not, "LDCT screening is not available through most health insurance programs," *Donovan II,* 268 F.R.D. at 26. *See* Oliver Report, D. 316–4, at 8 (noting that "[h]ealth insurance generally does not pay for screening LDCT") (report issued prior to certification). On the other hand, Philip Morris does correctly point out that one of the certification order's assertions, that "many class members may lack primary care physicians to prescribe LDCT screening," *Donovan II,* 268 F.R.D. at 26, may have been eroded by factual development. According to Dr. Schick's subsequent report, "92 percent of Massachusetts residents reported that they have a person they think of as their primary health provider." Schick Affidavit, D. 313–4 at ¶ 34. However, as the plaintiffs note, this figure may "include numerous individuals who consider their gynecologist, allergist, chiropractor, or psychologist as fulfilling that role, since that is the principal health care provider they see," Pls. Reply Regarding Motion to Strike Philip Morris' Thirty–Sixth Affirmative Defense (Existence of a Remedy at Law), D. 322 at 5. In any event, even read in the light most favorable to Philip Morris, Dr. Schick's figure suggests that at least 8% of Massachusetts residents would not know where to turn to receive a referral for LDCT testing.

10     Philip Morris' focus on facts showing that it may be possible under some circumstances for some individuals in Massachusetts to simply purchase LDCT scans without the assistance of a programmatic remedy, and its relative lack of emphasis on whether a damages remedy would provide relief as certain, complete and efficient as such a programmatic remedy, may stem from reliance on a phrase included in the Court's June 24, 2010 certification order taken out of its proper context. Philip Morris, at one point, cites to the Court's statement that "if a medical test is easily accessible and can be purchased, damages will suffice," Def. Memo Regarding Motion to Strike Philip Morris USA Inc.'s Thirty–Sixth Affirmative Defense (Existence of an Adequate Remedy at Law), D. 290 at 3 (quoting *Donovan II,* 268 F.R.D. at 25), but this statement was the Court summarizing the Supreme Judicial Court opinion, *Donovan I,* and not setting forth the standard for determining whether damages are an adequate remedy in the face of the plaintiffs' instant request for injunctive relief. Indeed, as a fuller reading of the June 24, 2010 order makes clear, the Court took pains to state that while an "accessible and purchasable" standard might be useful in an individual tort claim brought under the *Donovan I* standard, it is not appropriate to import that standard into class actions. *See Donovan II,* 268 F.R.D. at 25 ("The SJC opinion acknowledged that in some circumstances, legal damages will be perfectly appropriate, even preferable. For example, if a medical test is easily accessible and can be purchased, damages will suffice. This is most likely to be the case in an individual suit, which was precisely the way in which the SJC approached the certified questions. *See Donovan*

*[I],* [455 Mass. at 223 n. 10]. An elaborate medical monitoring program may not make sense if only a few individuals seek relief. But a class presents different issues"). Nothing in *Donovan II* should be read to suggest that the Court, in explaining the Supreme Judicial Court's approach to individual tort claims, set forth a novel standard for the adequacy of a remedy at law for class action purposes.

More precisely, the Court noted that "Massachusetts courts use a substantial factor test, instead of a but-for cause test, in cases in which there were two or more causal events sufficient to bring about the plaintiffs' harm. But in cases in which one defendant's conduct is alleged to have caused the harm, a but-for cause test is appropriate." *Donovan II,* 268 F.R.D. at 30 n. 8 (citing *Matsuyama,* 452 Mass. at 30–31 and 30 n. 47, 890 N.E.2d 819).

As the Court noted in *Donovan II, Haglund* "did leave open a small window" for an affirmative defense of unreasonable use if " 'an individual consumer's behavior [is] so overwhelmingly unreasonable in light of the consumer's knowledge about, for example, a specific medical condition from which [s]he suffers,' ... [and] 'the defendant [can] demonstrate that the plaintiff knew of her particular medical condition and the risks smoking posed to that specific condition at the time she began smoking.' " *Donovan II,* 268 F.R.D. at 20 (quoting *Haglund,* 446 Mass. at 743, 754, 847 N.E.2d 315). The only example of such a medical condition offered by the Supreme Judicial Court was emphysema. *Haglund,* 446 Mass. at 753, 847 N.E.2d 315. This Court noted that the unreasonable use exception set forth in *Haglund* "could not be narrower," and noted that in this case, "[t]he class member who would fit into this exception is rare, if she exists at all.... Such a narrow exception surely cannot stand in the way of class certification. The class can be certified so as to exclude those who had serious medical conditions such as emphysema when they began to smoke." *Donovan II,* 268 F.R.D. at 20. Philip Morris has not argued that decertification is justified on the basis of any forthcoming affirmative defense of unreasonable use. *See generally* Def. Memo, D. 313; Def. Reply, D. 329.

The Court also noted that "this case, like many class actions, would be of little value if brought individually." *Donovan II,* 268 F.R.D. at 27.

The Court in *Donovan II* also held, over Philip Morris' objection, that the second and sixth elements set forth in *Donovan I*—causation and reasonable medical necessity—are susceptible to common proof. *Donovan II,* 268 F.R.D. at 14–17. As discussed in more detail below, there has been no change in relevant law or fact sufficient to compel decertification on these issues.

Philip Morris also cites to *Corwin* in support of the proposition that " 'generalized or abstract commonality' [is] insufficient for certification of a(b)(2) class after *Dukes."* Def. Memo, D. 313 at 18 (quoting *Corwin,* 276 F.R.D. at 489). This appears to be a misreading of *Corwin,* which discussed commonality only in relation to Rules 23(a)(2) and (b)(3), *id.* at 489–90, and precluded Rule 23(b)(2) certification only on the ground the plaintiffs in *Corwin* sought individualized damages rather than purely declaratory or injunctive relief. *Id.* at 490 ("[e]ven if the class could be certified under Rule 23(b)(2) on the declaratory judgment count, before the main form of relief sought-damages-could be awarded, individualized decisions on liability would have to be made on the unjust enrichment count"). To the extent Philip Morris seeks to offer *Corwin* as relevant authority on Rule 23(b)(2), *Corwin* falls into the same category as *Huber* and Ellis, each of which is inapposite because, as discussed *supra,* the plaintiffs in those cases sought individual monetary damages as opposed to the wholly injunctive relief sought by the plaintiffs here.

The medical monitoring in *Gates* was for incipient brain cancer, and there was evidence in *Gates* that serial MRI scans sought by the plaintiffs in that case caused toxicological negative health effect not implicated by the LDCT scans recommended here. *Gates,* 655 F.3d at 269. Additionally, there was evidence in *Gates* that the contrast agent used for MRIs would have "pose[d] dangers to those with kidney diseases," *id.;* there is no analogous risk identified here.

As the Court has previously noted, "the four traditional 23(a) factors embrace [an] appraisal [of ascertainability,] and most courts do not independently address 'administrative feasibility' or 'ascertainability.' " *Donovan II,* 268 F.R.D. at 9 (collecting cases). The Court nonetheless addressed ascertainability "for the sake of thoroughness." *Id.*

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Cited in uploaded document as:
Friel v. Line 5, LLC, No. 3:24-cv-1866, 2025 U.S. Dist. LEXIS 162154 (M.D. Pa. Aug. 21, 2025)

2025 WL 2422617
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Joseph FRIEL, individually and on behalf of others similarly situated, Plaintiff

v.

LINE 5, LLC and Headstart Warranty Group, LLC, Defendants

No. 3:24cv1866
|
Signed August 21, 2025

**Attorneys and Law Firms**

Anthony I. Paronich, Pro Hac Vice, Paronich Law, P.C., Hingham, MA, Jeremy C. Jackson, Bower Law Associates, PLLC, State College, PA, Andrew Roman Perrong, Perrong Law LLC, Glenside, PA, for Plaintiff.

Brit J. Suttell, Barron & Newburger, P.C., Media, PA, for Defendant Line 5, LLC.

Andrew Michael Schwartz, Messer Strickler Burnette, Ltd., Downingtown, PA, Barry Guaglardi, Pro Hac Vice, Guaglardi & Meliti, LLP, Rochelle Park, NJ, for Defendant Headstart Warranty Group LLC.

## MEMORANDUM

JULIA K. MUNLEY, JUDGE

**\*1**  This putative class action case involves automated telephone calls allegedly sent by companies selling, guaranteeing, and/or financing vehicle service contracts, otherwise known as extended car warranties. After receiving numerous unsolicited extended-warranty calls over a two-month period, Plaintiff Joseph Friel filed this action pursuant to the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, ("TCPA"), seeking to represent a nationwide class of robocall recipients and a class of recipients on the National Do Not Call Registry ("DNCR"). Before the court is a motion to strike the class allegations from Friel's complaint prior to

discovery. Also pending is a motion to bifurcate discovery, which actually requests that discovery be conducted in three separate phases. Both motions are ripe for disposition.

## Background[1]

Friel's TCPA complaint alleges that former defendant JEA Management Services d/b/a Covered Auto ("JEA") sent prerecorded telemarketing calls on behalf of Defendants Headstart Warranty Group, LLC ("Headstart") and Line 5, LLC ("Line5"), including to recipients on the DNCR without the call recipient's express written consent. (Doc. 1, Compl. ¶ 5).

As for the extended car warranties involved in this TCPA litigation, Friel's complaint details a joint enterprise among the JEA, Headstart, and Line5 entities. Id. ¶ 17. As alleged, JEA and Headstart sell vehicle service contracts with JEA acting as a sales agent and Headstart acting as the guarantor of the contracts. id. ¶¶ 14–15. Line5 handles customer management, payment processing, and provides financing for the contracts sold by JEA and guaranteed by Headstart. Id. ¶ 16. To generate business, JEA places telemarketing calls, some of which are prerecorded, on behalf of Headstart and Line5. Id. ¶ 17.

Friel further alleges that he maintains a personal residential telephone number, which has been on the DNCR since 2011. Id. ¶¶ 18–20. According to the plaintiff, he has never been a customer of JEA, Headstart, or Line5 and never inquired into being a customer of these entities. Id. ¶ 21. Nevertheless, Friel received at least fourteen (14) telemarketing calls from JEA between August 8, 2024 and September 27, 2024. Id. ¶ 22. The caller IDs from these incoming calls reflected different phone numbers from area codes associated with the Philadelphia, Allentown-Bethlehem-Easton, and Scranton-Wilkes-Barre metropolitan areas. Id. ¶¶ 22, 27.

Friel answered the calls. They all began with a prerecorded voice message with fake typing and office background noise. Id. ¶¶ 23, 24. A robotic voice greeted Friel by name, identified that it was calling on behalf of the "vehicle service department," and asked how the plaintiff was doing. Id. ¶ 24. Friel hung up on most of the calls. Id. ¶ 26.

Friel answered one of the calls on September 27, 2024. Id. ¶ 27. Plaintiff heard the above prerecorded message, responded to questions posed by the artificial intelligence agent, and was then transferred to a human representative. Id. ¶¶ 23–

32. Next, Friel listened to that representative's sales speech about a vehicle service contract and the financing program offered by Defendant Line5. Id. ¶¶ 32–33. Subsequently, Friel received various emails and text messages from Line5 and a copy of a vehicle service contract for signature. Id. ¶ 36. From these communications, Friel discerned JEA, Headstart, and Line5's roles in the telephone calls. Id. ¶¶ 37–39.

**\*2** Approximately one month later, on October 29, 2024, Friel initiated this putative class action against JEA, Headstart, and Line5 under 47 U.S.C. § 227(b) and 47 U.S.C. § 227(c)(5) seeking to represent himself and other similarly situated individuals. (Doc. 1, Compl. ¶¶ 90–99). JEA responded by filing three motions: 1) a motion to strike class allegations, (Doc. 29); 2) a motion to dismiss for failure to state a claim, (Doc. 31), and 3) a motion to trifurcate discovery, (Doc. 33). JEA filed briefs in support of each motion. (Docs. 30, 32, 34). Defendant Line5 joined JEA's motion to strike and motion to trifurcate discovery. (Docs. 45–46).

On March 25, 2025, Friel filed a notice of voluntary dismissal regarding JEA. (Doc. 50). JEA's dismissal rendered the motion to dismiss moot. (Doc. 51). The court determined that Line5's joinder to the other motions required oppositional briefing. Id. Friel subsequently filed his briefs in opposition as ordered. (Docs. 52–53). Line5 then filed a reply brief regarding the motion to trifurcate discovery, (Doc. 54), but not the motion to strike. Based on the briefs of JEA and Friel, the motion to strike plaintiff's TCPA class allegations is ripe for disposition. Similarly, the motion seeking phased discovery is ready for a decision based upon the briefs of JEA, Friel, and Line5.

## Jurisdiction

Because Friel brings suit under a federal statute, the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. See Mims v. Arrow Fin. Servs., LLC, 565 U.S. 368, 387, 132 S.Ct. 740, 181 L.Ed.2d 881 (2012) (holding that nothing in the text, structure, or legislative history of the TCPA calls for displacement of federal question jurisdiction).

## Analysis

### 1. The TCPA and the Proposed Classes

This putative class action concerns alleged violations of the TCPA. "The TCPA protects businesses and consumers from intrusive telemarketing communications." McLaughlin

Chiropractic Assocs., Inc. v. McKesson Corp., 606 U.S. 146, 149, 145 S.Ct. 2006, —— L.Ed.2d —— (2025). The TCPA "makes it unlawful to use an automatic telephone dialing system or an artificial or prerecorded voice message, without the prior express consent of the called party, to call any... cellular telephone, or other service for which the receiver is charged for the call." Mims, 565 U.S. at 373, 132 S.Ct. 740 (citing 47 U.S.C. § 227(b)(1)(A)). The TCPA also "forbids using artificial or prerecorded voice messages to call residential telephone lines without prior express consent. Id. (citing 47 U.S.C. § 227(b)(1)(B)). "In plain English, the TCPA prohibited almost all robocalls to cell phones." Barr v. Am. Ass'n of Pol. Consultants, Inc., 591 U.S. 610, 615, 140 S.Ct. 2335, 207 L.Ed.2d 784 (2020) (footnote omitted).

Additionally, Section 227(b) contains a private right of action based on violations of that subsection or the regulations prescribed under that subsection. 47 U.S.C. § 227(b)(3). Under Section 227(b)(3), a person or entity may: 1) obtain injunctive relief; 2) recover actual monetary loss or receive $500 in damages, whichever is greater; or 3) both. See 47 U.S.C. § 227(b)(3)(A)–(C). "The TCPA imposes tough penalties for violating the robocall restriction," including trebling the above damages for willful or knowing violations, "which can add up quickly in a class action." Barr, 591 U.S. at 616, 140 S.Ct. 2335.

Section 227(c) concerns further protections of residential telephone subscribers' privacy rights and directs the Federal Communications Commission ("FCC") to prescribe regulations regarding do-not-call systems. See 47 U.S.C. § 227(c)(1)–(4). Section 227(c) "authorizes a private right of action for violation of the FCC's implementing regulations[ ]" related to do-not-call. See 47 U.S.C. § 227(c)(5); Mims, 565 U.S. at 375 & n.5, 132 S.Ct. 740. Section 227(c)(5) permits a civil action by "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations[.]" 47 U.S.C. § 227(c)(5).[2] Under Section 227(c)(5), a person or entity may: 1) obtain injunctive relief; 2) recover actual monetary loss or receive $500 in damages, whichever is greater; or 3) both. See 47 U.S.C. § 227(c)(5)(A)–(C). A plaintiff may also seek treble damages for willful or knowing violations of the do-not-call regulations. Id.

**\*3** These statutory provisions and attendant regulations form the basis of Friel's complaint against the defendants. They also form the basis of his two proposed classes. The proposed Robocall Class stems from the alleged Section 227(b) and

related regulatory violations, while the proposed National Do Not Call Registry Class ("DNCR Class") derives from the alleged Section 227(c) and related regulatory violations.

### 2. Motion to Strike Class Allegations

There are two motions presently pending before the court. First, as mentioned above, Line5 joined in JEA's motion to strike the class allegations from Friel's complaint. The motion to strike is partly premised upon Rule 12(f) of the Federal Rules of Civil Procedure. Rule 12(f) provides that the court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). Rule 12(f) motions are designed to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters. Goode v. LexisNexis Risk & Info. Analytics Grp., Inc., 284 F.R.D. 238, 243 (E. D. Pa. 2012) (citations omitted); see also Mclnerney v. Moyer Lumber and Hardware, Inc., 244 F.Supp.2d 393, 402 (E.D. Pa. 2002). Providing relief under Rule 12(f) is largely disfavored and such motions are typically denied "unless the material bears no possible relation to the matter at issue and may result in prejudice to the moving party." Miller v. Group Voyagers, Inc., 912 F.Supp. 164, 168 (E.D. Pa. 1996). In the class action context, however, it is unlikely that a defendant can show that a plaintiff's class allegations constitute matters usually contemplated by Rule 12(f). See In re Ry. Indus. Emp. No-Poach Antitrust Litig., 395 F. Supp. 3d 464, 496 (W.D. Pa. 2019) (citations omitted).

The motion to strike is also premised upon Federal Rule of Civil Procedure 23, which governs the administration of class actions in federal courts. See Perrigo Institutional Inv. Grp. v. Papa, No. 24-2861, 2025 WL 2315977, at *4 (3d Cir. Aug. 12, 2025). Although "an ingenious procedural innovationM" Eubank v. Pella Corp., 753 F.3d 718, 719 (7th Cir. 2014), "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' " Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) (quoting Califano v. Yamasaki, 442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). Thus, to ensure that named plaintiffs are appropriate representatives of the class whose claims they wish to litigate, Rule 23(a) contains four requirements: numerosity, commonality, typicality, and adequacy of representation. See id. at 348–49, 131 S.Ct. 2541. Additionally, for a class to be certified, the requirements of Rule 23(b)(1), (2), or (3) must also be met. Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 590 (3d Cir. 2012).

Friel brings this putative TCPA class action pursuant to Rule 23(b)(2) and/or Rule 23(b)(3). (Doc. 1, Compl. ¶ 73). Rule 23(b)(2) is used to pursue injunctions in class actions. See In re: Google Inc. Cookie Placement Consumer Priv. Litig., 934 F.3d 316, 323 (3d Cir. 2019). The complaint requests injunctive relief to prohibit defendants from using prerecorded voices in the future and from making telemarketing calls to telephone numbers on the DNCR. (Doc. 1, Compl. ¶¶ 94, 99). Friel, however, also seeks statutory damages on behalf of himself and the putative classes. Id. ¶¶ 92-93, 98. Rule 23(b)(2) certification is not authorized when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant, or when each class member would be entitled to individualized award of monetary damages. Wal-Mart Stores, Inc., 564 U.S. at 360, 131 S.Ct. 2541. Rather, "individualized monetary claims belong in Rule 23(b)(3)." Id. at 362, 131 S.Ct. 2541. Under Rule 23(b)(3), a class action may be maintained if the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a) are satisfied and "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[3] FED. R. CIV. P. 23(b)(3).

**\*4** Rule 23(c) further provides that "[a]t an early practicable time after a person sues... as a class representative, the court must determine by order whether to certify the action as a class action." FED. R. CIV. P. 23(c)(1)(A). Additionally, Rule 23(d) permits the court to issue orders that: 1) "determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument[,]" FED. R. CIV. P. 23(d)(1)(A), and/or 2) "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly[,]" FED. R. CIV. P. 23(d)(1)(D). Consequently, where the goal of the motion to strike is to eliminate class allegations prior to discovery, other district courts have concluded that such motions should be considered under the above provisions of Rule 23, not under Rule 12(f). See In re Ry. Indus. Emp. No-Poach Antitrust Litig., 395 F. Supp. 3d at 496; see also Johnson v. Ally Fin. Inc., No. 1:16-CV-1100, 2017 WL 3433689, at *2 (M.D. Pa. Aug. 10, 2017) (Conner, J.) (concluding that a motion to strike class allegations is not an improper procedural device).

To determine whether the requirements of Rule 23 have been satisfied, "a district court must conduct a 'rigorous

Friel v. Line 5, LLC, Slip Copy (2025)

analysis.' " Landsman & Funk PC v. Skinder-Strauss Assocs., 640 F.3d 72, 93 (3d Cir. 2011) (quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008)).[4] There are "rare few" instances in which "the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." Id. at 93, n.30. Thus, "delving into the propriety of class certification" can be "the wrong focus" at an early stage of a proceeding where there has been no motion for class certification and no discovery. Id. at 93–94. After all, "[a]n order striking class allegations is functionally equivalent to an order denying class certification[.]" Microsoft Corp. v. Baker, 582 U.S. 23, 34, n.7, 137 S.Ct. 1702, 198 L.Ed.2d 132 (2017).

One of the "rare few" instances where an early motion to strike class allegations may be granted is where the class definitions create impermissible fail-safe classes. See Zarichny v. Complete Payment Recovery Servs., Inc., 80 F. Supp. 3d 610, 624 (E.D. Pa. 2015). "A fail-safe class is 'one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim.' " Id. (quoting Messner v. Northshore University HealthSystem, 669 F.3d 802, 825 (7th Cir .2012)).

Friel's Robocall Class is defined as:

All persons in the United States who, (1) within four years prior to the commencement of this litigation until the class is certified (2) received one or more calls on their cellular telephone or any other protected telephone service (3) from or on behalf of JEA Management Services d/b/a Covered Auto, Headstart Warranty Group LLC, or Line 5, LLC, (4) sent using the same, or substantially similar, pre-recorded message used to contact the Plaintiff.

(Doc. 1, Compl. ¶ 74).

Friel's DNCR Class is defined as:

All persons within the United States: (1) whose residential telephone numbers were on the National Do Not Call Registry for at least 31 days; (2) but who received more than one telephone solicitation call from Defendants or a third party acting on Defendants' behalf; (3) within a 12-month period; (4) within the four years prior to the filing of the Complaint.

Id.

The motion to strike asserts that the proposed class definitions are facially uncertifiable. Line5 has adopted JEA's arguments that the proposed class definitions are overbroad, lack commonality, and are defined vaguely. There are no specific arguments that the proposed classes are fail-safe, yet this consideration hangs over the analysis.

### a. Overbreadth Arguments

**\*5** Defendant Line5 has joined in former defendant JEA's argument that both the proposed Robocall Class and the DNCR Class are overbroad. The Robocall Class definition is challenged as overbroad because it fails to exclude calls to individuals who consented to their receipt.[5] Similarly, the DNCR Class is challenged because this proposed class may include calls made to individuals with an established business relationship ("EBR") with the defendants and may include individuals who did not personally place their number on the DNCR.[6]

After careful consideration, however, Friel appears to be in a situation where he is forced to choose between two vulnerable alternatives in proposing class definitions at the outset of the litigation. On one hand, Friel must define his classes with reference to objective criteria. See Lewis v. Gov't Emps. Ins. Co., 98 F.4th 452, 462 (3d Cir. 2024) (citing Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015)). On the other hand, if Friel uses certain qualifiers, his proposed definitions could be deemed to advance improper fail-safe classes.[7]

As indicated above, "[a] fail-safe class bases its membership upon the validity of putative members' legal claims, meaning that 'a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment.' " Jackson, 2023 WL 2472606, at \*3 (quoting Messner, 669 F.3d at 825). More simply stated, fail-safe classes preclude membership in the class unless a putative member would prevail on the merits. See Orduno v. Pietrzak, 932 F.3d 710, 716 (8th Cir. 2019).

**\*6** Fail-safe classes cannot satisfy the ascertainability requirement of some class actions. See Zarichny, 80 F. Supp. 3d at 625 (citation omitted); see also Byrd, 784 F.3d at 163 & n.7 (explaining that a plaintiff seeking certification under Rule 23(b)(3) must prove by a preponderance that the class is ascertainable, but that ascertainability is not a requisite of a Rule 23(b)(2) class). The ascertainability standard requires a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition. Byrd, 784 F.3d at 163 (citations omitted).

In Zarichny, the Honorable Stewart R. Dalzell in the Eastern District of Pennsylvania determined that a putative TCPA class was defined in a fail-safe manner and granted a motion to strike. 80 F.Supp. 3d at 623-26. The proposed TCPA class was comprised of "those people 'who received one or more telephone calls from [d]efendants on the individual's cellular telephone that was initiated using an automatic telephone dialing system' without prior con[s]ent[.]" Id. at 623. Because the class was defined in a manner which only would include those who did not provide the defendant with prior consent, the court determined that "there is no way to provide notice to that putative class without the sort of extensive fact-finding that class actions should avoid," and "at the conclusion of the litigation, should [the defendant] prevail against [the plaintiff], any other putative class recipient would be free to litigate the same claim against [the defendant]." Id. at 625–26. In other words, the TCPA class could not be certified as defined in the initial pleading because the issue of consent was central to the merits of the underlying dispute.

Accordingly, many district courts within the Third Circuit have determined that TCPA class definitions avoid fail-safe concerns by omitting the issue of consent or other merits-based criteria. See Jackson v. Direct Bldg. Supplies LLC, No. 4:23-CV-01569, 2024 WL 184449, at *9 & n.101 (M.D. Pa. Jan. 17, 2024) (Brann, C.J.) (collecting cases); see also Abella v. Student Aid Ctr., Inc., No. CV 15-3067, 2015 WL 6599747, at *4 (E.D. Pa. Oct. 30, 2015) (noting the lack of reference to an automatic telephone dialing system in the proposed class definition since that is a required element of a Section 227(b)(1)(A) claim).[8] Consequently, to avoid fail-safe issues with his proposed Robocall Class in this case, Friel asserts that he intentionally did not include consent language in his class definition. (Doc. 53, Pl. Br. in Opp. at 13).

As indicated above, Line5 has adopted arguments challenging the proposed Robocall Class definition because it fails to exclude calls made with consent. In joining the motion to strike, Line5 also finds fault in the proposed DNCR Class definition because it fails to exclude calls to individuals with an EBR. Adding these qualifiers to the class definitions would incorporate more elements of liability into the definitions. That would then arguably require all putative class members to have winning TCPA claims before being included in the class. Although non-binding, the above cases discussing fail-safe classes would provide defendants with different arguments to strike the class allegations if Friel included reference to a lack of consent or an EBR in his proposed definitions. The court cannot fault Friel for choosing to define his classes around TCPA merits-based criteria.

**\*7** As for authority binding on this court, "in the specific context of claims filed under the TCPA statute, it is difficult to resolve without discovery whether there are factual issues regarding class members' business relationships with defendants or whether they consented to the receipt of [automated phone calls]." Landsman, 640 F.3d at 93–94. Friel's complaint alleges that the proposed classes are identifiable as presently defined through defendants' dialer records, other phone records, and phone number databases. (Doc. 1, Compl. ¶ 79). In the absence of discovery into these records, the court is unwilling to determine whether Friel's classes are defined too broadly or whether they fall short of ascertainability. Line5 thus has not demonstrated a valid reason to strike Friel's class allegations based on the potential breadth of the proposed classes.

### b. Commonality Arguments

Line5 has also adopted JEA's arguments that Friel's proposed classes lack commonality, that is, "the rule requiring a plaintiff to show that "there are questions of law or fact common to the class." Wal-Mart Stores, Inc., 564 U.S. at 349, 131 S.Ct. 2541 (citing FED. R. CIV. P. 23(a)). Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury, not merely that they have all suffered violation of the same provision of law. See id. (citations omitted). The claims "must depend upon a common contention[,]" which "must be of such a nature that is capable of classwide resolution[,]" meaning that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. As observed, "[t]he commonality requirement is not especially arduous." Johnson, 2017 WL 3433689, at *4.

For his part, Friel's complaint alleges that he received calls related to some extended-warranty sales effort using an artificial or prerecorded voice without his consent in violation of the TCPA. (Doc. 1, Compl. ¶¶ 18–31). Only discovery will reveal whether Friel's proposed classes sustained the same injuries from those sales efforts. Accordingly, the court also rejects arguments that the proposed classes are facially uncertifiable based on a lack of commonality.

### c. Vagueness Arguments

Lastly, Line5 has adopted JEA's arguments that the Robocall Class must be stricken for vagueness because that proposed

definition uses the phrase "same, or substantially similar" when describing the prerecorded messages allegedly sent by the defendants. In support, the motion to strike argues that, as presently defined, there would be no way for defendants to know which putative class members received the exact message that Friel received, and which putative class members received a "substantially similar" message. (Doc. 30, JEA Br. in Supp. at 20–21). Furthermore, per the arguments advanced in the motion to strike, the "substantially similar" definition uses improper subjective criteria and is improperly imprecise for a class action. Id.

Friel counters that such a definition is not vague under the circumstances because it essentially contemplates that defendants could have violated the TCPA as to other putative class members through the same sales efforts, but by using a different robotic voice, for example, or the same voice with a different script. (Doc. 53, Pl. Br. in Opp. at 21). Moreover, Friel explains that, even with this definition, his proposed Robocall Class is limited to calls that presumably had the same factual predicate for being sent, i.e., sales calls. Id. at 22.

Friel's argument signals that he is open to adding more qualifiers to his class definitions as this case moves forward. The court, however, will not strike the definitions or adjust any portion *sua sponte.* Discovery has not yet commenced and no motion to certify the class has been filed. To the extent that there are critical vagueness issues with Friel's proposed Robocall Class definition, those issues would be more easily understood following a period of discovery. Accordingly, the motion to strike Friel's class allegations will be denied.

### 3. Motion to Trifurcate Discovery

**\*8** On the issue of discovery, Defendant Line5 also joined in JEA's motion seeking to conduct discovery in three separate stages, that is, 1) discovery into Friel's individual claims;

2) discovery into the appropriateness of class certification if Friel's claims proceed; and 3) if any class is ultimately certified, merits discovery for the class or classes. (Doc. 34, JEA Br. in Supp.; Doc. 45, Line5 Joinder Notice). Friel opposes, arguing that, if this TCPA action has merit, a trifurcated course of discovery will lead to three rounds of written discovery, three rounds of depositions (with the same witnesses being deposed three times), three rounds of potential discovery disputes, and then three rounds of dispositive motions.[9] (Doc. 52, Pl. Br. in Opp. at 1-3).

Unlike JEA, which has been dismissed, Defendant Line5 filed an answer to Friel's complaint. (Doc. 20). Line5's answer does not raise any defenses unique to Friel's individual claims, only defenses common across the putative TCPA classes. (See Doc. 20, Affirmative and Other Defenses, ¶ 1 ("Line5 did not make or authorize any calls on its behalf."), ¶ 3 ("Upon information and belief, the alleged calls were not selling Line5's services, but rather the calls were made for the purpose of selling an extended car warranty provided by another of the defendants.")). Line5 has not otherwise demonstrated why Friel's specific TCPA claims would be any different from the claims of the putative class members. The court thus sees no reason to bifurcate, trifurcate, or otherwise order that discovery be conducted in phases at this time. Accordingly, the discovery motion will be denied, and this case will be scheduled for a case management conference.

### Conclusion

For the reasons set forth above, JEA's motion to strike class plaintiff's allegations and motion to trifurcate discovery will be denied. An appropriate order follows.

### All Citations

Slip Copy, 2025 WL 2422617

### Footnotes

1    This background section derives from the facts alleged in plaintiff's complaint. The court makes no determination as to the veracity of these allegations.

2    Pursuant to FCC regulations, "[n]o person or entity shall initiate any telephone solicitation to: ... A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2).

3    At this juncture, it is unknown how Friel will proceed if this matter reaches a motion for class certification. Given the availability of statutory damages of up to $1500 per class member under the TCPA, it may be later determined that this case is more driven by money damages than equitable relief, which would make certification under Rule 23(b)(2)

inappropriate. See e.g. Jackson v. Locust Med., LLC, No. 4:22-CV-00424, 2024 WL 2701695, at *5 (M.D. Pa. May 24, 2024) (Brann, C.J.) (denying a plaintiff's motion to certify a class under Rule 23(b)(2) where the complaint included a request for statutory damages under the TCPA).

4    Landsman is an opinion that has been reinstated in part, to the extent it is consistent with Mims. See No. 09-3105, 2012 WL 2052685 (3d Cir. Apr. 17, 2012).

5    To succeed with a cause of action under 47 U.S.C. § 227(b)(1) under the circumstances alleged in the complaint, Friel must show that defendants: 1) made "any call...using any automatic telephone dialing system or an artificial or prerecorded voice[;]" 2) to "any telephone number assigned to a...cellular telephone service[;] 3) without "the prior express consent of the called party[.]" 47 U.S.C. § 227(b)(1)(A)(iii).

6    There are certain regulatory defenses to TCPA actions premised upon 47 U.S.C § 227(c) and the do-not-call regulations. Pursuant to the regulations, a "telephone solicitation" does not include a call to any person with whom the caller has an EBR. 47 C.F.R. § 64.1200(f)(15)(ii). EBR is separately defined in 47 C.F.R. § 64.1200(f)(5). Furthermore, pursuant to the do-not-call regulations, "[n]o person or entity shall initiate any telephone solicitation to...[a] residential subscriber who has registered his or her telephone on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 C.F.R. § 64.1200(c)(2). Defendant Line5 adopts JEA's argument that this requires individuals to personally register their phones on the DNCR. Friel counters that personal registration is not required and would be impossible to prove in any case. (Doc. 53, Pl. Br. in Opp. at 15–17). The court need not reach this issue in disposing of the motion to strike.

7    "Although the United States Court of Appeals for the Third Circuit has not explicitly considered whether fail-safe classes are permissible, it has approvingly cited rulings by other circuits that categorically disallow fail-safe classes." Jackson v. Meadowbrook Fin. Mortg. Bankers Corp., No. 4:22-CV-01659, 2023 WL 2472606, at *3 (M.D. Pa. Mar. 10, 2023) (Brann, C.J.) (citing Byrd, 784 F.3d at 167; In re Nexium Antitrust Litig., 777 F.3d 9, 22 (1st Cir. 2015); Messner, 669 F.3d at 825).

8    On the other hand, the Honorable Christopher C. Conner reached a slightly different result when faced with this issue on a motion to strike in Johnson. 2017 WL 3433689 at *2–*3. Although the proposed TCPA class in Johnson included reference to consent, Judge Conner determined that it was not a facially uncertifiable fail-safe class because the proposed class definition contained reference to business records, which, with discovery, could reveal an ascertainable class. Id. at *1, *4.

9    Defendant Line5 indicates in its reply brief (filed after JEA's dismissal) that it only wishes to *bifurcate*, not *trifurcate* discovery. (Doc. 54). After review of Line5's reply brief, Line5 proposes a course of discovery that has no discernable distinction from the one proposed by JEA in the motion as initially filed.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

Heard v. Nationstar Mortgage LLC, Not Reported in Fed. Supp. (2018)

Case 1:26-cv-01529-JPW    Document 18-1    Filed 07/22/26    Page 36 of 64

⚑ KeyCite Yellow Flag

Called into Doubt by *Pascal v. Concentra, Inc.,* N.D.Cal., December 14, 2021

2018 WL 4028116
Only the Westlaw citation is currently available.
United States District Court, N.D.
Alabama, Southern Division.

Tommy & Katrina HEARD, Plaintiffs,

v.

NATIONSTAR MORTGAGE
LLC, Defendant.

Case No.: 2:16-cv-00694-MHH
|
Signed 08/23/2018

**Attorneys and Law Firms**

David Chami, Price Law Group APC, Scottsdale, AR, Joshua Chad Snable, Snable Law, LLC, Birmingham, AL, for Plaintiffs.

Gregory C. Cook, Balch & Bingham LLP, Birmingham, AL, Griffin L. Knight, John Wesley Naramore, Balch & Bingham LLP, Montgomery, AL, Henry Pietrkowski, Reed Smith LLP, Chicago, IL, Robert M. Luck, Reed Smith LLP, Richmond, VA, for Defendant.

## MEMORANDUM OPINION AND ORDER

MADELINE HUGHES HAIKALA, UNITED STATES DISTRICT JUDGE

**\*1** This case arises from defendant Nationstar Mortgage, LLC's efforts to collect purportedly overdue mortgage payments from plaintiffs Tommy and Katrina Heard and Nationstar's inaccurate reporting of the plaintiffs' payment delinquencies to credit bureaus. The Heards contend that Nationstar improperly billed them for force-placed property insurance which caused Nationstar to escrow their mortgage account. When the Heards made their mortgage payments without the added escrow charge, Nationstar began reporting the unpaid difference as delinquent. The Heards argue that by reporting unverified delinquencies, Nationstar violated their rights under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* Mr. Heard also contends that to collect the escrow charges Nationstar subjected him to repeated, autodialed

collection calls in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*

The Heards ask the Court to enter judgment in their favor on their FCRA and TCPA claims, leaving the issue of damages for trial. (Doc. 47, p. 6). Nationstar opposes the Heards' motion. (Doc. 51). For the reasons stated below, the Court grants the plaintiffs' motion and sets the issue of damages for trial.

## I. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). When considering the Heards' summary judgment motion, the Court must view the evidence in the record and draw reasonable inferences in the light most favorable to the non-moving party, Nationstar. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II. FACTS

The parties' dispute arises from a mortgage that the Heards obtained in 2001 for an investment property in Jacksonville, Alabama. (Doc. 48-2, p. 2). The Heards refinanced the mortgage in 2005 through GMAC Mortgage, LLC. (Doc. 52, p. 30). Mr. Heard provided his cell phone number to GMAC as part of his loan refinance application. (Doc. 48-1, pp. 35–36). GMAC transferred the mortgage to Ocwen Loan Servicing, LLC, and Ocwen transferred the mortgage to Nationstar in April 2015. (Doc. 48-2, p. 2; Doc. 48-15, p. 20). The facts surrounding Ocwen's servicing of the mortgage are somewhat murky, but it appears that just before transferring the mortgage, Ocwen provided insurance for the Heards' property (force-placed insurance) under the mistaken belief that the Heards had not insured their property. (Doc. 48-15, pp. 31, 172–73). Ocwen would have charged the Heards for the cost of this insurance, and as a result, the Heards' mortgage account had a negative escrow balance, which was reflected

in their account information when Ocwen transferred the mortgage to Nationstar. (Doc. 48-15, p. 12).

**\*2** Based on the loan information from Ocwen, Nationstar added charges to the Heards' monthly mortgage payments to account for the negative escrow balance. (Doc. 52, pp. 31–32). Mr. Heard was unaware of the escrow charges and set up monthly automatic payments in the amount he had historically paid on the loan. (Doc. 48-2, p. 3). Because this payment amount was less than the amount Nationstar billed to the Heards' account, Nationstar began to record the shortfall as late. (Doc. 48-7, pp. 13–14; Doc. 48-18, pp. 26–27).

Nationstar made a collection call to Mr. Heard's cellular phone on June 4, 2015. (Doc. 48-7, p. 3). During this call, Mr. Heard learned that his monthly payments had increased to reflect the addition of force-placed insurance which resulted in an escrow balance on the account. (Doc. 48-2, p. 3). Mr. Heard disputed the need for force-placed insurance and informed the representative that he had maintained insurance on the property for several years. (Doc. 48-2, p. 3). Mr. Heard had his insurer fax proof of his property insurance to Nationstar on June 5, 2015. (Doc. 48-7, pp. 4–5; Doc. 48-15, pp. 26–27).

Although Mr. Heard provided Nationstar with information indicating that the force-placed insurance was unnecessary, Nationstar continued to bill Mr. Heard for the escrow balance created by the force-placed insurance, and Nationstar's representatives continued to make collection calls to Mr. Heard's cell phone. (Doc. 48-7, pp. 13–14; Doc. 48-15, p. 14). During several of these calls, Mr. Heard contested the amount of his mortgage payment, and the Nationstar collections representative often would transfer his call to Nationstar's escrow department to correct the ongoing discrepancy. (Doc. 48-7, pp. 12–14). The record of a call on July 24, 2015 indicates that Nationstar removed the escrow from the Heards' account and planned to adjust the monthly payment to reflect the change. (Doc. 48-7, p. 9). Despite this, the Heards' monthly statements continued to reflect their mortgage payment plus an additional escrow charge.

The ongoing discrepancy between the Heards' monthly payments and their monthly statement caused a steady stream of collection calls to Mr. Heard's cell phone. (Doc. 48-7, pp. 15–34). Nationstar often would call Mr. Heard many times a day. (Doc. 48-7, pp. 21–22; Doc. 48-14, pp. 9–10). Mr. Heard states that on August 22, 2015, he told Nationstar to stop calling him on his cellular phone. (Doc. 48-2, p. 5).

Nationstar's call records indicate that on October 29, 2015, Mr. Heard first told Nationstar to stop calling him. (48-7, p. 19). Nationstar's call records also indicate that Mr. Heard told Nationstar collections representatives to stop calling him on ten subsequent occasions. (Doc. 48-7, pp. 20–23, 26–27, 29–30, 32).

Nationstar reported the Heards' mortgage account as thirty days delinquent for several months during 2015. (Doc. 48-18, pp. 27–28). In response to these negative entries, the Heards individually sent credit disputes to Transunion, Equifax, and Experian stating that the payment histories reported by Nationstar were inaccurate due to the incorrect forced placement of insurance on the property and the resulting escrow on the mortgage. (Doc. 48-23; Doc. 48-29). When Nationstar received notice of these disputes, Nationstar checked the information in the Heards' credit reports against Nationstar's records of the couple's payment history and reported that the Heards' account was delinquent. (Doc. 48-18, pp. 27–28; Doc. 48-19, pp. 32–33, 35; Doc. 48-20, p. 23). In fact, it was not. The Heards claim that in addition to the time and effort they spent attempting to correct the inaccuracies, Nationstar's incorrect reporting of their mortgage account caused them to be denied credit from their normal lenders and to pay higher rates with other institutions. (Doc. 47, p. 5). Nationstar has since revised its reporting of the mortgage loan and acknowledges that the account is current with no delinquencies. (Doc. 28-15, pp. 14, 15).

## III. DISCUSSION

### A. Mr. Heard's TCPA Claim

**\*3** "The TCPA was enacted to address certain invasive practices related to 'unrestricted telemarketing,' and is designed to protect consumers from receiving unwanted and intrusive telephone calls." *Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1276 (11th Cir. 2017) (citing *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) ). The TCPA makes it unlawful to use "any automatic telephone dialing system or an artificial or prerecorded voice" to call "any telephone number assigned to a ... cellular telephone service," without the express consent of the party being called. 47 U.S.C. § 227(b)(1). Congress provided a private right of action for those who receive calls made in violation of the TCPA's prohibitions. 47 U.S.C. § 227(b)(3).

"The TCPA is essentially a strict liability statute" that "does not require any intent for liability except when awarding treble damages." *Alea London Ltd. v. Am. Home Servs., Inc.*,

Case 1:26-cv-01529-JPW    Document 18-1    Filed 07/22/26    Page 38 of 64

Heard v. Nationstar Mortgage LLC, Not Reported in Fed. Supp. (2018)

638 F.3d 768, 776 (11th Cir. 2011). Because Nationstar called a number assigned to a cellular phone service, (Doc. 48-1, pp. 47–48), the question is whether Nationstar called Mr. Heard with his consent and whether Nationstar called him using an automatic dialer.

### 1. Mr. Heard's Consent to Receive Calls

"[A]utodialed ... calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the 'prior express consent' of the called party." *In re Rules & Reg. Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 559 (2008). Mr. Heard provided his cell phone number to GMAC in connection with his initial application to refinance his mortgage. (Doc. 48-1, p. 34–35). The transfer of the mortgage to Nationstar effectively gave Nationstar permission to contact Mr. Heard in connection with his existing mortgage debt at the number he provided to GMAC. Additionally, during several early calls from Nationstar, Mr. Heard expressly authorized Nationstar to call his cell phone. (*See, e.g.*, Doc. 48-7, pp. 4, 7, 11).

As the collection calls continued, Mr. Heard withdrew his consent and repeatedly told Nationstar collections representatives that he wanted them to stop calling his cell phone. (*See, e.g.*, Doc. 48-7, pp. 19–22, 24, 26–27, 29–30, 32). Nationstar argues that Mr. Heard could not unilaterally revoke his prior consent and that his oral revocations were ineffective. (Doc. 51, p. 18). The Court does not agree.

In *Osorio v. State Farm Bank*, the Eleventh Circuit held that where the creditor initially had obtained the debtor's phone number, the debtor could orally revoke his prior consent to receive calls at that number. 746 F.3d 1242 (11th Cir. 2014). The *Osorio* court reasoned that, absent statutory language to the contrary, courts presume that Congress intended the common law meaning of a long-used term like "consent," *id.* at 1252–53, and "[c]ommon-law notions of consent generally allow oral revocation." *Id.* at 1255. The Eleventh Circuit has since affirmed the proposition that oral revocation of consent is effective for purposes of the TCPA. *See Schweitzer*, 866 F.3d at 1274. In addition, the D.C. Circuit, in a recent opinion addressing a 2015 FCC ruling, affirmed the validity of the Commission's similar approach to consent. *ACA Int'l v. FCC*, 885 F.3d 687, 709–10 (D.C. Cir. 2018). While parties may contract to limit the means of revoking consent, Nationstar has not cited a contractual provision limiting Mr. Heard's

common law right to orally revoke his consent to be called, so nothing prohibited Mr. Heard's unilateral revocation of consent.

**\*4** Mr. Heard states that he first revoked consent on August 22, 2015. (Doc. 48-2, p. 5). Nationstar does not identify a particular date, but it does note that a collections representative did not actually speak with Mr. Heard on August 22, 2015. (Doc. 52, p. 11). The first call entry in which a Nationstar representative noted that Mr. Heard asked not to be called appears on October 29, 2015. (Doc. 48-7, p. 19). Before then, another representative noted that Mr. Heard said that he had retained legal counsel. (Doc. 48-7, p. 18). The parties dispute whether this was the point at which Nationstar should have stopped calling Mr. Heard, but resolution of this factual question affects only the amount of damages that Mr. Heard may recover if Nationstar made the calls using an automatic dialer. Therefore, it is a question appropriate for trial.

### 2. Whether Nationstar Used an Automatic Dialer

The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity **(A)** to store or produce telephone numbers to be called, using a random or sequential number generator; and **(B)** to dial such numbers." 42 U.S.C. § 227(a). The Heards emphasize the fact that Nationstar's system dials collection calls without the direct involvement of a collections representative. (Doc. 47, p. 15). Nationstar contends that the Heards have not provided evidence showing that Nationstar's system has "the capacity to store or produce telephone numbers to be called, using a random or sequential number generator." (Doc. 51, pp. 3–4).

The evidence concerning the features of Nationstar's calling system is largely undisputed.[1] But the parties dispute whether those features fall within the TCPA's definition of an automatic dialer. Because the parties are largely in agreement on the relevant facts, the TCPA's application to those facts is a legal question for the Court to resolve.

To contact borrowers, Nationstar uses the Avaya Proactive Contact system in conjunction with software known as iAssist. (Doc. 48-15, pp. 109–10; Doc. 52-4, p. 2). The Heards contend that Nationstar used this system to make two types of calls falling within the TCPA's prohibition: "blast" calls and predictive calls. (Doc. 48, p. 5). Regarding the first category, a representative for Nationstar testified that these blasts are

Case 1:26-cv-01529-JPW    Document 18-1    Filed 07/22/26    Page 39 of 64

Heard v. Nationstar Mortgage LLC, Not Reported in Fed. Supp. (2018)

calls "made by the system" in which Nationstar sends the customer "prerecorded messages." (Doc. 48-16, pp. 35–37). As the Heards note, these calls are prohibited by the TCPA's plain language. *See* 47 U.S.C. § 227(b)(1)(B). The record indicates that Nationstar placed eleven prerecorded blast calls to Mr. Heard's cell phone. (Doc. 48-14, pp. 3–5, 7, 9, 11, 18). Although the disputed factual issue of when Mr. Heard withdrew consent precludes the Court from tallying in this opinion the number of calls for which Nationstar is liable, there is no genuine dispute that once Mr. Heard withdrew his consent, Nationstar's blast calls violated the TCPA.

The analysis of predictive calls is more complex. Nationstar's iAssist program applies algorithms to customer information to predict when a customer is most likely to answer the phone. (Doc. 48-16, pp. 31–32). iAssist then dials numbers for collections representatives based on these predictions. (Doc. 48-17, pp. 18–19, 21). If iAssist detects a voice response, then the system connects the call to a representative. (Doc. 48-16, p. 54). Each day, Nationstar employees input the necessary call data from the company's loan files into iAssist. (Doc. 48-16, pp. 37–38). A collections representative must log into iAssist by entering his or her personal extension before the software can begin forwarding calls to the representative. (Doc. 48-15, p. 118; Doc. 48-17, p. 21).

**\*5** Since 2003, the FCC has regarded predictive dialers like the one used by Nationstar as automatic dialers within the meaning of the TCPA. *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14091–93 (July 3, 2003). In 2015, the FCC reaffirmed its position in its most recent ruling on the definition of autodialers. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7991–93 (2015). Recently, the Court of Appeals for the District of Columbia Circuit determined that "the Commission's ruling, in describing the functions a device must perform to qualify as an autodialer, fail[ed] to satisfy the requirement of reasoned decisionmaking." *ACA Int'l*, 885 F.3d at 703. Accordingly, the D.C. Circuit set aside that portion of the FCC's 2015 rule. *Id.*[2]

In the absence of agency guidance, courts must interpret and apply statutory provisions in accordance with the definitions Congress has given to statutory terms contained therein. *See* *Stansell v. Revolutionary Armed Forces of Colombia*, 704 F.3d 910, 915 (11th Cir. 2013). Nationstar argues that its system is not an automatic dialer because it does not "store" caller information. That information, Nationstar argues, is

located on a separate "host system." (Doc. 51, p. 6). But Nationstar's own representatives indicate that the information necessary for predictive calling is uploaded onto the Avaya/iAssist system daily. (Doc. 48-16, p. 38). The uploaded information is stored on Nationstar's dialing system until it is removed. This conclusion is supported by the fact that Mr. Heard received several calls in the course of one day. Thus, his caller information was stored in Nationstar's dialer throughout that day. (*See, e.g.*, Doc. 48-7, pp. 21–23).

Nationstar does not explain why the period in which the information is kept on its dialing system is too short to qualify under the TCPA as "store[d] [ ] telephone numbers to be called." 42 U.S.C. § 227(a). Nationstar has not pointed to evidence contradicting the Heards' showing that caller information remains in the dialing system for some period of time. The TCPA does not require that the automatic dialer be the primary or permanent storage location for caller information. *See* *Lardner v. Diversified Consultants, Inc.*, 17 F. Supp. 3d 1215, 1221 (S.D. Fla. 2014) ("The statute has no requirement on how long a telephone number is stored. If the equipment "has the capacity to store or produce telephone numbers," then it meets the statutory definition of an ATDS."). The fact that Nationstar stores the data elsewhere for longer periods of time is irrelevant.

The evidence shows that Nationstar's dialer system could and did store customer information for at least 24 hours. Nothing in the TCPA indicates that Congress intended a narrow definition of the storage concept that would limit the statute's application to technology that stores telephone numbers for an extended period of time. Rather, because the TCPA is "a consumer protection statute which is remedial in nature," this Court must interpret the statute broadly. *Carmichael v. Nissan Motor Acceptance Corp.*, 291 F.3d 1278, 1280 (11th Cir. 2002) (Noting that remedial statutes "must be construed liberally in order to best serve Congress' intent.") (internal quotation marks omitted). Therefore, Nationstar's system had the capacity to "store" caller information within the meaning of the TCPA.

**\*6** Next, to avoid Mr. Heard's TCPA claim, Nationstar seizes on the statutory requirement that an automatic dialer have "the capacity to store or produce telephone numbers to be called, **using a random or sequential number generator**." (Doc 51, p. 9) (emphasis in Nationstar's brief). As the D.C. Circuit noted in *ACA International*, this phrase "has generated substantial questions over the years." 885 F.3d at 701.[3] The phrase bolded above applies neatly in the context of

Case 1:26-cv-01529-JPW    Document 18-1    Filed 07/22/26    Page 40 of 64

Heard v. Nationstar Mortgage LLC, Not Reported in Fed. Supp. (2018)

telemarketing where the targets of automated calls are groups of individuals rather than specifically identified individuals. The application may be less clear in the collections context. An entity attempting to collect a debt will not generate phone numbers randomly or sequentially without regard to whether the person being called owes the company money. In that regard, an entity like Nationstar will always make its collection calls with reference to a relatively narrow, predetermined list of telephone numbers. But this fact does not prevent the TCPA from applying to Nationstar's predictive collection calls.[4] Again, Nationstar's proposed interpretation of the TCPA is too restrictive.

As discussed, Nationstar's system produces from the inputted call data a list of numbers that the iAssist software sequences according to a borrower's predicted availability to receive calls. iAssist then dials the numbers as sequenced and connects the call to a Nationstar representative only if someone answers the call that iAssist initiated. Yes, Nationstar's system is limited by the daily informational inputs of Nationstar employees, but the system orders sequentially the many numbers to call by analyzing customer information and assigning times for Nationstar to contact particular numbers. (Doc. 48-16, pp. 31–32, 38; Doc. 48-17, p. 18); 42 U.S.C. § 227(a)(1)(B).

Although a collections representative must log in before the system begins dialing, that does not detract from the fact that the representative does not choose whom to call or dial the outgoing calls. Cf. *Strauss v. CBE Grp., Inc.*, 173 F. Supp. 3d 1302, 1310–11 (S.D. Fla. 2016) (holding that a system in which a representative used a manual clicker to initiate each call was not an automatic dialer because "human intervention [was] essential at the point and time that the number is dialed"). Additionally, the fact that Nationstar employees "scrub" and input loan data for the system's use does not obviate the role that Nationstar's iAssist software plays in selecting the numbers to call and initiating each call. (Doc. 48-16, p. 38). To hold that a system is not an automatic dialer whenever an employee examines and transfers information from an external database onto the dialing system would unnecessarily limit the TCPA's application. Although the language Congress enacted in the TCPA may not anticipate and expressly address each new innovation in the telecommunications field, defendants should not be able to circumvent the TCPA's prohibitions simply by disaggregating the functions of an automatic dialer into nominally separate, but functionally complimentary systems. Again, the TCPA is a remedial statute, and the Court

may not harness its remedial power by applying the statute narrowly.

**\*7** Based on the facts in the record, the Court concludes that Nationstar's system satisfies the TCPA's definition of an automatic dialer. Therefore, when Mr. Heard withdrew his consent to be contacted on his cell phone, Nationstar's predictive calls violated the TCPA. Mr. Heard is entitled to summary judgment on his TCPA claims for Nationstar's blast and predictive calls following the date on which Mr. Heard withdrew his consent.

### B. **THE HEARDS' FCRA CLAIM**

Both Mr. and Ms. Heard assert claims against Nationstar under FCRA because Nationstar continued to report the couple as delinquent in their mortgage payments after the couple sent letters disputing their credit reports, and the credit reporting agencies provided Nationstar with notice of these disputes.

When a consumer gives notice to a credit reporting agency of a disputed credit report entry, the agency must conduct a reasonable investigation into the consumer's dispute. 15 U.S.C. § 1681i(a)(1). As part of this investigation, the agency must reach out to the person or entity that furnished the disputed information and provide the furnisher with "all relevant information regarding the dispute that is received by the agency from the consumer." 15 U.S.C. § 1681i(a)(2). The furnisher must review the information provided by the consumer and "conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s–2(b)(1)(A) & (B). The furnisher then must report the outcome of its investigation to the enquiring credit agency. 15 U.S.C. § 1681s–2(b)(1)(C). Failure to fulfill these obligations can render a furnisher, such as Nationstar, civilly liable to the affected consumer. 15 U.S.C. § 1681*o*.

"Reasonableness" is the touchstone for assessing the adequacy of a furnisher's investigation upon receiving notice of a dispute from a credit reporting agency. *Hinkle v. Midland Credit Mgmt.*, 827 F.3d 1295, 1302 (11th Cir. 2016). Whether a furnisher's investigation was reasonable is determined by reference to the circumstances of the case, including whether the furnisher is an original creditor, a collection agency, or a down-the-line debt buyer. *Hinkle*, 827 F.3d at 1303. When the furnisher possesses account level documentation, "such as applications, agreements, billing statements, promissory notes, notices, correspondence, payment checks, payment histories, or other evidence of indebtedness," the furnisher

can more accurately assess a credit dispute with greater ease than could a furnisher with little account-specific documentation. *Hinkle,* 827 F.3d at 1298, 1303. Section 1681s–2(b) requires all furnishers to conduct a careful inquiry into disputed credit information which requires the furnisher either to rely on personal knowledge or to acquire documentary evidence that is sufficient to prove that the disputed information is true before reporting the information as verified. *Hinkle,* 827 F.3d at 1303. If a reasonable investigation neither confirms nor disproves the information, then the furnisher may report that the disputed information is unverifiable. *Hinkle,* 827 F.3d at 1303.

Nationstar's representatives responded to the dispute notices from Experian, Transunion, and Equifax by checking the information in the Heards' credit report against Nationstar's records of the Heards' payment history. (Doc. 48-18, pp. 27–28; Doc. 48-19, pp. 32–33; Doc. 48-20, p. 21). One representative may have looked at the original note on the underlying mortgage, but the representatives otherwise did not seek documentary support for the reported information beyond the billing and payment information in Nationstar's system. (Doc. 48-18, pp. 34–34; Doc. 48-19, pp. 39–40; Doc. 48-20, pp. 24–25). One representative indicated that the type of dispute raised by the Heards is not the type of dispute she would have addressed even if she read the specifics in the couple's dispute letters. (Doc. 48-20, p. 21).

**\*8**  Here, Nationstar's reporting of the Heards' mortgage contained "a *factual* deficiency or error that could have been remedied by uncovering additional facts that provide a more accurate representation about a particular entry." *Cahlin v. Gen. Motors Acceptance Corp.,* 936 F.2d 1151, 1160 (11th Cir. 1991) (emphasis in original). Nationstar had account-level documentation for the Heards' mortgage, and thus a reasonable inquiry would be more involved for Nationstar than for a furnisher without these records. *See Hinkle,* 827 F.3d at 1302-1303, 1306. Mr. Heard repeatedly contacted Nationstar about the escrow error and provided Nationstar with information—proof of property insurance—that would have corrected the error. (Doc. 48-7, pp. 4–5, 7–15). Nationstar acknowledged receiving this information. (Doc. 48-7, p. 5; Doc. 48-15, pp. 26–27).

In their letters to the credit reporting agencies, the Heards explained that their dispute specifically concerned the improper escrowing of their mortgage account for property insurance that they did not need. (Doc. 48-23; Doc. 48-29).

The credit agencies were legally obligated to forward this information along with their automated dispute forms, 15 U.S.C. § 1681i(a)(2), and the evidence indicates that the Heards' disputes were transmitted to Nationstar with additional information concerning the particular error that the Heards sought to correct. (Doc. 48-18, pp. 21–22; Doc. 48-19, 17–18, 28).[5]

Nationstar argues that the notices sent to them by the agencies were vague and indicated only that the Heards generally disputed the reporting of their payment history. (Doc. 51, p. 6). In light of this, Nationstar claims that it was reasonable for its personnel to simply check the Heards' payment history and perhaps the original note. (Doc. 51, pp. 25–27). But a furnisher may not "truncate its investigation simply because the [credit reporting agency] failed to exhaustively describe the dispute in its § 1681i(a)(2) notice." *Hinkle,* 827 F.3d at 1306 (citing *Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1157 n. 11 (9th Cir. 2009) ). Even if the credit agencies gave a less than detailed description of the Heards' dispute, this did not relieve Nationstar of its responsibility to review documents in its possession. *Id.*

**\*9**  Under the circumstances, it was not reasonable for Nationstar to simply cross-reference the Heards' payment history with the information in the Heards' credit report when the credit dispute concerned a more specific factual issue that Mr. Heard had raised many times with Nationstar. The evidence in the record indicates that Nationstar did not investigate the dispute further before verifying the Heards' credit information to the reporting agencies. Therefore, the Court enters judgment in Mr. and Ms. Heard's favor on their FCRA claims. The Court leaves the issue of damages for trial.

## IV. CONCLUSION

For the reasons stated above, the Court enters judgment in favor of Mr. and Ms. Heard on their FCRA claims. The Court also enters judgment in favor of Mr. Heard on his TCPA claim. The Court will set the issue of damages for trial by separate order.[6]

**DONE** and **ORDERED** this August 22, 2018.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4028116

Case 1:26-cv-01529-JPW    Document 18-1    Filed 07/22/26    Page 42 of 64

Heard v. Nationstar Mortgage LLC, Not Reported in Fed. Supp. (2018)

Footnotes

1    The parties offer competing testimony to support their arguments. Mr. Heard relies on a recorded call in which a Nationstar collections representative states that he needs to confirm Mr. Heard's cell phone number because the representative is using an automatic dialer. (Doc. 48-15, pp. 53, 55). The defendants rely on the declaration of Richard Volel, a vice president of Nationstar's call center operations. Mr. Volel states that Nationstar did not use an automatic dialer to make collection calls. (Doc. 52-4, p. 2). Neither individual offers descriptive facts regarding Nationstar's call operations inconsistent with the facts recited below. Therefore, the contradictory, conclusory testimony of these non-experts does not control the Court's inquiry.

2    The D.C. Circuit released its decision in *ACA International* after the parties to this case had fully briefed the Heards' motion for summary judgment. Nationstar since has moved for leave to file supplemental briefing addressing the effect of D.C. Circuit's decision on the issues in this case. (Doc. 65). In a series of supplemental authority filings, Nationstar argued that the *ACA International* decision set aside not only the FCC's 2015 ruling but also the FCC's 2003 and 2008 rulings on which the 2015 ruling was based. The Court has read and considered the decision in *ACA International*. Because the Court does not rely on the FCC's guidance in it analysis below, the Court denies Nationstar's motion for supplemental briefing as moot.

3    In setting aside the FCC's ruling, the D.C. Circuit noted that the commission seemed to be of two minds on the phrase's meaning. *ACA Int'l*, 885 F.3d at 701. The FCC's ruling suggested that there was a legally significant difference between devices that generate the numbers to be called and devices that call numbers from a set list. *Id.* at 701–02. But the FCC also indicated that it considered both such devices to have the characteristics of automatic dialers. *Id.* at 702–3. The Commission's seemingly inconsistent approach to the subject doomed the 2015 ruling, but the D.C. Circuit noted that under the TCPA, the Commission could adopt the broader interpretation of automatic dialers, encompassing devices that called numbers from an external list. *Id.* at 703.

4    Although the TCPA includes an established business relationship exception that exempts certain debt collection calls, the TCPA does not make an exception for auto-dialed collection calls made to a cellular phone. *SeeClark v. Allied Interstate, LLC*, 2017 WL 2903358, at *3 (N.D. Ga. Jan. 20, 2017).

5    Nationstar contends that although the Heards' credit dispute notices were sent with images attached, there is no evidence that these images were viewable. (Doc. 51, p. 27). Two of the Nationstar representatives, whom the plaintiffs deposed, noted that images transmitted with dispute forms are often unreadable especially if they are handwritten. (Doc. 48-18, p. 22; Doc. 48-19, pp. 37–38). The Heards' letters were not handwritten. (Doc. 48-23; Doc. 48-29). Nationstar's representatives do not recall dealing with the Heards' dispute or viewing the images sent along with the Heards' credit dispute forms. (Doc. 48-18, pp. 20–21; Doc. 48-19, pp. 25, 28, 38).

As noted above, there is evidence that the Heards submitted dispute letters to the credit reporting agencies and that the agencies sent these letters to Nationstar. Nationstar has not produced evidence that the files accompanying the credit disputes were unreadable, and as such Nationstar has, at best, created only a metaphysical doubt about whether the company's representatives knew or should have known the specifics of the Heards' dispute. The non-movant must do more than this to create a genuine dispute of material fact. *SeeIn re Delco Oil, Inc.*, 599 F.3d 1255, 1262 (11th Cir. 2010) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ).

Additionally, given that Congress enacted FCRA to ensure that those involved in reporting consumer credit discharge their "grave responsibility" to the consumer and the financial system with care, 15 U.S.C. § 1681(a)(4), the Court declines to hold that a furnisher of credit information may avoid its obligation to reasonably investigate a credit dispute by relying on technology that frequently fails to read or transmit a debtor's description of the dispute.

6    A trial is the appropriate forum for addressing certain of the parties' arguments relating to damages including: when Mr. Heard withdrew his consent, whether the class action settlement in *Wright v. Nationstar Mortgage, LLC* precludes Mr. Heard from seeking damages for certain calls, and whether Nationstar's violation of the TCPA was willful.

Case 1:26-cv-01529-JPW    Document 18-1    Filed 07/22/26    Page 43 of 64

**Heard v. Nationstar Mortgage LLC, Not Reported in Fed. Supp. (2018)**

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Jackson v. Meadowbrook Financial Mortgage Bankers Corp., Not Reported in Fed. Supp. (2023)

Case 1:26-cv-01529-JPW    Document 18-1    Filed 07/22/26    Page 44 of 64

Cited in uploaded document as:
Jackson v. Meadowbrook Financial Mortgage Bankers Corp.,
No. 4:22-CV-01659, 2023 U.S. Dist. LEXIS 41211 (M.D. Pa.
Mar. 10, 2023)

2023 WL 2472606
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Gerard JACKSON, individually and on behalf
of all others similarly situated, Plaintiff,
v.
MEADOWBROOK FINANCIAL
MORTGAGE BANKERS CORP., Defendant.

No. 4:22-CV-01659
|
Signed March 10, 2023

**Attorneys and Law Firms**

Anthony I. Paronich, Broderick Law, P.C., Hingham, MA,
Jeffrey M. Bower, Bower Law Associates, PLLC, State
College, PA, for Plaintiff.

Candice Kearney, Lawrence Holmes, Offit Kurman, P.C.,
Philadelphia, PA, for Defendant.

**MEMORANDUM OPINION**

Matthew W. Brann, Chief United States District Judge

**\*1** After receiving three unsolicited and unwanted
telemarketing calls from the same company in the same
day, Plaintiff Gerard Jackson sued the allegedly offending
telemarketer—Defendant Meadowbrook Financial Mortgage
Bankers Corp.—asserting violations of the Telephone
Consumer Protection Act of 1991. Jackson brings this case,
a putative class action, on behalf of himself and all similarly
situated individuals. Although Jackson has yet to seek
discovery or class certification, Meadowbrook has moved
to dismiss the case, challenging the legality of Jackson's
proposed class definition and arguing that Jackson doesn't
have sufficient information to support a class action. But
those challenges are either without merit or premature.
Accordingly, Meadowbrook's motion is denied.

**I. BACKGROUND**

Gerard Jackson's telephone number has long been listed on
the National Do Not Call Registry, a list consumers can
voluntarily join to stop receiving telephone solicitations.[1]
Nevertheless, Meadowbrook—a supplier of reverse mortgage
services that makes telemarketing calls to generate leads
—placed three separate telemarketing calls to Jackson on
October 6, 2022.[2]

All three calls followed a similar script.[3] The callers asked
Jackson if he was interested in a reverse mortgage and then
explained that they were representatives of Meadowbrook
seeking to sell the company's reverse mortgage services.[4]
Jackson told all three callers that he did not want to receive
any more calls.[5] According to Jackson, he neither requested
nor consented to these calls.[6] Indeed, prior to October 6, 2022,
Jackson's attorney had sent Meadowbrook what amounted
to a cease-and-desist letter, claiming that prior calls from
Meadowbrook to Jackson violated the Telephone Consumer
Protection Act ("TCPA") and asking Meadowbrook to stop
calling him.[7]

Later that month, Jackson sued Meadowbrook, alleging
violations of the TCPA.[8] He initiated this claim on behalf
of himself and all similarly situated individuals.[9] Jackson
defines the class of persons he proposes to represent as
follows:

> All persons in the United States whose (1) telephone
> numbers were on the National Do Not Call Registry for
> at least 31 days, (2) but who received more than one
> telemarketing calls from or on behalf of Defendant (3)
> within a 12-month period, (4) from four years prior the
> filing of the Complaint.[10]

In his Complaint, Jackson also details the questions of law and
fact he considers "common" to him and the proposed class:

- "whether [Meadowbrook] systematically made multiple
  telephone calls to members of the National Do Not Call
  Registry Class";

- "whether [Meadowbrook] made calls to [Jackson] and
  members of [the proposed class] without first obtaining
  prior express written consent to make the calls";

- "whether [Meadowbrook's] conduct constitutes a
  violation of the TCPA"; and

Case 1:26-cv-01529-JPW    Document 18-1    Filed 07/22/26    Page 45 of 64

Jackson v. Meadowbrook Financial Mortgage Bankers Corp., Not Reported in Fed. Supp. (2023)

- "whether members of [the proposed class] are entitled to treble damages based on the willfulness of [Meadowbrook's] conduct."[11]

**\*2**  In November 2022, Meadowbrook filed the instant motion challenging the sufficiency of the class allegations and therefore asking the Court to dismiss the Complaint.[12] Although Meadowbrook styles its motion as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), it is, properly understood, a motion to strike the class allegations under Rule 12(f).[13] That motion has been fully briefed and is now ripe for disposition.[14]

## II. LAW

Defendants may move to strike class allegations prior to discovery.[15] However, striking such allegations is appropriate only in the "rare [cases] where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met."[16] The difficulty in striking such allegations arises in part because "[t]o determine if the requirements of Rule 23 have been satisfied, a district court must conduct a 'rigorous analysis.' "[17] That may require the court to "delve beyond the pleadings to determine whether the requirements for class certification are satisfied" and "venture into the territory of a claim's merits and evaluate the nature of the evidence."[18] In most cases, "some level of discovery is essential to such an evaluation," and "allowing time for limited discovery supporting certification motions may be necessary for sound judicial administration."[19]

Motions to strike class allegations are therefore "disfavored," as "a motion for class certification is a more appropriate vehicle for arguments about class propriety."[20] Courts should grant motions to strike class allegations "only when no amount of discovery or time will allow for plaintiffs to resolve deficiencies in class definitions under Rule 23."[21]

## III. ANALYSIS

**\*3**  Meadowbrook argues that the class allegations should be stricken for two reasons: (a) the proposed class constitutes an impermissible "fail-safe class"; and (b) the facts alleged do not satisfy the class action requirements under Federal Rule of Civil Procedure 23.[22] Neither argument justifies the relief

Meadowbrook requests. The former is without merit, whereas the latter, while potentially meritorious, is premature.

### A. Fail-Safe Class

First, Meadowbrook argues that Jackson's proposed class constitutes a fail-safe class as "it is defined by the elements it is required to prove."[23] Put differently, because Jackson alleges that one question of law and fact common to the proposed class is "whether [Meadowbrook's] conduct constitutes a violation of the TCPA," Meadowbrook believes "the question of whether the class exists and the question of whether [Meadowbrook] is liable are one and the same."[24] According to Meadowbrook, the Court should therefore strike Jackson's class allegations and, consequently, dismiss the Complaint.[25] The Court disagrees.

A fail-safe class bases its membership upon the validity of putative members' legal claims, meaning that "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment."[26] The "principal concern" with fail-safe classes is ascertainability, an "essential prerequisite" for class actions brought under Rule 23(b)(3).[27] The ascertainability inquiry requires plaintiffs to demonstrate that their proposed classes are "defined with reference to objective criteria," and that a "reliable and administratively feasible mechanism" exists "for determining whether putative class members fall within [a given] class definition."[28] Class certification is not proper if the court is unable to identify class members "without extensive and individualized fact-finding or 'mini-trials' "— the issue inherent to fail-safe classes.[29]

Although the United States Court of Appeals for the Third Circuit has not explicitly considered whether fail-safe classes are permissible, it has approvingly cited rulings by other circuits that categorically disallow fail-safe classes.[30] Accordingly, district courts within this circuit have stricken class allegations when "the face of the complaint leaves little doubt" that the plaintiff's "class definitions create impermissible fail-safe classes."[31] That said, if "[i]t is not readily apparent whether [the proposed] class is fail-safe," the court should refrain from striking the class allegations and instead permit the parties to proceed to discovery.[32] That way, "the permissibility of [the] proposed class" can be determined "at the class-certification stage."[33]

Case 1:26-cv-01529-JPW    Document 18-1    Filed 07/22/26    Page 46 of 64

Jackson v. Meadowbrook Financial Mortgage Bankers Corp., Not Reported in Fed. Supp. (2023)

**\*4**  As support for its contention that Jackson's proposed class is fail-safe, Meadowbrook directs this Court to a 2015 ruling by the Honorable Stewart R. Dalzell of the United States District Court for the Eastern District of Pennsylvania in *Zarichny v. Complete Payment Recovery Services, Inc.*[34] There, the plaintiff brought a putative class action under the TCPA on behalf of herself and similarly situated individuals who received one or more calls on their personal cell phones from the defendants using an automatic telephone dialing system without prior consent.[35] Judge Dalzell concluded that the class was an impermissible fail-safe class because "there is no way to provide notice to that putative class without the sort of extensive fact-finding that class actions should avoid," and "at the conclusion of the litigation, should [the defendant] prevail against [the plaintiff], any other putative class recipient would be free to litigate the same claim against [the defendant]."[36]

Nine months after his ruling in *Zarichny*, Judge Dalzell confronted a similar question—but reached a different result. In *Abella v. Student Aid Center, Inc.*, as in *Zarichny*, the defendant moved to strike the class allegations relating to violations of the TCPA, arguing that "the class definition proposed by the plaintiff was an impermissible 'fail-safe' class."[37] But Judge Dalzell concluded that the proposed class in *Abella* did not "meet[ ] the definition of a fail-safe class," highlighting two distinctions between the proposed classes in *Abella* and *Zarichny*: (1) unlike the proposed class in *Zarichny*, the *Abella* class "makes no reference to [the defendant's] use of an automatic telephone dialing system[,] ... which is a required element for a claim under the TCPA"; and (2) the plaintiff in *Abella* did not "rely[ ] on potential class members' word when determining whether they gave [the defendant] consent to send them text messages," relying instead on the defendant's "internal records that detail whether it received consent to text certain phone numbers."[38]

Since 2015, district courts within this circuit have consistently emphasized the latter distinction Judge Dalzell highlighted in *Abella*. For example, in *Johnson v. Ally Financial Inc.*, my colleague, the Honorable Christopher C. Conner, declined to strike class allegations concerning the following proposed class: "all persons in the United States who received a call from [the defendant] with the aid of an automatic telephone dialing system when [the defendant's] business records do not indicate it received prior consent."[39] Judge Conner held that this proposed class was not a "facially uncertifiable"

fail-safe class because it was properly defined with reference to objective, factual criteria—i.e., the defendant's "business records [that] may (with discovery) reveal an ascertainable [ ]class"—that fall "outside of the legal requirements of the [TCPA]."[40]

**\*5**  Similarly, in *O.P. Schuman & Sons, Inc. v. DJM Advisory Group, LLC*, the Honorable Juan R. Sánchez, now the Chief Judge of the Eastern District, denied the defendant's motion to strike class allegations for a proposed class consisting of "[a]ll persons who were sent one or more telephone facsimile messages ... that advertised the commercial availability or quality of [the defendant's] property, goods, or services" that "did not contain an opt-out notice that complied with federal law."[41] Citing *Abella*, Judge Sánchez held that "[i]t is not readily apparent whether [the proposed class] is fail-safe," as "it does not rely on ascertaining whether potential class members provided [the defendants] permission or invitation to send the facsimile."[42]

And, earlier this year, in *Shelton v. Absolute Home Mortgage Corp.*, the Honorable Nitza I. Quiñones Alejandro of the Eastern District denied a motion to dismiss the class action component of a TCPA claim brought on behalf of all persons who received a telemarketing call on or behalf of the defendant despite listing their numbers on the Do Not Call Registry.[43] There, Judge Quiñones Alejandro rejected the defendants' argument that the proposed class was impermissibly fail-safe, explaining that unlike *Zarichny*, the proposed class at issue "does not include the referenced 'without prior consent.' "[44]

Here, Jackson argues that like the plaintiffs in *Abella, Johnson, O.P. Schuman*, and *Shelton*, he elided the fail-safe concern present in *Zarichny* by making the "conscious decision to not include language about individuals who have not provided their 'prior express written consent' in the class definition."[45] The Court agrees. The issue of whether Meadowbrook's "conduct constitutes a violation of the TCPA" is arguably a question of law and fact common to Jackson and the other proposed class members. But that alone does not render the proposed class fail-safe. The question here is whether Jackson's proposed class is defined with reference to objective, factual criteria that fall "outside of the legal requirements of the [TCPA]."[46] Consistent with prior district court rulings in this circuit, the Court finds that it may well be.

Case 1:26-cv-01529-JPW    Document 18-1    Filed 07/22/26    Page 47 of 64

Jackson v. Meadowbrook Financial Mortgage Bankers Corp., Not Reported in Fed. Supp. (2023)

Whether Jackson's proposed class ultimately passes muster and warrants certification remains to be seen. But at this early stage, it is not "readily apparent" that the proposed class is fail-safe.[47] Therefore, that is not a valid basis for striking the class allegations and dismissing the Complaint.

### B. Class Action Requirements

Next, Meadowbrook argues that Jackson has not alleged facts establishing either "the requirements of Federal Rule of Civil Procedure 23(a) to sustain a class" or that a class action is "the superior method to adjudicate this controversy, as required by Rule 23(b)."[48] Because both are required, Meadowbrook contends that the class allegations should be stricken.[49] This argument, however, is premature, as Jackson has yet to seek discovery or move for class certification.

Under Rule 23(a), a plaintiff seeking class certification must establish four requirements:

(1) "the class is so numerous that joinder of all members is impracticable" (numerosity);

(2) "there are questions of law or fact common to the class" (commonality);

(3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (typicality); and

(4) "the representative parties will fairly and adequately protect the interest of the class" (adequacy of representation).[50]

**\*6** In addition, "plaintiffs must meet one of the requirements of Rule 23(b)."[51] Relevant here, Rule 23(b)(3) contains two elements: predominance and superiority.[52] To satisfy these elements, "a plaintiff must show that 'questions of law or fact common to the members of the class predominate' over questions affecting only individual members and that a class action is 'superior to other available methods for the fair and efficient adjudication of the controversy.' "[53]

That said, the Third Circuit has warned district courts about "decid[ing] the class certification issue" when there has "been no motion for class certification and no discovery," explaining that such rulings are typically "premature."[54] On this, the Court finds particularly instructive the Third Circuit's ruling

in *Landsman & Funk PC v. Skinder-Strauss Associates.*[55] There, the Third Circuit consolidated for appeal three cases brought in the United States District Court for the District of New Jersey under the TCPA, including a ruling by the Honorable William J. Martini in *Goodrich Management Corp. v. Afgo Mechanical Services, Inc.* ("*Afgo*").[56]

In *Afgo*, the defendant moved to dismiss the TCPA class action because it did not "satisfy the requirements for class certification under [Rule 23]."[57] Judge Martini granted the motion, explaining that the plaintiff could not satisfy either the elements of Rule 23(a) or Rule 23(b).[58] For the former, Judge Martini ruled that there were "too many crucial factual determinations to be made with respect to claims and defenses that will vary from party to party"—in particular, the "consent to receive faxes and the existence of a prior business relationship with [the defendant]."[59] For the latter, Judge Martini held that common issues of fact and law did not predominate, reiterating that there were "numerous issues ... that pertain only to individual plaintiffs and not to the class as a whole."[60] And Judge Martini concluded that "a class action would in fact be an inferior means of adjudicating this controversy" because "[a]n individual plaintiff who files a TCPA action in small claims court can typically receive damages quickly and without incurring legal fees."[61]

On appeal, the Third Circuit rejected Judge Martini's analysis and vacated his order.[62] At the outset, the Third Circuit held that "delving into the propriety of class certification was the wrong focus at that early stage of the proceeding," as there "had been no motion for class certification and no discovery."[63] The Third Circuit explained that "in the specific context of claims filed under the TCPA statute, it is difficult to resolve without discovery whether there are factual issues regarding class members' business relationships with defendants or whether they consented to the receipt of faxes."[64] Significantly, the Third Circuit emphasized that "differences among plaintiffs' consent may be defeated by common proof developed in discovery."[65] And even if they can't, that may not settle the matter in a defendant's favor: "it is not clear that, as a matter of law, differences regarding consent are sufficient to defeat class certification."[66]

**\*7** Further, the Third Circuit found Judge Martini's holding on superiority unpersuasive.[67] The Third Circuit noted that if Congress "wanted to preclude aggregation of individual

Case 1:26-cv-01529-JPW    Document 18-1    Filed 07/22/26    Page 48 of 64

Jackson v. Meadowbrook Financial Mortgage Bankers Corp., Not Reported in Fed. Supp. (2023)

TCPA claims, it could have so provided in the TCPA itself or in [the Class Action Fairness Act of 2005], which specifically lists certain types of statutory claims that could not be brought as class actions."[68] It did not do so.[69] And the Third Circuit explained that "[a]lthough individual actions under the TCPA may be easier to bring in small claims court than other types of cases, that does not necessarily undermine the greater efficiency of adjudicating disputes involving 10,000 faxes as a single class action."[70] Endorsing a position raised by the plaintiff, the Third Circuit found that there is "little reason to believe that individual actions are automatically efficient; plaintiffs can still face protracted litigation when they sue individually."[71]

Here, Meadowbrook raises the same arguments against class certification that the Third Circuit rejected in *Landsman*. For the Rule 23(a) factors, Meadowbrook's primary argument concerns commonality and typicality. Meadowbrook asserts that Jackson's proposed class "fails as a matter of law because there is no common issue that can be resolved without a factual determination being made as to each class member," emphasizing that to determine whether potential class members do, in fact, qualify for the class, the Court will need "to make an individual inquiry" into their placement on the National Do Not Call Registry, the calls they received, and what consent, if any, they gave.[72] Relatedly, Meadowbrook contends that Jackson's class allegations do not satisfy the typicality requirement because although he alleges that Meadowbrook "made potentially thousands of separate calls to separate potential class members," he "has not alleged that these calls were placed at the same time, by the same caller, or featured the same conversation."[73]

But as the Third Circuit explained in *Landsman*, issues concerning the relationship between the alleged telemarketer and the putative class members—in particular, those concerning consent—are "difficult to resolve without discovery."[74] The differences Meadowbrook presents "may be defeated by common proof developed in discovery," and even if they're not, those differences may not be "sufficient

to defeat class certification."[75] In any event, it is simply too early in the litigation to make that judgment.[76]

For the Rule 23(b) superiority requirement, Meadowbrook argues that Congress enacted the TCPA "to encourage individual causes of action, granting adequate relief without requiring a plaintiff to hire counsel."[77] To Meadowbrook, because plaintiffs seeking redress for alleged violations of the TCPA can do so in small claims or magisterial district courts—"with expediency and minimal cost"—a class action "is not the superior alternative."[78] But as Jackson explains, "courts routinely find class actions to be the superior method of adjudicating claims in the TCPA context" because "[m]ost of those who received these unwanted calls would not seek relief on an individual basis": the cost of doing so "would not be practical or economical given the potential size of individual awards."[79] Indeed, that is the precise position the Third Circuit adopted in *Landsman*.[80]

## IV. CONCLUSION

**\*8** Class action lawsuits, as with most things in life, typically unfold according to a standard procedure. First, an allegedly representative plaintiff files a complaint. The parties then engage in discovery relevant to the class determination. After that, the plaintiff moves for class certification. And then the court, engaging in the required rigorous analysis, rules on the propriety of the proposed class.

With its motion to dismiss, Meadowbrook seeks to circumvent that standard procedure and "slip through the backdoor."[81] But there is a reason why the standard procedure is standard. Because Meadowbrook's proffered bases for dismissal are either meritless or premature, the motion is denied.

An appropriate Order follows.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2472606

---

Footnotes

1        Doc. 1 (Compl.) ¶¶ 12, 18.

2        *Id.* ¶¶ 15–16, 19.

Case 1:26-cv-01529-JPW    Document 18-1    Filed 07/22/26    Page 49 of 64

Jackson v. Meadowbrook Financial Mortgage Bankers Corp., Not Reported in Fed. Supp. (2023)

*Id.* ¶ 21.

*Id.* ¶¶ 22–23.

*Id.* ¶ 24.

*Id.* ¶ 28.

*Id.* ¶ 20.

*Id.* ¶¶ 42–46.

*Id.* ¶ 30.

*Id.* ¶ 31.

*Id.* ¶ 37.

Doc. 7 (Meadowbrook Br.); Doc. 8 (Jackson Opp.); Doc. 9 (Meadowbrook Reply).

Meadowbrook insists its motion is a Rule 12(b)(6) motion to dismiss, but the legal standard it invokes, *see* Doc. 7 (Meadowbrook Br.) at 5 ("[w]here it is clear from the complaint itself that the requirements for maintaining a class action cannot be met, a defendant may *move to strike* the class allegations before a motion for class certification is filed") (emphasis added), the arguments it presents, *see id.* at 4 (asserting that Jackson "has not pleaded a case capable of class-wide resolution" and "cannot establish the requirements ... to sustain a class"), and the principal case it relies on, *Zarichny v. Complete Payment Recovery Services, Inc.*, 80 F. Supp. 3d 610 (E.D. Pa. 2015), signal otherwise. Regardless of whether the motion, if granted, would result in dismissal, the nature and legal basis of the motion affirm that it is, in truth, a motion to strike the class allegations. The Court must therefore apply the legal standard for motions to strike under Rule 12(f). Meadowbrook cannot mandate a more permissive legal standard and elide precedential rulings unhospitable to its position by simply characterizing the motion as something other than what it is.

Doc. 5 (Mot. to Dismiss).

*See* Fed. R. Civ. P. 12(f).

*Landsman & Funk PC v. Skinder-Strauss Associates*, 640 F.3d 72, 93 n.30 (3d Cir. 2011), *opinion vacated in part on other grounds*, 2012 WL 2052685 (3d Cir. Apr. 17, 2012).

*Id.* at 93 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 154, 167 (3d Cir. 2008)). 4

*Id.* (internal quotation marks and citations omitted).

*Id.* (brackets, ellipses, and internal quotation marks omitted).

*Luciano v. Teachers Insurance and Annuity Association of America – College Retirement Equities Fund*, 2022 WL 1044969, at *3 (D.N.J. Apr. 7, 2022).

*Id.* (internal quotation marks omitted).

Doc. 7 (Meadowbrook Br.) at 1.

*Id.* at 8.

*Id.*

*Id.* at 5.

Case 1:26-cv-01529-JPW    Document 18-1    Filed 07/22/26    Page 50 of 64

Jackson v. Meadowbrook Financial Mortgage Bankers Corp., Not Reported in Fed. Supp. (2023)

26    *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012).

27    *Johnson v. Ally Financial Inc.*, 2017 WL 3433689, at *3 (M.D. Pa. Aug. 10, 2017) (Connor, C.J.) (citing *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 592–93 (3d Cir. 2012)).

28    *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013) (citation omitted).

29    *Marcus*, 687 F.3d at 593.

30    *See Byrd v. Aaron's Inc.*, 784 F.3d 154, 167 (3d Cir. 2015) (citing *In re Nexium Antitrust Litig.*, 777 F.3d 9, 22 (1st Cir. 2015); *Messner*, 669 F.3d at 825).

31    *Zarichny*, 80 F. Supp. 3d at 624 (citing *Landsman*, 640 F.3d at 93 n.30).

32    *O.P. Schuman & Sons, Inc. v. DJM Advisory Group, LLC*, 2017 WL 634069, at *4 (E.D. Pa. Feb. 16, 2017).

33    *Id.*

34    80 F. Supp. 3d at 610.

35    *Id.* at 623. The plaintiff brought separate claims on behalf of a second putative class: people who received one or more telephone calls from the defendants to whom the defendants did not send written notice as required by the [Fair Debt Collection Practices Act]." *Id.*

36    *Zarichny*, 80 F. Supp. 3d at 625–26; *accord Sauter v. CVS Pharmacy, Inc.*, 2014 WL 1814076, at *8–9 (S.D. Ohio May 7, 2014) (granting motion to strike class allegations because "[e]ach of the [p]laintiff's proposed classes is defined to include only those individuals who did not expressly consent to the receipt of the defendant's phone calls made with the use of an [automated dialing system]," making them fail-safe classes as they "consist solely of persons who can establish that defendant violated the TCPA") (internal quotation marks, brackets in the original, and citations omitted).

37    2015 WL 6599747, at *3–4 (E.D. Pa. Oct. 30, 2015).

38    *Id.* at *4.

39    2017 WL 3433689 at *1, 4.

40    *Id.* at *4.

41    2017 WL 634069 at *1, 5.

42    *Id.* at *4 (cleaned up).

43    Case No. 22-1934, Doc. 17 (E.D. Pa. Jan. 24, 2023).

44    *Id.* at 2 n.1.

45    Doc. 8 (Jackson Opp.) at 10.

46    *Johnson*, 2017 WL 3433689 at *4.

47    *O.P. Schuman*, 2017 WL 634069 at *4.

48    Doc. 7 (Meadowbrook Br.) at 4.

49    *Id.* at 5.

50    Fed. R. Civ. P. 23(a).

Case 1:26-cv-01529-JPW   Document 18-1   Filed 07/22/26   Page 51 of 64

Jackson v. Meadowbrook Financial Mortgage Bankers Corp., Not Reported in Fed. Supp. (2023)

51    *Landsman*, 640 F.3d at 92 n.28.

52    *Id.*

53    *Id.* (citing Fed. R. Civ. P. 23(b)(3)).

54    *Id.* at 93; *see also Shelton*, Case No. 22-1934, Doc. 17 (noting that courts generally "decide whether a plaintiff has met the requirements of Rule 23 on a motion for class certification, rather than a motion to dismiss," Judge Quiñones Alejandro "decline[d] to stray" from the general practice); *Martin v. Ford Motor Co.*, 765 F. Supp. 2d 673, 680 (E.D. Pa. 2011) ("[C]ourts within the Third Circuit have ... [found] a motion to strike class allegations premature where a motion for class certification has not been made and denied.").

55    640 F.3d at 90–95.

56    2009 WL 2602200 (D.N.J. Aug. 24, 2009), *vacated by Landsman*, 640 F.3d at 90–95.

57    *Id.* at *4.

58    *Id.* at *4–6.

59    *Id.* at *5.

60    *Id.*

61    *Id.* at *6.

62    *Landsman*, 640 F.3d at 92–93.

63    *Id.*

64    *Id.* at 93–94.

65    *Id.* at 94.

66    *Id.*

67    *Id.* at 94–95.

68    *Id.*

69    *Id.*

70    *Id.* at 95.

71    *Id.*

72    Doc. 7 (Meadowbrook Br.) at 11.

73    *Id.* at 8.

74    640 F.3d at 93–94.

75    *Id.* at 94.

76    Separately, Meadowbrook asserts that Jackson cannot satisfy the numerosity requirement because "[o]ther than the allegation that he himself received three unwelcome calls, [Jackson] makes no allegations that any other individuals have received similar calls," and "no one has joined as an additional class representative." Doc. 7 (Meadowbrook Br.) at 9. The Court finds this similarly unpersuasive. As Jackson contends, his proposed class definition satisfies all requirements for a TCPA claim, and his factual allegations—namely, that he received three telemarketing calls on the same day, all of

which followed a script, all of which came after his attorney sent Meadowbrook a cease-and-desist letter, Doc. 1 (Compl.) ¶¶ 19–21—"make clear [the] *en masse* nature of the calling." Doc. 8 (Jackson Opp.) at 11–12. Whether Jackson can substantiate those allegations, discovery will reveal.

77      Doc. 7 (Meadowbrook Br.) at 14.

78      *Id.* at 14–15.

79      Doc. 8 (Jackson Opp.) at 15 (citing *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740, 753 (2012)).

80      640 F.3d at 93–94 (rejecting the argument that individual TCPA actions in small claims court are inherently superior to joint resolution via class action).

81      *Martin*, 765 F. Supp. 2d at 680 (citing *Korman v. The Walking Co.*, 503 F. Supp. 2d 755, 762 (E.D. Pa. 2007)).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by Compressor Engineering Corporation v. Thomas, E.D.Mich., December 29, 2016

Cited in uploaded document as:

Sandusky Wellness Ctr., LLC v. Wagner Wellness, Inc., No. 3:12-cv-2257, 2014 U.S. Dist. LEXIS 166275, at *14-15 (N.D. Ohio Dec. 1, 2014)

2014 WL 6750690

Only the Westlaw citation is currently available.

United States District Court,

N.D. Ohio,

Western Division.

SANDUSKY WELLNESS CENTER, LLC, Plaintiff,

v.

WAGNER WELLNESS, INC., et al., Defendant.

No. 3:12 CV 2257.

|

Filed Dec. 1, 2014.

**Attorneys and Law Firms**

Brian J. Wanca, Ryan M. Kelly, Anderson & Wanca, Rolling Meadows, IL, Scott D. Simpkins, Climaco, Lefkowitz, Peca, Wilcox & Garofoli, Cleveland, OH, for Plaintiff.

Dale E. Markworth, Jaclyn C. Staple, Timothy T. Reid, Mansour Gavin, Cleveland, OH, R. Brian Borla, Hanna, Campbell & Powell, Akron, OH, for Defendant.

*MEMORANDUM OPINION AND ORDER*

KATZ, District Judge.

 **\*1**  This cause is before the Court on Sandusky Wellness Center's pending class action motion. The Court previously denied Sandusky Wellness's most recent request for class certification because the Court found too many issues had not been addressed by the parties for the Court to properly rule on the certification request. Those issues have now been briefed by the parties, (Doc. Nos.56, 57, 58), and the motion for class action is now ripe for adjudication.

Defendant Wagner Wellness is a Florida corporation that engages in the business of selling vitamins and nutritional supplements with its principal place of business in Longwood, Florida. Wagner Wellness is owned by Robert and April Wagner and the business has no other employees. However, Mr. Wagner has stated that his son Chad occasionally assisted with the business by helping at an occasional meeting and by opening the door. The Wagners serve as both officers and shareholders of Wagner Wellness. Sandusky Wellness is an Ohio limited liability company located in Sandusky, Ohio, within the jurisdiction and venue of this Court.

Sandusky Wellness alleged that the defendants violated the Telephone Consumer Protection Act of 1991 (TCPA), as amended by the Junk Fax Prevention Act of 2005, 47 U.S.C. § 227, by sending an unsolicited advertisement, via facsimile, to promote their business and invite physicians to seminars discussing their products. The facsimile contained the following "opt-out" statement: "To be removed from future facsimiles call 1–877–281–6342 and enter pin# 8283."

The record establishes that Wagner Wellness purchased on its corporate charge card a list of facsimile numbers from infoUSA. Wagner Wellness directed infoUSA to send the facsimile list to Alert Solutions, Inc., doing business as BLI Messaging. BLI then sent facsimiles to the people on the list provided by infoUSA. Although the parties disputed Mr. Wagner's involvement with the facsimiles, they agreed that April Wagner played no role in the creation or distribution of the facsimiles which lead to the dismissal of the complaint against her.

Regarding Mr. Wagner's motion for summary judgment on the issue of personal liability, the Court denied the motion. The Court noted that it did not express any opinion on whether Mr. Wagner violated the TCPA, or whether the "opt-out language" of the facsimile in question was sufficient under the statute. The Court's ruling was strictly limited to the question of whether Mr. Wagner could be held personally liable for any violations of the TCPA. (Doc. Nos.45, p. 6).

The TCPA makes it unlawful "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement" unless certain exceptions apply. 47 U.S.C. § 227(b)(1)(C). The statute provides a private right of action to enforce its provisions. A "person or entity may" bring "an action based on a violation" of the statute to: 1) "enjoin such violation"; 2) "to recover for actual monetary loss from such a violation, or

to receive $500 in damages for each such violation, whichever is greater"; or 3) "both such actions." 47 U.S.C. § 227(b)(3). In addition, "[i]f the court finds that the defendant willfully or knowingly violated" the statute, "the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount" of the plaintiff's award for statutory or actual damages. *Id.*

**\*2** In enacting the TCPA, Congress noted "the proliferation of facsimile machines" in the business community had been "accompanied by explosive growth in unsolicited facsimile advertising, or 'junk fax.' " H.R. Rep. 102–317 at 10 (1991). Congress further stated that such advertising "is problematic for two reasons. First, it shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax." *Id.* The recipient of the facsimile advertisements assumes both the cost associated with the use of the facsimile machine and the cost of the paper. In addition, when receiving the facsimile, it may require several minutes or more to process and print the advertisement. During that time, the facsimile machine is unable to process actual business communications. *Id.* at 25. Thus, the statute's legislative history indicates that the TCPA was intended to address the costs incurred by the owner of the facsimile machine and the facsimile machine owner's loss of the use of the machine.

Sandusky Wellness moved for class certification pursuant to Federal Rule of Civil Procedure 23. The proposed class is: "All persons who (1) on or after September 5, 2008, (2) were sent telephone facsimile messages inviting attendance at a Physicians Wellness and Weight Loss Program, and (3) which did not display a proper opt-out notice." (Doc. No. 33). The Defendants contended that the requirements of Rule 23 were not satisfied.

Rule 23 allows Sandusky Wellness to pursue claims on behalf of a class of similarly situated individuals if it demonstrates that it is "part of the class and 'possess[es] the same interest and suffer[s] the same injury' as the class members." *East Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). To justify this "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Califano v. Yamasaki,* 442 U.S. 682, 700–01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979), Sandusky Wellness must meet a series of conditions set forth in Rule 23 to ensure, first, that it is an appropriate representative for absent class members, and, second, that its

claim is appropriate for classwide resolution. *See* Fed.R.Civ.P. 23.

Class-certification litigation is the process of determining whether a plaintiff can meet these conditions. The rule establishes four requirements:

> (1) the class [must be] so numerous that joinder of all members is impracticable; there are questions of law or fact common to the class;
>
> the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a)(1)-(4). If a plaintiff does not satisfy each of these requirements, the class claim fails. If, however, a plaintiff shows that he is an appropriate representative within the meaning of Rule 23(a), the focus shifts to the case itself.

**\*3** Under Rule 23(b), four types of lawsuits may proceed as class actions. Class resolution is appropriate when:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>> adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed.R.Civ.P. 23(b)(1)-(3). If a plaintiff's claim does not fall into one of these categories, class certification is

inappropriate, even if a plaintiff meets each of Rule 23(a)'s four threshold requirements.

Thus, a plaintiff must show that he meets all four Rule 23(a) criteria, and that the case falls into at least one of the four Rule 23(b) categories. If the plaintiff fails to satisfy any of these requirements, class certification is not appropriate.

This Court must conduct "a rigorous analysis," *General Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), at "an early practicable time ... [to] determine by order whether to certify the action as a class action." Fed.R.Civ.P. 23(c)(1)(A). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Wal– Mart Stores, Inc. v. Dukes,* —— U.S. ——, ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). In the class-certification context, courts are permitted to "probe behind the pleadings," *Falcon,* 457 U.S. at 160, and "touch[ ] aspects of the merits." *Dukes,* 131 S.Ct. at 2552.

Under Rule 23(a)(2), a plaintiff must show that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). *Dukes* clarified the scope of this inquiry. To satisfy Rule 23(a)(2), a plaintiff's "claims must depend upon a common contention-.... [which is] of such a nature that it is capable of classwide resolution-which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 131 S.Ct. at 2551. The crucial inquiry, the Court explained, is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (internal quotation marks and citation omitted) (emphasis in original).

**\*4** The Sixth Circuit's decision in *American Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.,* 757 F.3d 540 (6th Cir.2014), provides guidance regarding Sandusky Wellness's class certification motion. Lake City is a Pennsylvania-based corporation that distributes pipe-thread sealing tape. *American Copper,* 757 F.3d at 542. In February 2006, Lake City received an unsolicited fax from Business to Business Solutions (B2B), a "fax-blasting" company, advertising B2B's services. *Id.* Lake City's president, Jeffrey Meeder, responded to the advertisement. *Id.* B2B offered to transmit approximately 10,000 faxes on Lake City's behalf for $92. *Id.* Meeder accepted B2B's offer, and Lake City and B2B began drafting the Lake City advertisement. *Id.* After Meeder made revisions to a draft that a B2B representative had sent

to him, the Lake City advertisement was finalized. *Id.* B2B subsequently transmitted thousands of unsolicited faxes in February 2006 that featured the Lake City advertisement. *Id.*

American Copper, an equipment wholesaler headquartered in Michigan, received the Lake City advertisement on a fax machine at its Traverse City location on February 20, 2006. *Id.* Lake City and American Copper had no preexisting business relationship, nor did Lake City obtain American Copper's permission before the advertisement was transmitted to American Copper. *Id.*

American Copper filed suit against Lake City and Meeder in December 2009. *Id.* Lake City and Meeder in turn filed a third-party complaint against B2B and others affiliated with B2B. *Id.* The district court entered a default judgment against the third-party defendants after they failed to appear or otherwise respond to the third-party complaint. *Id.*

After amending its complaint twice, American Copper moved for class certification in August 2011. *Id.* American Copper proposed the following class definition:

> All persons who were successfully sent a facsimile on February 20, 2006, February 21, 2006 or February 22, 2006 from "Lake City Industrial Products, Inc."; inquiring, "Sick And Tired of Thin, Low Quality Import Pipe Thread Sealing Tapes?"; stating "End the problems now with high quality, MADE IN U.S.A. 100% virgin ptfe pipe thread sealing tapes!"; and offering "Free! Private label on every roll for first time orders."

*Id.* at 542–43.

In support of its motion, American Copper attached a report from its expert witness, Robert Biggerstaff. *Id.* at 543. The report stated that, based on Biggerstaff's review of B2B's fax records, "a total of 10,627 successful transmissions of a complete fax [i.e., the Lake City advertisement] were successfully sent to and received by 10,627 unique fax numbers." *Id.*

Lake City opposed American Copper's motion for class certification. *Id.* In July 2012, the district court rejected all of Lake City's arguments and certified the class as formulated by American Copper. *Id.* The district court also appointed class counsel and ordered the preparation of a notification form to be sent to class members. *Id.*

**\*5** Lake City then petitioned the Sixth Circuit for permission to appeal the class-certification order. *Id.* After concluding

that interlocutory review was not warranted, the Sixth Circuit denied Lake City's petition. *Id.* American Copper then moved for summary judgment in the district court. *Id.* The district court subsequently granted American Copper's motion for summary judgment. *Id.* Explaining that the TCPA is "essentially a strict liability statute," the district court rejected Lake City's argument that it should not be held liable under the TCPA because B2B had actually transmitted the advertisements. *Id.* The district court was likewise unpersuaded by Lake City's contention that summary judgment was inappropriate due to the absence of proof regarding how many of the Lake City advertisements had actually been printed by recipients. *Id.* Nor did the district court find any merit in Lake City's argument that summary judgment would lead to its bankruptcy, noting that Lake City's ability (or inability) to pay a judgment was irrelevant at the summary-judgment stage of the case. *Id.* After the district court entered an amended judgment in favor of American Copper and the class-action plaintiffs in November 2013, Lake City and Meeder appealed. *Id.* The Sixth Circuit affirmed the district court's class definition on appeal. *Id.* at 546.

The Court previously denied Sandusky Wellness's motion for class certification following the two orders of remand from the Sixth Circuit. The Court deemed the failure of the parties to address certain significant issues underlying the potential class action rendered a ruling on the motion inappropriate at that time. The parties have now fully briefed the Court regarding its concerns. (Doc. Nos.56, 57, 58). The Court has carefully reviewed the arguments of the parties and concludes that a ruling on the class certification motion is now appropriate.

I. Regarding the conditions contained in Rule 23(a).

*A. Numerosity:* The evidence suggests that the proposed class contains over 125,000 members. Specifically, evidence indicates that the Defendants sent 496,525 faxes to 125,373 unique faxes. "When class size reaches substantial proportions ... the impracticability requirement is usually satisfied by the numbers alone." *In re Am. Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir.1996)* (quotations and citations omitted). In addition, certification of the class does not require the identities of the class members at this time. *See Golden v. City of Columbus, 404 F.3d 950, 965–66 (6th Cir.2005).* Joinder of all class members would not be practicable. Thus, the "numerosity" requirement is satisfied.

*B. Commonality:* The "commonality" requirement is met. Several common questions of law and fact are present. The Defendants engaged in conduct which led to every class member receiving a fax which failed to comply with the TCPA. In addition, the case involves common legal questions regarding Defendants' liability under the TCPA.

**\*6** *C. Typicality:* The "typicality" requirement is met as the legal theory for each class member is based on the same facts and legal theory as Sandusky Wellness. Therefore, Sandusky Wellness's claim is typical of the other class members' claims. *See In re Am. Med. Sys., 75 F.3d at 1082.*

*D. Adequacy of Representation:* Sandusky Wellness can fairly and adequately protect the interests of the class. "The adequate representation requirement overlaps with the typicality requirement." *Id. at 1083.* Sandusky Wellness's interests are aligned with other class members because all class members seek statutory damages under the TCPA arising from Defendants' faxes. Sandusky Wellness is an adequate representative of the class.

II. Regarding Rule 23(b)(3)'s requirement.

*A. Predominance:* Rule 23(b)(3)'s predominance resembles Rule 23(a)(3)'s typicality requirement. *See Ball v. Union Carbide Corp., 385 F.3d 713, 728 (6th Cir.2004).* "The commonality requirement is satisfied if there is a single factual or legal question common to the entire class. The predominance requirement is met if this common question is at the heart of the litigation." *Powers v. Hamilton Cnty. Pub. Defender Comm'n, 501 F.3d 592, 619 (6th Cir.2007)* (citation omitted).

The common questions are at the heart of this litigation. Namely, whether Defendants violated the TCPA by sending the faxes with the improper "opt-out" information to every class member.

*B. Superiority:* Rule 23(b)(3) requires that a class action be the superior method for adjudicating the claims. A class action is superior when the "class action would achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)* (internal quotation marks and citation omitted). One of the purposes of Rule 23(b)(3) is "vindication of the rights of groups of people who individually would be without effective strength to bring their

opponents into court at all." *Id.* at 617 (internal quotation marks and citation omitted).

This type of case weighs in favor of the class action as a superior device. Under the TCPA, the maximum recovery for each class member is $1,500, and it does not allow for fee shifting. Hence, individual class members are unlikely to litigate TCPA claims. *See id.*

Second, in finding federal courts have concurrent jurisdiction with state courts over TCPA actions, the Supreme Court effectively found that Congress did not intend state small claims courts to be the sole forum for TCPA claims. *See Mims v. Arrow Fin. Servs., LLC,* —— U.S. ——, ——, 132 S.Ct. 740, 751, 181 L.Ed.2d 881 (2012).

III. Regarding Rule 23(g)'s adequacy of class counsel requirement.

This Court must consider four criteria in appointing class counsel, Rule 23(g)(1)(A), and may consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interest of the class." Fed.R.Civ.P. 23(g)(1)(B). In *American Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.,* No. 1:09–CV–1162, 2012 WL 3027953, at *6–7 (W.D.Mich. July 24, 2012), Judge Quist discusses in great detail Anderson + Wanca's torrid past in representing clients in TCPA cases. Yet, Judge Quist concluded that "for better or worse, [Anderson+Wanca] have experience in TCPA class actions." *American Copper & Brass, Inc.,* No. 1:09–CV–1162, 2012 WL 3027953, at *7.

 **\*7**  In the instant case, local counsel Scott D. Simpkins of Climaco, Wilcox, Peca, Tarantino & Garofoli Co. LPA, one of the proposed attorneys for the class, "has not been tainted by any allegation of unethical misconduct." *Id.* at *7. As a result, he is designated as lead counsel in this case and will be held fully responsible for all acts of counsel. As with each attorney representing the class, Mr. Simpkins must competently, diligently, and adequately represent the class.

With this understanding, the Court has no serious doubt that the members of the class will receive adequate representation. Therefore, the Court believes that class counsel meets all of the requirements of Rule 23(g)(1) and will adequately represent the class.

IV. Conclusion

Sandusky Wellness's motion for class certification is granted. The Court certifies the following class:

"All persons who (1) on or after September 5, 2008, (2) were sent telephone facsimile messages inviting attendance at a Physicians Wellness and Weight Loss Program, and (3) which did not display a proper opt-out notice."

Furthermore, the Court, based upon the previously stated reasons and the factors of Rule 23(g), appoints Scott D. Simpkins of Climaco, Wilcox, Peca, Tarantino & Garofoli Co. LPA; Brian J. Wanca and Ryan M Kelly of Anderson + Wanca as class counsel, with Mr. Simpkins being deemed lead counsel. Moreover, Sandusky Wellness's counsel are ordered to file a proposed notification form which complies with Rule 23(c), together with a statement describing the method by which the notice will be provided to class members and a list of persons to whom the notice will be sent on or before April 3, 2015.

Finally, class counsel are put on notice that any claim for attorney's fees will be closely scrutinized for duplication and value of the time spent. For example, only one lawyer should attend any court hearings or conferences, and requests for fees should not include research already performed in other cases. *Id.* at *8.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6750690

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Sauter v. CVS Pharmacy, Inc., Not Reported in F.Supp.3d (2014)

🚩 KeyCite Yellow Flag

Distinguished by In re Humana, Inc., 6th Cir.(Ky.), December 30, 2025

Cited in uploaded document as:

Sauter v. CVS Pharmacy, Inc., No. 2:13-CV-846, 2014 U.S. Dist. LEXIS 63122, 2014 WL 1814076, at *2 (S.D. Ohio May 7, 2014)

2014 WL 1814076
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Eastern Division.

Chris SAUTER, Plaintiff,
v.
CVS PHARMACY, INC., Defendant.

No. 2:13–cv–846.
|
Signed May 7, 2014.

**Attorneys and Law Firms**

Brian K. Murphy, Geoffrey J. Moul, Jennifer A. Hemenway, Joseph F. Murray, Murray Murphy Moul & Basil, LLP, Columbus, OH, for Plaintiff.

Joseph C. Pickens, Taft Stettinius & Hollister LLP, Columbus, OH, Michael D. Leffel, Madison, WI, Robert H. Griffith, Foley & Lardner LLP, Chicago, IL, Stephen H. Jett, Taft, Stettinius & Hollister, Cleveland, OH, for Defendant.

*OPINION AND ORDER*

JAMES L. GRAHAM, District Judge.

 **\*1**  The Plaintiff brings this putative class action against the Defendant for alleged violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. This matter is before the Court on the Defendant's Motion to Strike Plaintiff's Class Allegations (doc. 23) filed on February 3, 2014. For the reasons that follow, the Court will GRANT the Defendant's Motion to Strike (doc. 23). The Court will GRANT the Plaintiff 14 days in which to file an amended complaint.

**I. Background**

The following allegations are taken from the Plaintiff's Complaint:

The Plaintiff is a resident of Columbus, Ohio. First Am. Compl. at ¶ 1, doc. 16–1. The Defendant, CVS Pharmacy, Inc., is a national pharmacy chain that sells prescription drugs among other products. *Id.* at ¶ 15. In order to meet internal sales quotas, CVS enrolls individuals in a program that automatically refills their prescriptions without obtaining customers' consent. *Id.* at ¶¶ 16–17.

On March 28, 2013, the Plaintiff received a phone call from CVS (the First Call), which utilized an automatic telephone dialing system (ATDS) to call the Plaintiff's cell phone without the Plaintiff's consent. *Id.* at ¶ 22. Upon answering the phone, the Plaintiff heard a robotic voice delivering a prerecorded message. *Id.* at ¶ 23. The voice provided him with general information about a prescription refill and the location of his local CVS pharmacy. *Id.* Thousands of individuals have received similar messages. First Am. Compl. at ¶ 23. On at least four occasions after the First Call and prior to the filing of this lawsuit, the Defendant used an ATDS to make phone calls to the Plaintiff's cell phone without the Plaintiff's consent. *Id.* at ¶ 24. After the Plaintiff filed this lawsuit on August 28, 2013, the Defendant used an ATDS to make eight additional phone calls to the Plaintiff's cell phone without his consent. *Id.* at ¶¶ 25–27. These additional calls made by the Defendant utilized an automated prerecorded message, indicative of the use of an ATDS. *Id.* at ¶¶ 23–25, 27–29.

The Plaintiff did not provide his cellular telephone number to the Defendant and did not subscribe to any telemarketing service offered by the Defendant. *Id.* at ¶ 32. The Defendant "harvested" the Plaintiff's number from his physician when the Plaintiff filled his prescription at his local CVS pharmacy. *Id.* at ¶ 29. The Plaintiff never expressly consented to receive notifications from CVS on his cell phone. *Id.* at ¶¶ 33–36.

The Plaintiff alleges that the Defendant has repeatedly violated the TCPA over the past several years through its use of ATDS and prerecorded messages without the prior express consent of the recipients of those messages. *Id.* at ¶¶ 38–41. The Plaintiff seeks to represent a class comprised of "all persons within the United States who received a non-emergency telephone call from CVS to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice and who did not provide prior express consent for such calls" in the four years prior to the filing of the Plaintiff's Complaint in this case. *Id.* at ¶ 42.

The Plaintiff also seeks to represent two additional subclasses. First, the Plaintiff proposes to represent a subclass of:

> **\*2** all persons within the United States who received a non-emergency telephone call on or after October 16, 2013 from CVS to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice and who did not provide prior express written consent for such calls ....

First Am. Compl. at ¶ 43. Second, the Plaintiff proposes to represent a subclass of:

> all persons within the United States who received a non-emergency telephone call from CVS to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice and who had expressly revoked any consent previously given to CVS for such calls, at any time within the four years prior to the filing of the instant Complaint.

*Id.* at 44.

The Plaintiff's Complaint includes three counts. Count I alleges that the Defendant negligently violated the TCPA through its use of an ATDS and/or prerecorded messages. *Id.* at ¶¶ 54–57. Count II alleges that the Defendant willfully or knowingly violated the TCPA through its use of an ATDS and/or prerecorded messages. *Id.* at ¶¶ 58–61. Count III requests injunctive relief to bar future TCPA violations on the part of the Defendant. *Id.* at ¶¶ 62–64.

The Defendant filed its Motion to Strike Class Allegations (doc. 23) on February 3, 2014. The Defendant's motion is fully briefed.

## II. Motions to Strike Class Allegations

"Most courts recognize that a motion to strike class action allegations may properly be filed before plaintiffs have filed a motion for class certification." 1 McLaughlin on Class Actions § 3:4 (10th ed.2013) (collecting cases). Courts in the Sixth Circuit have permitted the use of motions to strike class allegations prior to discovery. *See, e.g., Pilgrim v. Universal Health Card,* LLC, 660 F.3d 943, 945 (6th Cir.2011) (affirming the district court's judgment striking class allegations and dismissing a lawsuit prior to discovery, finding that the defect in the class action at issue involved "a largely legal determination" that "no proffered factual development offer[ed] any hope of altering"); *Loreto v. Procter & Gamble Co.,* No. 1:09–cv–815, 2013 WL 6055401, at \*6 (S.D.Ohio Nov.15, 2013); *Rikos v. Procter & Gamble*

*Co.,* No. 1:11–cv–226, 2012 WL 641946, at \*7 (S.D.Ohio Feb.28, 2012); *Bearden v. Honeywell Intern., Inc.,* No. 3:09–01035, 2010 WL 1223936, at \*9 (M.D.Tenn. Mar.24, 2010).

"[C]ourts should exercise caution when striking class action allegations based solely on the pleadings," *Manning v. Boston Med. Ctr. Corp.,* 725 F.3d 34, 56 (1st Cir.2013), because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (internal citations and quotations omitted). *See also Mazzola v. Roomster Corp.,* 849 F.Supp.2d 395, 410 (S.D.N.Y.2012) ("[A] motion to strike class actions ... is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of ... litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification"). But "[a] court may strike class action allegations before a motion for class certification where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met." *Loreto,* 2013 WL 6055401, at \*2 (citing *Pilgrim,* 660 F.3d at 949). *See also General Tel. Co. of Sw.,* 457 U.S. at 160 ("Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question").

## III. Discussion

**\*3** Pursuant to Federal Rule of Civil Procedure 23(d)(1)(D),[1] the Defendant moves to strike or dismiss the Plaintiff's class allegations, arguing that the Plaintiff's proposed class and subclasses are impermissible "fail safe" classes. Def.'s Mot. to Strike at 2, doc. 23. According to the Defendant, the Plaintiff's proposed classes "are specifically defined such that whether a person qualifies as a member of the respective class depends upon whether the person ultimately has a valid claim under the TCPA as interpreted by Plaintiff." Def.'s Mot. to Strike Class Allegations at 6–7, doc. 23 (citing *Young v. Nationwide Mut. Ins. Co.,* 693 F.3d 532, 538 (6th Cir.2012)). Each proposed class includes only those individual who did not provide prior express consent to the Defendant's alleged use of an ATDS to contact those individuals by phone. As a result, the Defendant contends that the class

allegations are improper as a matter of law because the issue of consent would require individualized fact-finding, which is impermissible under Rule 23.

At the outset of his Response, the Plaintiff emphasizes that motions to strike class action allegations are rarely granted, particularly prior to the Plaintiff being able to conduct discovery. Further, the Plaintiff observes, "nearly every court presented with a motion to strike TCPA class allegations prior to discovery has denied the motion, including where, as here, the class is not so narrow as to require the court to make individualized findings which would settle the dispute at hand." Pl.'s Resp. in Opp. at 3, doc. 24. The Plaintiff recognizes that fail-safe classes are impermissible, *id.* at 4, but maintains that the proposed class definitions do not require individualized determinations with respect to liability, *id.* at 5. Citing his Amended Complaint, the Plaintiff asserts that the Defendant maintains a list of individuals enrolled in its automatic prescription refill program and who subsequently receive phone calls made with an ATDS. *Id.* at 5. In the Plaintiff's view, this list would obviate the need for individualized determinations of consent. *Id.* Even if the Court finds that the Plaintiff's proposed classes are fail-safe, the Plaintiff argues that the appropriate remedy is for the Court to refine or correct the class definition, rather than strike those definitions. *Id.* at 6.

A. *Telephone Consumer Protection Act (TCPA)*
"In 1991, Congress enacted the TCPA 'to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile ... machines and automatic dialers.' " *Charvat v. NMP, LLC,* 656 F.3d 440, 443 (6th Cir.2011) (quoting S.Rep. No. 102–178, at 1, *reprinted* in 1991 U.S.C.C.A.N.1968, 1968). Relevant here, the TCPA prohibits the:

> mak[ing][of] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service.

**\*4** 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA requires the Federal Communications Commission (FCC) to "prescribe regulations to implement the requirements of" subsection (b). *Id.* § 227(b) (2). "Private parties are authorized to seek injunctive relief and statutory damages for violations of these prohibitions." *Ashland Hosp. Corp. v. Serv. Emps. Intern.*

*Union, Dist. 1199 WV/KY/OH,* 708 F.3d at 741 (6th Cir.2013) (citing 47 U.S.C. § 227(b)(3)).

B. *Fail–Safe Classes*
Here, the Defendant argues that the Plaintiff's proposed classes are impermissible failsafe classes.

1. The Sixth Circuit And Fail–Safe Classes

"[A] class definition is impermissible where it is a 'fail-safe' class, that is, a class that cannot be defined until the case is resolved on its merits." *Young,* 693 F.3d at 538 (citing *Randleman v. Fidelity Nat'l Title Ins. Co.,* 646 F.3d 347, 352 (6th Cir.2011)). A "fail-safe" class "includes *only* those who are *entitled* to relief." *Young,* 693 F.3d at 538. "Such a class is prohibited because it would allow putative class members to seek a remedy but not be bound by an adverse judgment —either those 'class members win or, by virtue of losing, they are not in the class' and are not bound." *Id.* (quoting *Randleman,* 646 F.3d at 352).

a. Randleman v. Fidelity Nat'l Title Ins. Co.
In *Randleman,* the Sixth Circuit affirmed the district court's order decertifying the plaintiffs' class action on the grounds that the proposed class definition included only those who were "entitled to relief," and was therefore an impermissible fail-safe class. The plaintiffs purchased a home in 2001 along with title insurance and a homeowner's policy. *Randleman,* 646 F.3d at 349. Three years later, in 2004, the plaintiffs refinanced their home. *Id.* At that time, the new mortgagee required the plaintiff to obtain a new title insurance policy. *Id.* The plaintiffs purchased the new title policy from the defendant but the defendant failed to give the plaintiffs the discounted "refinance" rate to which they were entitled. *Id.*

The plaintiffs subsequently filed a class action suit against the defendant. The district court initially certified a class of all persons who paid for title insurance issued by the defendant in connection with the refinancing of a residential mortgage loan and who "were entitled to receive the 'reissue' or 'refinance' rate for title insurance." *Id.* at 350. After extensive discovery, the district court reversed course, concluding that liability could only be determined on an individual basis after reviewing each homeowner's file. *Id.* Based on this conclusion, the district court held that the plaintiffs' proposed class failed to meet the commonality or typicality requirements under Rule 23. *Id.* at 350–51. Further, the

district found that common issues did not predominate because of the required individualized determination of each homeowner's liability. *Randleman,* 646 F.3d at 351.

**\*5** At the outset of its decision affirming the district court's decertification order, the court of appeals observed that the plaintiff's proposed class "was flawed in that it only included those who are 'entitled to relief.' " *Id.* at 352. As the court explained, "[t]his is an improper fail-safe class that shields the putative class members from receiving an adverse judgment" because "[e]ither the class members win, or by virtue of losing, they are not in the class, and, therefore, not bound by judgment." *Id.* (collecting cases). Significantly, before considering the predominance requirement, the court of appeals noted that the prohibition against fail-safe classes constituted an independent ground for denying class certification." *Id.*

b. Young v. Nationwide Mut. Ins. Co.

In contrast, in *Young,* the court of appeals rejected the defendants' argument that the plaintiffs' proposed class was invalid as a fail-safe class. The plaintiffs purchased insurance products from the defendants. *Young,* 693 F.3d at 535. Under Kentucky state law, local governments could impose a tax on insurers for the premiums they collected from the sale of specific insurance products. *Id.* Further, local governments could charge a "collection fee" to compensate for their expenses in collecting those taxes. *Id.* All of the defendants passed the cost of those taxes and collection fees onto their policyholders. *Id.*

According to the plaintiffs, the defendants charged them for the taxes on their premiums "when either the tax was not owed or the tax amount owed was less than the insurer billed." *Id.* The plaintiffs filed a class action alleging numerous violations of state law by the defendants. *Id.* Among other arguments before the district court, the defendants asserted that the plaintiffs' proposed class definition "would require the court to engage in impermissible individual determinations on the merits of the claims of each putative class member." *Young,* 693 F.3d at 535–36. The district court rejected this argument and subsequently certified ten subclasses, finding that they satisfied the Rule 23(a) and Rule 23(b) requirements. *Id.* at 536. The court defined the subclasses as "[a]ll persons in the Commonwealth of Kentucky who purchased insurance from or underwritten by [Defendant insurer] during the Relevant Time Period ... and who were charged local government taxes on their payment of premiums which were either not owed, or were at rates higher than permitted." *Id.*

On appeal, the defendants challenged the certification of the class, arguing that the class definition created improper fail-safe classes. The court reviewed *Randelman's* discussion of failsafe classes, and, with limited explanation, concluded that the class definition at issue did not create a fail-safe class. *Id.* at 538. The court of appeals emphasized that "Plaintiffs' classes will include both those entitled to relief and those not," reasoning that "Defendants' other argument—that they are not ultimately liable for many of the class members, even if they were incorrectly charged—proves the point." *Id.* Therefore, the court found that the plaintiff's class definitions were not fail-safe. *Id.*

2. Fail–Safe Classes under the TCPA

**\*6** Courts have had limited occasion to consider fail-safe classes in the context of the TCPA. Those courts that have considered the issue have reached contradictory conclusions.

a. Wolfkiel v. Intersections Insurance Services Inc.

In *Wolfkiel v. Intersections Insurance Services Inc.,* the named plaintiffs filed a putative class action against a mortgage loan servicer (Ocwen) and company (Intersections Insurance Services) from which they received telemarketing calls, allegedly in violation of the TCPA. —— F.R.D. ——, 2014 WL 866979 (N.D.Ill. Mar.5, 2014). After the named plaintiff's[2] mortgage was transferred to a mortgage servicing company, Ocwen, he began to receive unsolicited marketing phone calls to his cell phone. *Id.* at \*1. The plaintiff contacted the number from which he received calls, leading him to Ocwen. *Id.* The plaintiff inquired as to the reason for the phone calls, and the telemarketer explained that the purpose of the calls was to offer him Intersections' identify theft membership services. *Id.* The plaintiff informed the telemarketer that he was not interested in the service and that he did not wish to receive any more phone calls for those services. *Id.* Despite this request, plaintiff continued to receive similar telemarketing phone calls. *Id.* The named plaintiff subsequently filed suit against the defendants, asserting that he never consented to receiving telemarketing calls and that he should have not received any calls after he requested that they be stopped. *Wolfkiel,* 2014 WL 866979, at \*1

The plaintiff filed suit and sought to represent two putative classes, including a "NoConsent Class" defined as:

All individuals in the United States (1) whose mortgage is held or serviced by Defendant Ocwen; (2) who received a telephone call; (3) on a cellular telephone number; (4) promoting Defendant Intersections' products or services; (5) who never consented to receive telemarketing calls promoting Defendant Intersections' products or services.

*Id.,* at *3–4. The defendants alleged that No–Consent Class was fail-safe and, therefore, inherently flawed. *Id.* at *5. Citing Seventh Circuit case law and the Sixth Circuit's decision in *Young,* the district court concluded that it was "not yet persuaded that the No–Consent Class qualifie[d] as a fail-safe class ." *Id.* at *6. According to the court, it was not clear "that this class definition create[d] a situation where membership in the class [was] dependent upon the validity of a putative member's claim ." *Id.* "More importantly," the court concluded, "it [was] not a basis on which to strike Plaintiff's class allegations prior to the certification stage." *Id.* (citing *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 814 (7th Cir.2012) ("[the fail-safe problem] can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis")).

b. Lindsay Transmission, LLC v. Office Depot, Inc.

**\*7** In contrast, the district court in *Lindsay Transmission, LLC v. Office Depot, Inc.* concluded that a similar proposed class definition in a TCPA fax case would create a fail-safe class. No. 4:12–CV–221, 2013 WL 275568 (E.D.Mo. Jan.24, 2013). The *Lindsay* plaintiff purportedly received three unsolicited advertisements by fax from the defendant. Thereafter, he filed a putative class action on behalf of himself and all similarly-situated individuals. *Id.* at * 1. Relying on the TCPA's prohibition against the use of "any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine," 47 U.S.C. § 227(b) (1)(C), the plaintiff sought to certify a nationwide class defined as:

All persons who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimile messages of material advertising the commercial availability of any property, goods, or services by or on behalf of Defendant (3) with respect to whom Defendant cannot provide evidence of prior express permission or invitation for the sending of such faxes, (4) with whom Defendant does not have an established business relationship and (5) which did not display a proper opt out notice.

*Lindsay Transmission, LLC,* 2013 WL 275568, at *3.

The defendant filed a motion to strike the plaintiff's class allegations, arguing, *inter alia,* that the plaintiff's proposed class definition created an impermissible fail-safe class. *Id.* at *4. In response, the plaintiff asserted that the defendant's motion to strike was "premature." *Id.* The district court reviewed the Seventh Circuit's decision in *Messner* and the Sixth Circuit's decision in *Randleman,* concluding that "the proposed class includes only those persons to whom defendant sent faxes without prior consent and with whom defendant did not have an established business relationship." *Id.* Therefore, the court held that "the proposed class consist[ed] solely of persons who can establish that defendant violated the TCPA," and consequently, was a fail-safe class. *Id.*

c. Olney v. Job.com, Inc.

In *Olney v. Job.com, Inc.,* one of the defendants allegedly used an ATDS to make phone calls to the plaintiff's cell phone without the plaintiff's prior express consent. No. 1:12–CV–01724, 2013 WL 5476813, at * 1 (E.D.Cal. Sept.30, 2013). The plaintiff brought a putative class action against the defendants on behalf of himself and all other similarly-situated individuals. *Id.* The defendants subsequently filed a motion to deny class certification and strike class allegations, asserting, *inter alia,* that the plaintiff's proposed class was an impermissible fail-safe class. *Id.*

Initially, the plaintiff proposed the following class:

All persons within the United States who received any telephone call from Defendant to said person's cellular telephone made through the use of any automated telephone dialing system or an artificial or prerecorded voice and such person had not previously consented to receiving such calls within the four years prior to the filing of this Complaint.

**\*8** *Id.* at * 10. The district court agreed with the defendant that, as originally proposed, the plaintiff's class was a fail-safe class. *Id.* at *11. Recognizing that "the TCPA prohibits calls to cellular telephones using ATDSs unless prior express consent has been given," the district court found that "defining the class to include anyone who received such a call without prior express consent means that only those potential members who would prevail on this liability issue would be members of the class." *Id.* The district court continued its analysis, noting that the class could be redefined to avoid the fail-safe problem. *Olney,* 2013 WL 5476813, at * 11. In his response to the defendants' motion, the plaintiff offered an amended proposed class definition:

All persons within the United States who received any telephone call/s from Defendant or its agent/s and/or employee/s to said person's cellular telephone made through the use of any automatic telephone dialing system within the four years prior to the filling of the Complaint.

*Id.* After reviewing this language, the court found that "[t]here is no longer any language in this class definition that could even arguably cause a 'failsafe' problem," and denied the defendants' motion to strike class allegations accordingly. *Id.*

3. The Plaintiff's Proposed Class Definitions Are Fail–Safe

Here, the Plaintiff seeks to represent a class:

of all persons within the United States who received a non-emergency telephone call from CVS to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice and *who did not provide prior express consent for such calls,* at any time within the four years prior to the filing of the instant Complaint.

First Am. Compl. at ¶ 42 (emphasis added). The Plaintiff also seeks to represent two subclasses of individuals that fall within the class definition. The Plaintiff's first subclass includes:

[a]ll persons within the United States who received a non-emergency telephone call on or after October 16, 2013 from CVS to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice and *who did not provide prior express written consent* for such calls.

*Id.* at ¶ 43 (emphasis added). The Plaintiff's second subclass includes:

all persons within the United States who received a non-emergency telephone call from CVS to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice and *who had expressly revoked any consent* previously given to CVS for such calls, at any time within the four years prior to the filing of the instant Complaint.

*Id.* at ¶ 44 (emphasis added).

Each of the Plaintiff's proposed classes is defined to include only those individuals who did not expressly consent to the receipt of the defendant's phone calls made with the use of an ATDS.

**\*9** Because the TCPA prohibits calls to cellular telephones using ATDSs unless prior express consent has been given, defining the class to include anyone who received such a call without prior express consent means that only those potential members who would prevail on this liability issue would be members of the class. *Olney,* 2013 WL 5476813, at *11. In other words, "the proposed class[es] consist[ ] solely of persons who can establish that defendant violated the TCPA." *Lindsay Transmission, LLC,* 2013 WL 275568, at *4.[3] If the Plaintiff successfully demonstrates that the Defendant made calls using an ATDS or an artificial or prerecorded voice to the class members' cell phones without the class members' prior express consent, then the class members win. *See* 47 U.S.C. § 227(b)(1)(A)(iii). However, if the Plaintiffs are unsuccessful in meeting their burden of proof, the class does not exist and the class is not bound by the judgment in favor of the Defendant. This is the definition of a prohibited fail-safe class. *See Randleman,* 646 F.3d at 352 (defining a fail-safe class as a class where "[e]ither the class members win, or by virtue of losing, they are not in the class, and, therefore, not bound by judgment").

Assuming that the Court finds his proposed classes to be fail-safe, the Plaintiff argues that the Court should permit him to amend his class definitions rather than striking them entirely. The Court agrees. "[D]istrict courts have broad discretion to modify class definitions." *Powers v. Hamilton Cnty. Pub. Defender Com'n,* 501 F.3d 592, 619 (6th Cir.2007) (citing *Schorsch v. Hewlett–Packard Co.,* 417 F.3d 748, 750 (7th Cir.2005); *In re Monumental Life Ins. Co.,* 365 F.3d 408, 414 (5th Cir.2004)). "Defining a class so as to avoid, on one hand, being overinclusive and, on the other hand, the fail-safe problem is more of an art than a science. Either problem can and often should be solved by refining the class definition rather than by flatly denying class certification." *Messner,* 669 F.3d at 825 (collecting cases). The Court will grant the Plaintiff 14 days to file an amended complaint accordingly.

**IV. Conclusion**

The Court GRANTS the Defendant's Motion to Strike (doc. 23) and GRANTS the Plaintiff fourteen (14) days in which to file an Amended Complaint.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1814076

Footnotes

1       Courts cite Rule 12(f), Rule 23(c)(1)(A), Rule 23(d)(1)(D) as authority for striking class allegations prior to discovery. *See Bearden v. Honeywell Intern., Inc.,* No. 3:09–01035, 2010 WL 1223936, at *9 (M.D.Tenn. Mar.24, 2010) (quoting *Hovsepian v. Apple, Inc.,* No. 08–5788, 2009 WL 5069144, at *2 (N.D.Cal. Dec.17, 2009)) ("Under Rules 23(c)(1)(A) and 23(d)(1)(D), as well as pursuant to Rule 12(f), this Court has authority to strike class allegations prior to discovery if the complaint demonstrates that a class action cannot be maintained"); 1 McLaughlin on Class Actions § 3:4 (10th ed.2013) (citing *Pilgrim v. Universal Health Card, LLC,* 660 F.3d 943, 949 (6th Cir.2011)) (same).

2       A second named plaintiff's claim was dismissed for failure to state a claim. *See Wolfkiel,* 2014 WL 866979, at *2.

3       The Plaintiff attempts to distinguish *Lindsay Transmission* from the facts of the present case. *See* Pl.'s Resp. in Opp. at 4–5. The Plaintiff's argument concerning *Lindsay Transmission* is more relevant to the issue of whether the proposed class definitions satisfy Rule 23's commonality and predominance requirements, an issue not presently before the Court.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.